1   SETH E. PIERCE (SBN 186576), sep@msk.com
    ALFREDO ORTEGA (SBN 261961), axo@msk.com
2   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
3   Los Angeles, California 90064-1683
    Telephone: (310) 312-2000
4   Facsimile: (310) 312-3100

5   Attorneys for Defendants

6

7

8               UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11                                              Master File  No.  08 CV 1746 DMS (NLS)

12                                              Judge Dana Sabraw
                                                Magistrate Judge Nita Stormes
13  IN RE HITACHI TELEVISION OPTICAL
    BLOCK CASES                                 **[REDACTED COPY OF SEALED]**
14                                              **DEFENDANTS' OPPOSITION TO**
                                                **PLAINTIFFS' MOTION FOR CLASS**
15      This document relates to: All Actions  **CERTIFICATION**

16                                              Date:        11-12-2010
                                                Time:        1:30 p.m.
17                                              Courtroom:    10

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

                                    CASE NO.  08 CV 1746 DMS (NLS)

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ......................................................................................... 1

II. BACKGROUND ........................................................................................... 2

    A. Claims ................................................................................................. 2

    B. Proposed Class Definition; Models at Issue ...................................... 2

    C. LCD RPTV Technology/Image Allegations ....................................... 2

    D. Impact of Temperature on Optical Engine Failure .............................. 3

III. STANDARD FOR CLASS CERTIFICATION ............................................ 4

IV. PLAINTIFFS' CONCLUSORY ALLEGATIONS ARE INSUFFICIENT ...................... 4

    A. Heavy Burden; Detailed Evidence Required ...................................... 4

    B. Plaintiffs Must – But Have Failed To – Prove Factual Variations Are Immaterial ........................................................................................... 5

    C. Plaintiffs Must – But Have Failed To – Prove That A Single Body of Law Governs the Absent Class's Claims .......................................... 7

        1. Plaintiffs Have Not Demonstrated That Significant Contacts Exist ...................................................................................... 7

        2. Plaintiffs Have Not Demonstrated That Relevant State Law Is Uniform ............................................................................ 9

        3. Plaintiffs Have Not Demonstrated That Subclassing Is Viable ..................................................................................... 9

V. PLAINTIFFS CANNOT DEMONSTRATE REQUISITE ELEMENTS ........................ 10

    A. FRCP 23(a) Requirements ................................................................ 10

    B. FRCP23(b)(3) requirements ............................................................. 11

        1. Common Issues Do Not Predominate ................................... 11

            a. Predominance Inquiry in Warranty Class Actions Focuses on Model Differences, Human Factors, and State Law Variances ........................................ 11

                (i) Model Variations Case Law.............................. 12

                (ii) Human/Environmental Factors Case Law ......... 12

                (iii) State Law Variations Case Law ........................ 13

Mitchell
Silberberg &
Knupp LLP

2952860.6

i      CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**<u>TABLE OF CONTENTS</u>**
**<u>(continued)</u>**

<u>Page(s)</u>

b.  Model Differences and Human Factors Preclude Factual Predominance Here ............................................................ 13

(i)  Lamp Wattage ............................................................. 14

(ii)  Lamp Manufacturer ...................................................... 14

(iii)  Number and Location of Polarizers ................................... 15

(iv)  Polarizer Base Material and Base Material Size.................................................................................. 15

(v)  Polarizer/Panel Surface Area ......................................... 15

(vi)  Number and Location of Cooling Fans............................ 16

(vii)  Fan Size, Air Opening Size and RPMs ............................ 16

(viii)  Air Source ................................................................... 17

(ix)  Internal Cooling Configuration....................................... 17

(x)  Design Density............................................................. 18

(xi)  Running Changes ......................................................... 18

(xii)  Human Factors ............................................................ 19

(xiii)  Other Relevant Fact Specific Inquiries ........................... 19

c.  State Law Variations Further Preclude Predominance Here .............................................................................................. 20

(i)  Conflict of Laws Analysis .............................................. 21

(ii)  California's Government Interest Approach...................... 21

(iii)  CA Decisions Declining to Certify Nationwide Class ................................................................................. 23

(iv)  Nationwide Warranty Class Actions Consistently Denied ......................................................... 23

(v)  Material Differences Are Dispositive .............................. 23

2.  Manageability, Superiority and Subclassing.............................. 24

VI.  ALLEGED SPOLIATION.................................................................. 24

VII.  CONCLUSION.................................................................................. 25

CASE NO.  08 CV 1746 DMS (NLS)

Mitchell
Silberberg &
Knupp LLP

2952860.6

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591, 623 (1997).............................................................................. 11

*Ardoin v. Stine Lumber Co.,*
  220 F.R.D. 459, 465 (W.D.La. 2004) ........................................................... 12

*Benner v. Becton Dickinson & Co.,*
  214 F.R.D. 157, 172 (S.D.N.Y. 2003) ............................................................ 4

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
  155 F.3d 331, 345 (4th Cir. 1998) .................................................................. 4

*Castano v. Am. Tobacco Co.,*
  *Bridgestoneaint*84 F.3d 734, 746 (5th Cir. 1996)....................................... 4, 9

*Chin v. Chrysler Corp.,*
  182 F.R.D. 448, 459 (D.N.J. 1998).............................................................. 9, 20

*City of St. Petersburg v. Total Containment, Inc.,*
  265 F.R.D. 630, 640 (S.D.Fla. 2010)............................................................ 19

*Clark v. Experian Info. Solutions Inc.,*
  2005 WL 1027125, at *5 (N.D. Ill. April 26, 2005)...................................... 21

*Emig v. Am. Tobacco Co., Inc.,*
  184 F.R.D. 379, 384 (D. Kan. 1998).............................................................. 4

*Frosini v. Bridgestone Firestone N. Am. Tire, LLC,*
  2007 WL 2781656, at *15 (C.D.Cal. Aug. 24, 2007)................................... 12

*Gen. Tel. Co. of Sw. v. Falcon,*
  457 U.S. 147, 161 (1982)................................................................................ 4

*In re Abbott Labs. Norvir Anti-Trust Litig.,*
  2007 WL 1689899, at *9 (N.D.Cal. June 11, 2007) ...................................... 9

*In re Am. Med. Sys, Inc.,*
  75 F.3d 1069, 1081 (6th Cir. 1996) .............................................................. 11

*In re Bridgestone/Firestone, Inc.,*
  288 F.3d 1012, 1016 (7th Cir. 2002) .......................................... 4, 11, 12, 24

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,*
  174 F.R.D. 332, 355 (D.N.J. 1997)..................................... 9, 10, 19. 20, 21

Mitchell
Silberberg &
Knupp LLP

2952860.6

iii       CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Ford Motor Co. Vehicle Paint Litig.*,
    182 F.R.D. 214, 220 (E.D.La. 1998)..................................................................... 11, 12

*In re Ford Motor. Co. Bronco II Prod. Liab. Litig.*,
    177 F.R.D. 360, 366 (E.D.La. 1997).................................................................. 9, 12, 13

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
    241 F.R.D. 305, 324 (S.D.Ill. 2007 .................................................................. 12, 21, 23

*In re Grand Theft Auto Video Game Consumer Litig. (No. II)*,
    251 F.R.D. 139, 147 n.8 (S.D.N.Y. 2008) ............................................................. 21, 22

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*,
    170 F.R.D. 417, 424 (E.D. La. 1997)............................................................................ 12

*In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847, 853 (9th Cir. 1982) ............................................................................... 19

*In re Paxil Litig.*,
    212 F.R.D. 539, 551 (2003) ......................................................................................... 23

*In re Prempro Prods. Liab. Litig.*,
    230 F.R.D. 555, 564 ( E.D. Ark. 2005)........................................................................... 8

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124, 141 (2d Cir. 2001).................................................................................... 9

*Kaczmarek v. Int'l Bus. Machs. Corp.*,
    186 F.R.D. 307, 312 (S.D.N.Y. 1999) ............................................................ 4, 11, 12, 23

*Kennedy v. Unlimited Imports, Inc.*,
    2007 WL 135951, at *4 (N.J. Super. Ct. App. Div. Jan 22, 2007) ................................. 22

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797, 821 (1985).............................................................................................. 20

*Puerto Rico v. M/V Emily S.*,
    158 F.R.D. 9, 15 (D.P.R. 1994) .................................................................................... 11

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441, 450 (E.D.Pa. 2000)................................................................... 11, 12, 19

*Schwartz v. Upper Deck Co.*,
    183 F.R.D. 672, 679 (S.D. Cal. 1999) ........................................................................... 23

Mitchell
Silberberg &
Knupp LLP

2952860.6

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Sweet v. Pfizer,*
    232 F.R.D. 360, 372 (C.D. Cal. 2005) .............................................................. 22

*Utility Consumers' Action Network v. Sprint Solutions, Inc.,*
    259 F.R.D. 484, 487 (S.D. Cal. 2009) .............................................. 22, 23, 24

*Walsh v. Ford Motor Co.,*
    807 F.2d 1000, 1017 (D.C. Cir. 1986) ...................................................... 9, 13

*Wash. Mut. Bank, FA v. Superior Court,*
    24 Cal. 4th 906, 919-21 (2001) ............................................................... 21, 23

*Zinser v. Accufix Research Inst., Inc.,*
    253 F.3d 1180, 1187 (9th Cir. 2001) ......................................................... 8, 20

**FEDERAL RULES OF CIVIL PROCEDURE**

FRCP 23(a) ............................................................................................................ 9

FRCP 23(b)(3) ...................................................................................................... 10

FRCP(a)(4) ............................................................................................................ 9

**OTHER AUTHORITIES**

*Federal Practice and Procedure,* § 1785 (Supp. 2002) ...................................... 10

Mitchell
Silberberg &
Knupp LLP

2952860.6

v

CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# I.     <u>INTRODUCTION</u>

Plaintiffs contend, but have not proven and cannot prove, that certification is proper here.

Certification, or sample-based adjudication, only works – is only possible – if the representatives' and the class's claims are legally and factually cohesive.

Plaintiffs **contend** that the capacity of the 37 different television models and thousands of individual units at issue to generate and dissipate heat – the critical failure issue – are "materially identical," i.e., factually common.

But the various designs at issue (i) utilized different lamps that generated variable levels of heat based on wattage and bulb design, (ii) employed different numbers and configurations of heat-sensitive polarizers, that were themselves mounted on six different base materials of varying heat conductivity, (iii) made use of polarizers and LCD panels with different surface areas and thus heat absorption rates and tolerances, (iv) had different internal cooling layouts that incorporated variable numbers and sizes of cooling fans, (v) had different size air-intake openings and sources of cooling air, and (vi) were subject to customer-specific installation, environmental, maintenance, and usage conditions – among other relevant factors.

Plaintiffs do not even discuss, let alone refute, the relevance of these variations.

Plaintiffs next **contend** that because "significant contacts" exist, California law can be applied nationwide to achieve the required legal cohesiveness.  But the facts and law are to the contrary.

Plaintiffs must prove factual and legal cohesiveness with evidence and analysis.  Plaintiffs' unsupported conclusions do not suffice.

Defendants, in stark contrast, provide below and in their supporting declarations, extensive, **unrefuted** evidence of the relevance of model variations, and other factors, to the probability and timing of any heat-related failure of the televisions – evidence that precludes common factual findings.  Defendants also provide a detailed conflict of laws analysis, under the comparative impairment approach, that demonstrates why California law cannot be applied nationwide and how state consumer protection and warranty law varies – analysis that precludes common legal findings.

Mitchell
Silberberg &
Knupp LLP

2952860.6

1          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    The conclusion, based on the evidence, is certain – Plaintiffs' Motion should be denied.

2    **II.    BACKGROUND**

3         **A.    CLAIMS**

4         Plaintiffs contend that Hitachi-brand LCD Rear Projection televisions ("LCD RPTV") fail

5    prematurely.  First Amend. Compl. ("FAC"), ¶ 3.  Plaintiffs do not claim that repairs were denied

6    within the express warranty period.  Rather, Plaintiffs contend that the manufacturer's limited

7    warranty was insufficient; **that the televisions should have lasted longer or been warranted for**

8    **their "expected useful life."**  FAC, ¶ 22 ("time limitations … grossly inadequate").

9         **B.    PROPOSED CLASS DEFINITION; MODELS AT ISSUE**

10        Plaintiffs propose to certify a class of **all U.S. purchasers** of Hitachi-brand LCD RPTVs.

11   Plaintiffs' Mem. In Support Of Motion For Class Certification ("Motion") at 1:3-1:5.  Defendant

12   Hitachi America, Ltd. ("HAL") distributed in the U.S., between 2003 and 2008, all of the LCD

13   RPTV models listed, except for the following, which were either never manufactured or never sold

14   in the United States: 50V500E, 60V500E, 42V525, 50V525E, 60V525E, and 50VS69.  Decl. of B.

15   Whalen ("Whalen Decl."), ¶ 2; Decl. of T. Omar ("Omar Decl."), ¶ 12.

16        **C.    LCD RPTV TECHNOLOGY/IMAGE ALLEGATIONS**

17        LCD RPTVs – large, cabinet style televisions – use a lamp, LCD panels, and polarizers,

18   among other components, to generate the screen image displayed on the television.  (*See*

19   accompanying Expert Report of A. Kemal ("Kemal Rpt."), at 15, for more detail.)

20        Plaintiffs contend that heat[1] generated within the LCD RPTVs – primarily by the lamp –

21   **prematurely** degrades the LCD panels and polarizers, causing them to fail before their expected

22   useful life.  Plaintiffs allege that their LCD RPTVs exhibit "bright blue and red haze, spots, and

23   streaks" as a result of this premature failure.  FAC, ¶ 13.  Examples of the alleged color anomalies

24   are attached as Exhibit 1 to the Pierce Decl.

25

26   _____

[1] Plaintiffs' expert contends, in his report, that light radiation contributes to LCD panel and
polarizer failure.  Mr. Amador clarified this point at his deposition, stating that the primary
27   problem associated with excess radiation in the televisions is a further increase in component
temperature – due to the increase in light energy.  *See* Deposition of Plaintiffs' Expert E. Amador
28   ("Amador Tr.") at 156:9-157:17, Ex. 2 to the Decl. of S. Pierce ("Pierce Decl.").

Mitchell
Silberberg &
Knupp LLP

2952860.6

2       CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   While Plaintiffs have refused to permit Defendants to disassemble and forensically

2   examine their televisions, Plaintiffs' pictures are consistent with the blue-path LCD panel or

3   polarizer (or both) failing – most likely due to excess heat.  Objection to Request for Inspection,

4   Ex. 3 to Pierce Decl.; Decl. of N. Ogura ("Ogura Decl."), ¶ 8 (probable cause).

5   **D.      IMPACT OF TEMPERATURE ON OPTICAL ENGINE FAILURE**

6   Temperature is the critical determinant of LCD panel and polarizer longevity.

7   The LCD panels and polarizers degrade with use – primarily as a result of exposure to heat

8   and light energy generated by the lamp.  Ogura Decl., ¶ 9; Amador Tr. at 49:2-49:5 ("temperature

9   will shorten its lifetime"), Ex. 2 to Pierce Decl.  This degradation is normal and expected.  Ogura

10  Decl., ¶ 9.  It is the optical engine equivalent of normal "wear and tear."  When those parts are

11  degraded too much – when they wear out – they must be replaced or the television discarded.  *Id.*

12  The LCD panels and polarizers are extremely sensitive to heat.  Report of Plaintiffs'

13  Expert E. Amador ("Pls.' Exp. Rpt.") at 3 ("LCD panels can be readily damaged by excess heat")

14  and 12 ("delicate optical components").

15  The greater the heat, the shorter the life.  Ogura Decl., ¶ 9; Kemal Rpt. at 19.

16  Plaintiffs' expert agrees:

17  Q. And the hotter the temperature is the shorter the life span will be?
    A. That is correct....

18

19  Amador Tr. at 10:23-10:25, 42:3-43:5 (increase at "higher temperature can have a greater effect

20  than a similar increase at a lower temperature range"), 43:16-43:20 (same), Ex. 2 to Pierce Decl.

21  Any increase in heat will materially shorten the LCD panels' and polarizers' respective

22  lives.  *See* Decl. of T. Mochizuki ("Mochizuki Decl."), ¶ 7e(iv) at 5 and Ex. 6 (2-3ºC increase).

23  Decreases in internal temperature will similarly extend life.  Ogura Decl., ¶ 9; Amador Tr.

24  at 10:13-10:22, Ex. 2 to Pierce Decl. ("The life of the panel will extend if it's operated cooler.").

25  Studies performed during design-stage testing of the LCD RPTVs evidence these points.

26  •   A design target life study on the 55VS69, circa January 2006, determined that

27      increasing the temperature of the blue input polarizer a consistent 10ºC over its life,

28      decreased its lifespan approximately ████.  *See* Mochizuki Decl., ¶ 7c at 3-4,d Ex. 4.

- A design modification study on the 50VF820, circa July 2005, determined that slowly decreasing the temperature of the blue input polarizer between ████████ **over its life**, increased its lifespan by more than ███. *See* Mochizuki Decl., ¶ 7d at p.4 and Ex. 5.

- A design target life study on the 50VF820, circa September 2005, determined that slowly increasing the temperature of the green input polarizer **just ████████ over the first part of its life**, decreased its overall life approximately ███.[2] *See* Mochizuki Decl., ¶ 7e at 4-5 and Ex. 6.[3]

Thus, the capacity of the 37-different television models and thousands of individual units at issue to generate and dissipate heat in actual usage conditions is the central factual issue in this case. But it is not appropriate for class adjudication – because of the myriad design variables, among other factors (all discussed *infra*), that will impact heat within any given LCD RPTV.

## III.   STANDARD FOR CLASS CERTIFICATION

Plaintiffs accurately state the standard for class certification. Motion at 8-9.

## IV.   PLAINTIFFS' CONCLUSORY ALLEGATIONS ARE INSUFFICIENT

But accurately stating the standard is not enough.

### A.   HEAVY BURDEN; DETAILED EVIDENCE REQUIRED

Plaintiffs bear the heavy burden of presenting evidence and detailed analysis in support of each class action requirement; conclusory statements or analysis will not suffice. *See, e.g.*, *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 172 (S.D.N.Y. 2003) ("Although plaintiffs conclude

---

[2] The difference actually would have been even more significant, but for the fact that the proposed design change actually **decreased** the same polarizer's temperature 17.5ºC at a later point in the study (as the test conditions changed to reflect anticipated use conditions). This later decrease extended the polarizer's life, ameliorating some of the increased heat experienced earlier, but not all of it. If the ████████ increase had remained constant (or continued to increase slightly), the overall reduction in life would have been far greater. Mochizuki Decl., ¶ 7e(iv) at 5 and Ex. 6.

[3] Plaintiffs' expert agrees that temperature testing, of the kind Defendants performed, is the only way to measure the impact of temperature increases on product life. Amador Tr. at 44:11-45:14 ("Q. If I increase the LCD panel from 65 degrees to 66 degrees centigrade, will that 1 degree change decrease its life? A. … the answer is yes….Q. Would it materially decrease its life? A. As you increase temperature, you will reduce the life, yes. I don't understand what you mean by materially…. Q. So you can't give me an estimate based on general scientific principles? A. No[,] it varies from one component to the next and this is something you would measure."), Ex. 2 to Pierce Decl.

Mitchell
Silberberg &
Knupp LLP

2952860.6

4       CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  that the differences in the needle devices are not material, … they have not satisfied their burden

2  of showing that the differences are not material."); *Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D.

3  379, 384 (D. Kan. 1998) ("strict burden of proof[;]" "evidentiary basis"); *Gen. Tel. Co. of Sw. v.*

4  *Falcon*, 457 U.S. 147, 161 (1982) ("rigorous analysis" required).

5       Plaintiffs do not even come close to meeting their heavy burden.[4]

6       **B.**     **PLAINTIFFS MUST – BUT HAVE FAILED TO – PROVE FACTUAL**

7               **VARIATIONS ARE IMMATERIAL**

8       Plaintiffs seeking to certify a consumer action must demonstrate – through evidence, not

9  supposition or speculation – that "'the different models are not materially different or that other

10  factors beyond the alleged design flaw,'" e.g., installation, environmental, or operational variables,

11  are immaterial to the alleged problems. *Benner*, 214 F.R.D. at 172 (*quoting Kaczmarek v. Int'l*

12  *Bus. Machs. Corp.*, 186 F.R.D. 307, 312 (S.D.N.Y. 1999) ("Plaintiffs have not satisfied their

13  burden of showing that the different models are not materially different….").

14       Here, Plaintiffs must **prove** that design differences and environmental variables, among

15  other factors, will not materially affect LCD panel and polarizer temperature/life.  Absent such

16  evidence, Plaintiffs have not met their burden of demonstrating that premature failure, for all of

17  the models and units produced, can be established through common proof.

18       But the Hitachi-brand LCD RPTV models at issue:

19            (i) utilized different lamps that generated variable levels of heat/radiation based on

20  wattage and bulb design (Ogura Decl., ¶ 17a at 9-12; discussed *infra* at 14);

21            (ii) employed different numbers and configurations of heat-sensitive polarizers

22

23  [4] The importance of the class certification decision cannot be overstated.  "Class certification

24  magnifies and strengthens the number of unmeritorious claims."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996).  It "creates insurmountable pressure on defendants to settle," as the "risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an

25  adverse judgment is low."  *Id.*; *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002) (settlement "reflects the risk of a catastrophic judgment as much as, if not more than, the

26  actual merit of the claims.").  Class certification should only be granted if the Court determines, after a rigorous examination, that the Rule 23 requirements have been met.  *See, e.g.*, *Broussard v.*

27  *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) ("[C]ourts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be.").

28

Mitchell
Silberberg &
Knupp LLP

2952860.6

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

(Ogura Decl., ¶ 17b(i) at 12-14; discussed *infra* at 15), that were themselves mounted on ▮ different base materials of varying heat conductivity (Ogura Decl., 17b(iii) at 17-19; discussed *infra* at 14);

(iii) made use of polarizers and LCD panels with different heat absorption rates and tolerances (Ogura Decl., ¶¶ 17b(ii) at 15-17 and 17c at 19-20; discussed *infra* at 15-16);

(iv) utilized varying numbers of cooling fans, the location of which varied by design (Decl. of N. Kaku ("Kaku Decl."), ¶ 20a at 8-10; discussed *infra* at 16);

(v) had differently sized fans, with different size air-intake openings, and different sources of cooling air (Kaku Decl., ¶¶ 20b at 10-13, 20d at 19-22, and 20c at 13-18; discussed *infra* at 16-17); and

(vi) had different internal cooling layouts and component design densities (Kaku Decl., ¶¶ 20f at 23-24 and 20g at 24-25; discussed *infra* at 17-18).

The LCD RPTV models also were subject to production line changes – design changes made at the production unit level, not the model level – that also would affect heating and/or cooling of the LCD panels and polarizers, such as changes to the number of ventilation slots and the cooling duct configuration. *See* Kaku Decl., ¶ 21 at 25; discussed *infra* at 18-19).

The LCD RPTV models were further subject to customer-specific installation, environmental, maintenance, and usage conditions. *See* Ogura Decl., ¶ 18 at 21-24; *see also* Kaku Decl., ¶ 25 at 31-32; discussed *infra* at 19).

All of these differences would affect LCD panel and polarizer temperature/life. *See* Ogura Decl., ¶ 24 at 26; Kaku Decl., ¶¶ 16-17 at 6-7; Kemal Rpt.. at 79-81 (all discussed in detail *infra*).

**Plaintiffs do not even discuss, let alone refute, the relevance of these variations.**

Plaintiffs and their expert spend only approximately 2 pages each discussing factual variations and there is **no analysis** – period.  *See* Motion at 6:9-7:4, 13:26-15:5; Pls.' Exp. Rpt at 19-20.  Plaintiffs and their expert simply, repeatedly insist that the televisions are "materially identical."  Pls.' Exp. Rpt at 17; *see also* Motion at 14:4 ("the televisions share the same design"); Motion at 6:10-11 ("there are no differences with respect to how they each dissipate heat").

Mitchell
Silberberg &
Knupp LLP

2952860.6

6      CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    Plaintiffs' expert held tight to this mantra during his deposition, even as he conceded that

2    design variations existed, the temperature significance of which he could not assess without actual

3    testing – **which he did not perform.** *See, e.g.*, Amador Tr. at 238:11-238:23, 241:24-242:7 (lamp

4    differences), 168:20-169:18, 226:1-227:4 (polarizer differences), 199:2-199:25, 202:15-207:16

5    (fan differences), 53:20-53:22, 69:15-69:25 (testing "is how you would know it"), 74:20-75:9 ("I

6    can't estimate that"), 75:25-76:20 ("for any temperature differential"), 47:3-47:5 ("Q  Have you

7    performed any heat tests on Hitachi [] brand LCD rear projections televisions?  A.  No I have

8    not."); 47:6-47:8, 69:15-70:7 (same), Ex. 2 to Pierce Decl.[5]

9    Repetition is not fact – particularly when refuted by the evidence. *See infra* at 14-19.

10   Plaintiffs, like the plaintiff in *Benner*, "conclude that the differences … are not material,

11   and genuflect to their expert's report." *Benner*, 214 F.R.D. at 172.  Plaintiffs and their expert,

12   however, must do more.  They must demonstrate that the differences are immaterial – a burden

13   they wholly failed to meet.

## C.    PLAINTIFFS MUST – BUT HAVE FAILED TO – PROVE THAT A SINGLE BODY OF LAW GOVERNS THE ABSENT CLASS'S CLAIMS

16   Plaintiffs seeking nationwide certification also must either prove that a single jurisdiction's

17   law applies or that the law of the 50 states is of sufficient commonality to justify certification.

### 1.    Plaintiffs Have Not Demonstrated that Significant Contacts Exist

19   Plaintiffs argue that California law can be "appropriate[ly]" applied nationwide because

20   "significant California contacts" exist.  Motion at 15.  Plaintiffs primarily support this assertion, if

21   at all, with quotes from their complaint.  But the evidence is to the contrary.

22

23   [5] Plaintiffs' fundamental conclusion that "the common use of non user serviceable air filters in the
     design of the air cooling system, essentially guarantees that dust will obstruct the airflow after
24   approximately 3,000 hours" is not based on any testing either.  Pls.' Exp. Rpt. at 20.  Rather,
     Plaintiffs' expert based his conclusion on (i) a limited, competitor-initiated study (the Intertek
25   study) examining office projectors, that Mr. Amador did not conduct and the details of which he
     did not know, including such basic information as what manufacturers, models, LCD panels,
26   polarizers, designs, and cooling systems were tested, and (ii) the recommended cleaning interval
     (which he arbitrarily multiplied by six) for a different Hitachi-brand television, that is not at issue,
27   was never distributed in the United States, had a different LCD panel design, and used a
     completely different cooling system.  Amador Tr. at 113:3-114:17, 106:1-112:18, 115:20-116:2,
28   and 263:22-264:6, Ex. 2 to Pierce, Decl.; Whalen Decl., ¶ 7.

Mitchell
Silberberg &
Knupp LLP

2952860.6

1    Plaintiffs **allege** that the televisions were developed and designed in California.  Motion at

2    15 (citing complaint).  "But the Hitachi-brand LCD RPTVs, and particularly the optical engines,

3    were primarily developed/designed in Japan."  Ogura Decl., ¶ 7.

4    Plaintiffs **allege** that all persons "who had questions regarding their warranty, service, or

5    operation or technical assistance" were "directed" to personnel in Defendants' "California

6    location."  Motion at 15 (citing complaint).  But all customer service inquiries were directed to,

7    and virtually all responses provided by, third-party call center operators located in Illinois.  Omar

8    Decl., ¶¶ 3-5 (noting that less than 1% are escalated to personnel in California).

9    Plaintiffs **allege** that all product "marketing" emanated from California.  Motion at 15

10   (citing complaint).  But Hitachi America, Ltd. ("HAL") did "not directly, actively market the

11   Hitachi-brand LCD RPTVs for sale to potential individual purchasers.  HAL's primary strategy,

12   [rather], was to encourage the retail dealers … to advertise and promote the product[]" themselves.

13   Whalen Decl., ¶ 4.

14   Plaintiffs **allege**, again citing their complaint, that HAL, the company that distributed the

15   LCD RPTVs, maintains its principal offices in California.  But HAL is a New York corporation

16   with its principal offices in Tarrytown, New York.  *See* Answer at ¶ 8 (denying allegation), [Doc

17   No. 14.]; *see also* Ex. 11 to Pierce Decl.

18   Plaintiffs' efforts to proffer evidence fair no better.

19   Plaintiffs state that the LCD RPTVs were assembled in a Mexican factory "operated by

20   Hitachi employees based in its Chula Vista, California headquarters."  Motion at 15 (citing

21   transcript).  But the personnel who supervised operations at the factory primarily worked in

22   Tijuana; they merely lived and occasionally attended meetings in California.  *See* Decl. of K.

23   Kato, ¶ 6, Ex. 4 to Pierce Decl.; Testimony of K Kato at 13:22-15:22, Ex. 10 to Pierce Decl.

24   Plaintiffs state that "[a]ll decisions pertaining to the Television warranties were made from

25   California…."  Motion at 15 (citing transcript).  But with rare exception, warranty decisions were

26   made, nationwide, at the independent, authorized servicer level or by the referenced call center

27   operators in Illinois.  Omar Decl., ¶¶ 6-9 (noting that less than 1% are escalated to personnel in

28   California and discussing appeal committee).

Mitchell
Silberberg &
Knupp LLP

2952860.6

8       CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1     Plaintiffs conclude, on the basis of their allegations and the misquoted testimony, that

2  "there can be no question that California has the closest connections."  Motion at 15.  But there is

3  no such nexus.  Hitachi, Ltd designed the LCD RPTVs in Japan.  A nonparty assembled them in

4  Mexico.  A New York company distributed them nationwide.  Independent retailers marketed

5  them.  A nonparty, call center, based in Illinois, responded to technical and warranty inquiries, and

6  a nationwide system of independent, servicers decided whether the customer qualified for in-

7  warranty repair.  *See* Ogura Decl., ¶ 7; *see generally* Declaration of William Warren, Decls. of

8  Omar and Whalen.

9     The California contacts are not significant; they are fleeting.[6]

10           **2.**     **Plaintiffs Have Not Demonstrated That Relevant State Law Is Uniform**

11     Plaintiffs do not contend, let alone demonstrate, that state law variations are immaterial.

12  Nor could they.  *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.

13  2001) ("differences in state law will compound the … disparities among class members from the

14  different states") (quotation marks omitted); *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555,

15  564 ( E.D. Ark. 2005) ("Both consumer fraud and unfair competition laws of the states differ with

16  regard to the defendants' state of mind, type of prohibited conduct, proof of injury-in-fact,

17  available remedies, and reliance, just to name a few differences.").

18           **3.**     **Plaintiffs Have Not Demonstrated That Subclassing Is Viable**

19     Plaintiffs simply state, like an afterthought, that if necessary, "variations in state law can be

20  effectively managed" through subclassing or other case management tools.  Motion at 16.

21     But "Plaintiffs, not the Court, have the burden of designing a workable plan for trial

22  embracing all claims and defenses prior to class certification."  *Chin v. Chrysler Corp.*, 182 F.R.D.

23  448, 459 (D.N.J. 1998).  Plaintiffs must proffer a concrete plan – not vague "assurances."  *See,*

24  *e.g., In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 355 (D.N.J. 1997)

25  ("The court will not conditionally certify these cases on the basis of a hope that at some point

26  plaintiffs may find a feasible, realistic way to bring these cases to trial in class form."); *Castano v.*

27

---

28  [6] To the extent the Court disagrees, Defendants' conflict of laws analysis, under California's
comparative impairment approach, is set forth *infra*, beginning at page 20-23.

Mitchell
Silberberg &
Knupp LLP

2952860.6

9     CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    *Am. Tobacco Co.*, 84 F.3d 734, 742 (5th Cir. 1996) ("a court cannot rely on assurances of counsel

2    that any problems with predominance or superiority can be overcome").

3           Plaintiffs do not just fail to offer a workable plan, they do not even try.[7]

4           Where, as here, Plaintiffs fail **their heavy burden** of proving that factual variations are

5    immaterial and that a single jurisdiction's law applies to the class, certification must be denied.

6    **V.      PLAINTIFFS CANNOT DEMONSTRATE REQUISITE ELEMENTS**

7           Nor can Plaintiffs demonstrate that certification is proper here in any event.

8           **A.     FRCP 23(A) REQUIREMENTS**

9           Class certification decisions rarely turn on the FRCP 23(a) requirements – so Defendants

10   will not belabor those issues here. *See, e.g., In re Ford Motor. Co. Bronco II Prod. Liab. Litig.*,

11   177 F.R.D. 360, 366 (E.D.La. 1997) ("courts usually do not spend a great deal of time").[8]

12

13   [7] Plaintiffs' abbreviated citations to *Walsh*, *Visa*, and *Abbott Labs* are unavailing.

14   *Walsh* stands for the unremarkable proposition that movants must demonstrate that state law
     variances do "not present insuperable obstacles," which would include "determining whether such
15   variations can be effectively managed through creation of a small number of subclasses" – the
     passage Plaintiffs quote. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986).
16   Plaintiffs have made no such showing, the *Walsh* Court did not conclude that subclassing was
     proper, **and the district court declined to certify that case on remand.** *Walsh v. Ford Motor*
17   *Co.,* 130 F.R.D. 260, 277-78 (D.D.C. 1990) (denying class certification, in part, due to state law
     variances).

18   *Visa* was an antitrust case in which the **only** uncommon issue was the class members' right to
     "individualized damages" – a case management dynamic far different from the plethora of
19   individual issues presented here. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124,
     141 (2d Cir. 2001).

20   *Abbot Labs*, another antitrust case, involved only one nationwide state law claim (not at issue
     here) – which the Court specifically found did not vary materially from state to state. *In re Abbott*
21   *Labs. Norvir Anti-Trust Litig.*, 2007 WL 1689899, at *9 (N.D.Cal. June 11, 2007).

22   [8] Defendants do question Plaintiffs' Counsel's adequacy to represent the class. FRCP(a)(4).

23   Plaintiffs' Counsel control the litigation of this matter. No plaintiff, for example, even bothered
     to appear in San Diego – notwithstanding Magistrate Judge Stormes' Order – for the Early Neutral
     Evaluation of this case. *See, e.g.*, Pierce Decl., ¶ 1.

24   But recent events call lead Plaintiffs' Counsel's motives and actions into question.

25   First, Plaintiffs Lead Counsel (Lax and Koncius) alleged in a recent complaint filed against Sony
     that they had access to two well-placed "confidential sources" who would testify that the Sony
26   televisions were defective and that Sony knew they were defective when sold – allegations (albeit
     without the whistleblowers) eerily similar to the claims in this case. Plaintiffs' Lead Counsel then
27   repeatedly resisted Sony's attempts to learn the identity of and to depose the witnesses. When the
     witnesses were finally deposed, they contradicted the allegations. Plaintiffs' Lead Counsel and
28   several co-counsel in this case were formally reprimanded for violating FRCP 11 in connection
                                                                               (…continued)

Mitchell
Silberberg &
Knupp LLP

2952860.6

10          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## B.     FRCP23(B)(3) REQUIREMENTS

Class certification, pursuant to FRCP 23(b)(3), requires three separate, but related findings: predominance, manageability, and superiority.

### 1.     <u>Common Issues Do Not Predominate</u>

The predominance requirement focuses on the fundamental certification question – can a Court hear evidence regarding one or a few claims, and on that limited basis, adjudicate the rest?

The predominance inquiry examines "the applicable law" and the "factual questions that qualify each class member's case." *Ford Ignition Switch*, 174 F.R.D. at 339-40.  The purpose is to determine "what will have to be proved at trial" and "whether those matters can be presented by common proof."  7B Charles Alan Wright et al., *Federal Practice and Procedure*, § 1785 (Supp. 2002); *Ford Ignition Switch*, 174 F.R.D. at 345 n.6 ("assessing the evidentiary paths that a trial on the merits would likely traverse" is critical to "determining … factual predominance").[9]

There is no bright line test.  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997) (class's claims must be "sufficiently cohesive"); *Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 15 (D.P.R. 1994)  ("common questions must be central to all the claims").

#### a.     **Predominance Inquiry in Warranty Class Actions Focuses on Model Differences, Human Factors, and State Law Variances**

The considerations upon which the predominance decision turns in nationwide warranty

---

(…continued)
with this episode.  Req. for Jud. Not., Ex. 1.

Second, Plaintiffs' Lead Counsel negotiated the terms of a potential settlement in the same Sony case, but the negotiations foundered over Plaintiffs' Counsel's proposed attorneys' fee award. Plaintiffs' co-counsel in that case then proceeded to negotiate the same settlement terms for the proposed class, but accepted a lower attorneys' fee award – permitting the settlement to go forward, but cutting Plaintiffs' Lead Counsel out of the case/settlement.  Plaintiffs' Lead Counsel objected to the settlement on the grounds that it was inadequate – even though the terms were substantively identical to the ones Plaintiffs' Lead Counsel had themselves negotiated for the settlement class before the negotiations faltered over their fee.  The District Court approved the settlement; Plaintiffs' Lead Counsel are appealing.  Req. for Jud. Not., Exs. 2-7.

[9] Plaintiffs state, Motion at 16, that either factual or legal predominance will suffice.  Plaintiffs' assertion is technically true, but misleading.  The Court is required to look at all of the issues in the case, factual and legal, to determine whether sufficient cohesiveness exists.  Factual predominance is only sufficient if legal individuality is immaterial (and vice versa) – otherwise neither is predominate.

Mitchell
Silberberg &
Knupp LLP

2952860.6

11     CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

cases are well established – model design differences, human factors, and state law variations.  *See* cases cited immediately below.  If design differences and human factors (e.g., environment, usage, installation) are immaterial, **and** a single jurisdiction's law applicable, class issues subject to generalized proof predominate and the requirement is satisfied.  But where, as here, multiple material design variations exist, human factors are relevant, **or** no single body of law controls, common issues do not predominate.

**(i)      Model Variations Case Law**

Cases denying or reversing certification on the basis of model design differences are common.  *See, e.g.*, *Bridgestone*, 288 F.3d at 1019 ("[T]he class certification order comprise[s] 67 master tire specifications:  'Firehawk ATX' tires, for example, come in multiple diameters, widths, and tread designs; their safety features and failure modes differ accordingly. . . . There are other differences too, but the ones we have mentioned preclude any finding 'that the questions of law or fact common to the members of the class predominate….'"); *Kaczmarek*, 186 F.R.D. at 310-12 (computer card case; "If a class were certified, a detailed factual inquiry into the differences between these models would be required.").[10]

**(ii)     Human/Environmental Factors Case Law**

Cases denying certification on the basis of human factors, including environmental considerations and customer usage, are equally common.  *See Bronco II Litig.*, 177 F.R.D. at 373 (car roll-over class; individual "environmental factors" and "differences in vehicle maintenance

---

[10] *See also, e.g., Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 450 (E.D.Pa. 2000) ("[T]he proposed classes comprise at least eight model years, 13 different manufacturing plants and hundreds of makes and models . . . . There is no one product, let alone one act, to evaluate."); *In re Am. Med. Sys, Inc.*, 75 F.3d 1069, 1081 (6th Cir. 1996) ("AMS has produced at least ten different models, and [] these models have been modified over the years.  Plaintiffs' claims … will differ depending upon the model and the year it was issued."); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D.La. 1998) ("[C]ommon issues do not predominate. . . . This case does not involve a single failure event or a simple, fungible product.  Rather, Ford's challenged course of conduct spanned at least seven years and involved different models of vehicles, made of different materials, painted a variety of colors at different plants, using different paint formulae."); *Bronco II Litig.*, 177 F.R.D. at 372 ("[A]ll Bronco II vehicles are not substantially the same….[T]he Bronco II was sold over seven years in varying configurations, including two wheel drive and four wheel drive, different tire sizes, different wheel sizes, with variances in mechanical configuration and track width, all of which can affect the stability index."); *Frosini v. Bridgestone Firestone N. Am. Tire, LLC*, 2007 WL 2781656, at *15 (C.D.Cal. Aug. 24, 2007) ("there are 75 different populations of tires, differing in design, size and capacities").

1    and use by individual consumers … can affect the handling and stability characteristics of the

2    vehicle"); *see also Sanneman*, 191 F.R.D. at 450 (car paint peeling case; "Even if **ultraviolet rays**

3    are the root cause of [the problem], a determination will nonetheless be necessary, for each

4    vehicle, as to whether any other factors contributed to the [problem].") (emphasis added).[11]

5                        **(iii)      State Law Variations Case Law**

6        Also common are cases denying certification on the basis of state law variances.  *See, e.g.*,

7    *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 424 (E.D. La. 1997)

8    ("Even in a liability-only trial, composite instructions accounting for all of these differences would

9    hazard a chaos that seems counterintuitive to the spirit of Rule 23."); *Kaczmarek*, 186 F.R.D. at

10   312-13 (application of the "law of all fifty states" leads to conclusion that "[c]ommon questions of

11   law do not predominate in this case.").[12]

12                      **b.       Model Differences and Human Factors Preclude Factual**

13                               **Predominance Here**

14       LCD RPTV model design differences and human/environmental variables similarly bar

15   certification here.  Plaintiffs contend, at 17 and 20 of Pls.' Exp. Rpt., that the LCD panels and

16

---

17   [11] *See also, e.g., Ford Vehicle Paint*, 182 F.R.D. at 220 (paint peeling case; "the environmental
     factors to which the vehicles were exposed" and "how individual drivers used their vehicles"
18   preclude factual predominance); *Ardoin v. Stine Lumber Co.*, 220 F.R.D. 459, 465 (W.D.La. 2004)
     (home building materials; "climate where the wood is used, amount and nature of precipitation,
19   acidity of precipitation, [and] type of surface water" preclude factual predominance); *Masonite*,
     170 F.R.D. at 425 (home siding; "Location and climate around [the] plaintiffs' homes [were] also
20   likely to be varied factors.  They [would] affect moisture absorption, and go directly to the
     generalized claim of generic product defect" and thus the ability of the Court to rule on common
21   proof.); *Kaczmarek*, 186 F.R.D. at 312 (computer card case; "outside problems such as line noise,
     receiving modem problems, and internet problems may have caused the[] problems [at issue].").

22   [12] *See also, e.g., Bridgestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under
     the law of so many jurisdictions, a single nationwide class is not manageable."); *In re Gen. Motors
23   Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 324 (S.D.Ill. 2007) ("In view of the
     significant variations with respect to the law of warranty among the states in the proposed class,
24   the Court's path is clear.  The Seventh Circuit Court of Appeals has warned repeatedly in recent
     years against the certification of unwieldy multistate classes, holding that the difficulties inherent
25   in applying the laws of numerous states to the class claims defeat both predominance and
     manageability."); *Walsh*, 130 F.R.D. at 277 ("And when the myriad of factual permutations are
26   piled upon layers of legal standards and choice of law dilemmas, this litigation appears to take on
     epic proportions."); *Bronco II Litig.*, 177 F.R.D. at 371-72 ("Having been unsuccessful in arguing"
27   that Michigan law should govern all of the claims, "what remains is a record that reflects so many
     variations in state laws that common questions of law clearly cannot be said to predominate for
28   purposes of Rule 23(b)(3).").

Mitchell
Silberberg &
Knupp LLP

2952860.6

                                                  13           CASE NO.  08 CV 1746 DMS (NLS)
                    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   polarizers fail prematurely due to "insufficient airflow" and inadequate heat tolerance.  And, as

2   explained above, even small temperature differences can have a big impact on LCD panel and

3   polarizer life.  Plaintiffs' premature failure claims thus turn on the temperatures those parts reach,

4   when they reach them, and why.  But those questions are not subject to common proof because the

5   design of the LCD RPTVs' cooling systems and the specifications and configurations of the LCD

6   panels, polarizers, and other critical heat management-related components of the LCD RPTVs,

7   **varied markedly by model, when the particular units were produced, and the specific usage**

8   **conditions to which such units were subjected.**

9                                   **(i)      Lamp Wattage**

10          First, the size of the LCD RPTV's lamp, the primary source of heat, varied by optical

11   engine design – ███████████.  Ogura Decl., ¶ 17a(i)(d) at 10 (wattage by engine chart); Kemal

12   Rpt. at 39.  The size of the lamp matters because a ████████ generates **approximately** ███

13   more light (heat) than a ████████.  Amador Tr. at 235:10-235:25, Ex. 2 to Pierce Decl.;

14   Kemal Rpt. at 39.  While Plaintiffs' expert could not quantify the life impact, design-stage tests

15   performed by Hitachi, Ltd. demonstrate that this one change alone can lead to a ████████ in

16   projected panel life.  Amador Tr. at 237:22-238:8, Ex. 2 to Pierce Decl.; Ogura Decl., ¶ 17a(i)(b)

17   at 10 and Ex. 4 (study).

18                                  **(ii)     Lamp Manufacturer**

19          Second, the LCD RPTV lamps were sourced from three different vendors – ████████

20   ██████████████  Ogura Decl., ¶ 17a(ii)(d) at 11-12 (manufacturer by engine chart).  The

21   manufacturer of the lamp matters because different companies use different, proprietary arc

22   designs that generate different levels of light (and thus heat) **at the same wattage level.**  Kemal

23   Rpt. at 39.  Design-stage tests performed by Hitachi, Ltd. demonstrate that this one change alone

24   can materially increase panel and polarizer life temperature, materially decreasing life.  Ogura

25   Decl., ¶ 17a(ii)(b) at 11 (study).  While Plaintiffs' expert downplays this difference, Mr. Amador

26   readily admits that he has not tested the issue – and that the only way to assess the temperature

27   impact of a design difference is to measure it.  Amador Tr. at 240:10-245:6 (downplays; no

28   testing), 69:15-69:25 (testing crucial), Ex. 2 to Pierce Decl.

Mitchell
Silberberg &
Knupp LLP

2952860.6

14          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

### (iii)  Number and Location of Polarizers

2        Third, the LCD RPTV optical engines utilized different numbers and configurations of

3 heat-sensitive input and output polarizers – the very parts alleged to have failed.  Ogura Decl., ¶

4 17b(i)(b)6 at 14 (chart identifying relevant configuration differences by engine).  The number and

5 placement matters because adding more input polarizers would reduce the heat and light impacting

6 the LCD panel and output polarizers and reduce the energy load each input polarizer is required to

7 bear, thus extending life.  Ogura Decl., ¶ 17b(i)(b) at 13-14; Kemal Rpt. at 47.  Adding output

8 polarizers would similarly reduce the energy load each output polarizer is required to bear.  *Id.*

9 Plaintiffs' expert could not recall whether the configurations varied, then downplayed this

10 difference, but ultimately admitted that the configuration would matter and that it could

11 substantially extend polarizer life.  Amador Tr. at 168:20-170:1 (no recall), 170:2-171:11

12 (downplays), 173:22-174:3 ("depend on the configuration"), 176:21-177:6 ("substantial

13 extension?  It could….too many variables" to know how much), Ex. 2 to Pierce Decl.

14

### (iv)  Polarizer Base Material and Base Material Size

15        Fourth, the LCD RPTV optical engines utilized ▮ different polarizer base materials –

16 ███████████████████████████████████████████████████████████.  Ogura Decl.,

17 ¶ 17b(iii)(b) at 17-19 (chart identifying differences by engine).  The base material matters because

18 different base materials "conduct" (remove) heat away from the polarizers to varying degrees –

19 based on the physical properties (heat conductivity) of the base material and the size of the base.

20 Ogura Decl., ¶ 17b(iii)(a) at 17; Kemal Rpt. at 46-47, Amador Tr. at 181:2-181:4 ("What base

21 material … can impact the temperature…?  Yes.").  Plaintiffs' expert tried to downplay this

22 variation at his deposition, even after admitting that heat conductivity would vary while

23 acknowledging that he could not recall to what degree or which units had what material.  Amador

24 Tr. at 183:1-184:5, 186:18-186:21, Ex. 2 to Pierce Decl.; *see also* Pls.' Exp. Rpt. at 20 (attaching

25 the output polarizers "to the optical prism surfaces" would "**conduct heat away** from the output

26 polarizers") (emphasis added).

27

### (v)  Polarizer/Panel Surface Area

28        Fifth, the LCD RPTV optical engines used polarizers and LCD panels with different

Mitchell
Silberberg &
Knupp LLP

2952860.6

15        CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    surface areas.  Ogura Decl., ¶¶ 17b(ii)(b) at 15-16 and 17c(i)(c) at 19 (identifying differences).

2    Surface area matters because smaller panels get hotter than larger panels when subjected to the

3    same amount of energy – a fact Mr. Amador concedes.  Ogura Decl., ¶ 17b(ii)(a) at 15 and

4    17c(i)(a) at 19; Kemal Rpt. at 46-48; Amador Tr. at 189:13-189:19, Ex. 2 to Pierce Decl.

5                    **(vi)      Number and Location of Cooling Fans**

6          Sixth, the LCD RPTV models utilized between ███████ to cool the components in the

7    optical engine, the location of which varied by design.  Kaku Decl., ¶ 20a(vii) at 9-10 (chart

8    identifying differences).  Design-stage tests performed by Hitachi, Ltd. demonstrate that the

9    presence (and thus number of) cooling fans in the vicinity of the optical assembly – even if not

10   directed at the LCD panels and polarizers themselves – would significantly decrease panel and

11   polarizer temperature, extending life.  Kaku Decl., ¶¶ 20a(v)-20a(vi) at 8-9, 20b(iv)(b) at 12 and

12   Exs. 5, 37 (studies).

13         Mr. Amador conceded that he did not perform any temperature testing regarding this

14   variation.  He did purport to "test" the potential impact of the additional fans with his "eyes" and,

15   on that basis, concluded that they could not impact LCD panel or polarizer temperature.  Amador

16   Tr. at 231:11-231:14 ("your test…consisted of you looking…?  Right…that is a test"), Ex. 2 to

17   Pierce Decl.  But the credibility of Mr. Amador's assertion aside, it directly contradicts his own

18   prior testimony that actual temperature testing (with temperature measuring devices) is required,

19   not to mention his prior, candid statement that additional fans would have an impact.  *Id.* at 208:6-

20   208:10 ("could contribute"), 69:15-69:25 (testing required).

21                   **(vii)     Fan Size, Air Opening Size and RPMs**

22         Seventh, the LCD RPTV models had different size fans ███████████ with different

23   size air-intake openings (approximately ████████████), and different blade rotation speeds

24   (████████ revolutions per minute).  Kaku Decl., ¶¶ 20b(vi) at 12-13 and 20d(iii) at 21-22

25   (charts); s*ee also* Kemal Rpt. at 51.  Size and speed matter because bigger, faster fans produce

26   more cooling.  Kaku Decl., ¶¶ 20b(ii)-20b(iii) at 10-11.  Plaintiffs' expert concedes that there were

27   differences, but dismisses them – without testing – as immaterial.  Amador Tr. at 202:15-202:21

28   ("there were some variations"), 202:22-203:18 (dismissing them), Ex. 2 to Pierce Decl.  But actual

Mitchell
Silberberg &
Knupp LLP

2952860.6

16        CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   design-stage testing performed by Hitachi, Ltd. demonstrates the (obvious) impact bigger cooling

2   systems have on LCD panel and polarizer temperature.  *See, e.g.*, Kaku Decl., ¶¶ 20b(iii)-20b(iv)

3   at 11-12 (study recording approximately ███ decrease in blue input polarizer and blue LCD panel

4   from increasing LCD fan speed by █████).

### (viii)   Air Source

6       Eighth, the LCD RPTV models sourced cooling air from two different locations within the

7   television –███████████████████ and the █████████████████

8   ███  Kaku Decl., ¶ 20c(ii) at 13-14 (chart); Kemal Rpt. at 54.  This is important because the

9   temperature of the air and the potential for dust clogging (of the air filter) varied considerably by

10   source location.  Kaku Decl., ¶¶ 20c(ii)(b), 20c(ii)(e)1, 20c(ii)(e)2 at 14-16; Kemal Rpt. at 54.  Air

11   in the ████████████████████████ would be

12   significantly hotter than air pulled from the ██████████████████████

13   ███  Kaku Decl., ¶ 20c(ii)(b) at 14.  Air in the ████████ also was markedly cleaner – since

14   the ███████ was thoroughly cleaned during manufacture and contained no external air vents

15   or other openings.  Kaku Decl., ¶ 20c(ii)(e)1 at 15.  Air in the ████████ in contrast, was in

16   close proximity to various air intake openings and ventilation slots – increasing the chance for

17   filter clogging.  Kaku Decl., ¶ 20c(ii)(e)2 at 15-16.  Plaintiffs' expert notes the critical significance

18   of air filter clogging, but was not aware that the LCD RPTV models sourced air from the different

19   locations.  Pls.' Exp. Rpt. at 202:22-203:14 (clogging); Amador Tr. at 212:13-212:18, 215:1-

20   215:17 (source same), Ex. 2 to Pierce Decl.

### (ix)   Internal Cooling Configuration

22       Ninth, the LCD RPTV models had materially different internal cooling duct

23   configurations.  Kaku Decl., ¶ 20f(v) at 24, Ex. 39.  Cooling duct (or air passageway)

24   configuration matters because the size, twists and turns, and narrowing and widening of the ducts

25   and other passages through which the cooling air travels have a dramatic effect on its cooling

26   capacity.  Kaku Decl., ¶ 20f at 23-24.  Plaintiffs' expert does not appear to disagree, but contends

27   that the cooling configurations do not vary.  Amador Tr. at 197:5-197:18, Ex. 2 to Pierce Decl.

28   But even a cursory examination of the schematics reveals that the LCD RPTVs' cooling

Mitchell
Silberberg &
Knupp LLP

2952860.6

17       CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   configurations varied substantially.  *See* Ex. 39 to Kaku Decl.; Kemal Rpt. at 54, 56-61.

2                            **(x)      Design Density**

3        Tenth, the LCD RPTV models had different design densities – i.e., how many components

4   were installed, how closely together.  Kaku Decl., ¶ 20g(iii) at 25, Ex. 41; Kemal Rpt., Table 5 at

5   45; 53.   Design density matters because it affects cooling efficiency.  Closely packing the LCD

6   panels and polarizers will subject them to more radiative heat (from each other), and the narrower

7   passages created thereby permit less cooling air then when those same parts are more widely

8   dispersed.  Kaku Decl., ¶¶ 20g(i)(a)-20g(i)(b) at 24; Kemal Rpt. at 47, 55.  Plaintiffs' expert

9   admits that the design density varied, but contends – again, without testing – that millimeters

10  simply do not matter.  Amador Tr. at 197:5-198:4 (testing required), 195:2-195:10 ("slight

11  variations"), 229:16-230:2 (downplaying absence of testing based on visual conclusions), Ex. 2 to

12  Pierce Decl.  While that statement might have surface appeal, given the sizes at issue, a 1-3

13  millimeter range is material.  Such a difference could increase the airflow significantly.  Kemal

14  Rpt. at 55.

15                                    * * *

16       The preceding highlights **some**[13] of the relevant design differences that exist by model.

17                           **(xi)     Running Changes**

18       While the bulk of design-related activities are performed during the design and pre-

19  production phase, it is common to make design changes during mass production.  Kaku Decl.,

20  ¶ 21.  The result is that the first unit produced for a given model is materially different from the

21  last – with a plethora of interim iterations of varying temperature significance.

22       This is not theoretical makeweight.  The factory that assembled the LCD RPTVs

23  implemented numerous changes that would impact the LCD panels' and polarizers' temperature

24  and the efficiency of the cooling system **in the affected units**.  Kaku Decl., ¶ 23.  For example:

25

26  _____

13 *See, e.g.*, Amador Tr. at 80:8-80:12 (noting that source, in addition to amount, of heat can
27  matter; "It's a complex set of factors."), 81:13-85:19 (listing long list of variables) Ex. 2 to Pierce
    Decl.; *see also* Kemal Rpt. at 53-54 (number and size of air filters), 48 (panel manufacturer);
28  Ogura Decl., ¶ 20 (polarizer manufacturer).

Mitchell
Silberberg &
Knupp LLP

2952860.6

                                    18        CASE NO.  08 CV 1746 DMS (NLS)
    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

- In July 2005, mid-production, the design of the ████████ in three models, 60VS810, 60VS810A, and 60VX915, was changed ██████████████ in all subsequently produced units. Kaku Decl., ¶ 23(a) at 26-27.

- In the May to July 2005 timeframe, mid-production, ████████████████ ████████ in the 50VS810, 50VS810A, 50VX915, 60VS810, 60VS810A, 60VX915, 70VS810, and 70VX915, ██████████████████████ ████ in all subsequently produced units. Kaku Decl., ¶ 23(b) at 27-28.

This is just the tip of the iceberg. *See* Kaku Decl., at 26 n.5 and ¶ 23; Kemal Rpt. at 68-71. Plaintiffs would thus need to prove their claims not at the model level – which is individual enough – **but at the unit level.**

### (xii)   Human Factors

The LCD RPTV models were also subject to a variety of different pre-sale storage conditions and post-sale installation, environmental, maintenance, and usage conditions – all of which could materially affect longevity: *See* Amador Tr. at 31:4-31:24 (pre-sale storage conditions), 27:13-27:18 (impact of variable room temperature), 221:2-221:5 (discussing variations in dust/dirt), 93:13-94:4, 103:17-103:23 (variation in on/off frequency "might be good, might be bad" and could vary by unit), Ex. 2 to Pierce Decl.; Kaku Decl., ¶ 12 (discussing impact of blocking vents).

### (xiii)   Other Relevant Fact Specific Inquiries

While the preceding discussion is sufficient, if not overwhelming – it is far from complete.

The predominance inquiry must examine **all** of the elements of each cause of action to determine whether the matters subject to common proof predominate. Here, the Court will have to determine the following facts for each class member – among many others:

- Whether the class member's television has actually failed? *Sanneman*, 191 F.R.D. at 451 ("each vehicle must be examined").

- Whether the television was purchased for home or commercial use, as well as the kind of commercial use? *See, e.g., Ford Ignition Switch*, 194 F.R.D. at 497-98 (noting that some protection statutes are limited to consumers who purchase for personal, family,

Mitchell
Silberberg &
Knupp LLP

2952860.6

19      CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

or household purposes, while others apply to business purchasers as well, and still
others apply to some business purchasers but not others).

- The date of purchase and failure (if failure has occurred) and thus whether the claim is
  barred by the applicable statute of limitations?  *See, e.g., In re N. Dist. of Cal. Dalkon
  Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (when defendant's
  "affirmative defenses (such as . . . the statute of limitations) may depend on facts
  peculiar to each plaintiff's case," class certification is erroneous.).

- Whether the class member's purchase included an express warranty and from which
  Defendant?[14]  *See, e.g., City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D.
  630, 640 (S.D.Fla. 2010) ("In this case, Defendants issued warranties of varying
  lengths during different times within the class period ….").

- Whether the television was purchased directly from a Defendant and which one, to
  determine whether the claim, or some part of it, is barred for lack of privity?  *Chin*,
  182 F.R.D. at 456 ("[U]nder the law of some states, for a plaintiff to prove an implied
  warranty claim, the plaintiff must demonstrate contractual privity with the
  defendant….Plaintiffs from these states will have to prove that they purchased their
  Chrysler vehicle either from Chrysler itself or from one of its agents….")?[15]

These are just further examples of the complexity – the sheer individuality – presented.[16]

### c.    State Law Variations Further Preclude Predominance Here

But that is not all.  State law variations further preclude the requisite cohesiveness.

[14] The length of the warranty varied by sales channel ██████████████
and/or model and sales channel ██████████████████████████████████
Decl. of B. Warren, ¶¶ 5-6.  The issuer of the warranty varied over time. *Id.* at ¶¶ 5, 7.

[15] It is worth comparing Defendants' list with Plaintiffs' list of purported common issues.
Defendants' list focuses on the facts that will need to be proven and the evidence that will need to
be presented.  Whether such facts can be established through common proof is the *sine qua non* of
the predominance inquiry.  Plaintiffs' list, in contrast, focuses on the ultimate claims – "whether
the televisions are defective;" whether "Hitachi violated the CLRA;" etc.  Motion at 10.  But it is
the road, not the destination, that determines factual and legal cohesiveness.

[16] Plaintiffs citations to various omission cases are inapposite.  In those cases, the court concluded
that the models/products were indistinguishable and that a uniform body of law was applicable.

Mitchell
Silberberg &
Knupp LLP

2952860.6

20          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

**(i)      Conflict of Laws Analysis**

2          Each proposed class member (whether from Arizona or Alaska) is entitled to have his or

3   claim adjudicated under the same state substantive law that would apply if he or she brought the

4   action directly.  *See Ford Ignition Switch*, 174 F.R.D. at 347-48  ("[I]n nationwide class actions,

5   … [class members] have a due process right to have their claims governed by the applicable state

6   law for their dispute."); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).

7   District courts are required to follow the **conflict of laws procedure** of the state in which the

8   district court is located.  *See, e.g.*, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th

9   Cir. 2001) ("in diversity [courts] must look to the forum state's choice of law rules").

10

**(ii)      California's Government Interest Approach**

11          California's approach, well known to this Court, includes three steps: (i) determine

12   whether foreign law "materially differs from the law of California," (ii) "determine what interest,

13   if any, each state has in having its own law applied to the case," and (iii) if a true conflict exists,

14   apply "the law of the state whose interests would be 'more impaired' if its laws were not

15   applied."[17]  *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919-21 (2001).

16

**(a)      State Law Materially Varies In This Case**

17          Material differences in consumer protection law are endemic and outcome determinative:

18               For example: (1) some states require a showing of reliance to state a
                 claim for consumer fraud, while others do not; (2) some states
19               require no proof of scienter to make out a claim for consumer fraud,
                 while those requiring proof of scienter vary as to the level of proof
20               demanded; [etc.]

21   *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, 251 F.R.D. 139, 147 n.8 (S.D.N.Y.

22   2008); *see also Deceptive Trade Practices Acts Applicability and Statutes of Limitation* (2008)

23   (LEXIS) (50-state survey of differences in claims for "unfair trade practices, unfair competition

24   [and] unfair acts in consumer transaction"), Ex. 12 to Pierce Decl.

25          The same outcome determinative variability exists in express and implied warranty law.

26   *See, e.g.*, *Dex-Cool*, 241 F.R.D. at 315 (analysis of "significantly-differing laws of forty-seven

27

─────────────

[17] Defendants demonstrated, *infra*, at 7-9, that Plaintiffs have not established and cannot establish

28   significant contacts.

Mitchell
Silberberg &
Knupp LLP

2952860.6

1   states"); *Ford Ignition Switch*, 174 F.R.D. at 489 ("Implied warranty … claims [also] vary

2   significantly from state to state[,]" including "definition of merchantability," "whether the remedy

3   lies in tort or contract[,]" and "[w]hether the relevant [s]tate allows waiver"); *Grand Theft*, 251

4   F.R.D. at 147 n.8 (for implied warranty claim, "many states require proof of privity, …while many

5   others require no such proof").

6                       **(b)**       **Each State Has An Interest In Its Own Laws**

7         State legislatures elected those differences for a reason:  They reflect the economic and

8   social balance those states and their citizens chose to draw.  Each state has an interest in seeing its

9   particular balance applied to its citizens/residents.  *See, e.g.*, *Ford Ignition Switch*, 174 F.R.D. at

10  348 (each state has an inherent interest "**in delineating the scope of recovery for its citizens**

11  **under its own laws**") (emphasis added); *Clark v. Experian Info. Solutions Inc.*, 2005 WL

12  1027125, at *5 (N.D. Ill. April 26, 2005) (rejecting plaintiffs' request to apply California law

13  because California's interest "does not override Illinois's more significant contacts to this case")

14  (unpublished); *Kennedy v. Unlimited Imports, Inc.*, 2007 WL 135951, at *4 (N.J. Super. Ct. App.

15  Div. Jan 22, 2007) (unpublished) (rejecting application of more consumer protective New Jersey

16  law, in part, because Pennsylvania "has a further interest in protecting its businesses….[and thus]

17  [a]pplication of New Jersey's [law] would tend to frustrate Pennsylvania's purpose");

18  RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145 cmt. c (1971) ("A rule which exempts the

19  actor from liability for harmful conduct is entitled to the same consideration in the choice-of-law

20  process as is a rule which imposes liability.").

21                      **(c)**       **Comparative Impairment Analysis**

22        The fundamental question is who has the greater interest here?  Is it the state of the class

23  member's residence, where the television was marketed and purchased, serviced, and any

24  warranty claim denied?  Or is it California, which as demonstrated above, has no particular

25  connection to the vast majority of claims?  But to ask this question is to answer it:

26          The interests of the state of purchase would be most impaired if its
            consumer-fraud laws were not applied, and the state of purchase also has

27          the most significant contacts with the parties' sales contract.…
            Therefore, California conflicts jurisprudence also requires the application

28          of the law of the state of purchase to [class] members' claims.

Mitchell
Silberberg &
Knupp LLP

2952860.6

22          CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Grand Theft*, 251 F.R.D. at 150.  California simply has no interest, let alone a significant one, in seeing its materially different laws applied to persons who purchased Hitachi-brand LCD RPTVs in other states.

This is true, and dispositive, even if significant contacts existed.

### (iii)    CA Decisions Declining to Certify Nationwide Class

Courts, in California, have repeatedly denied certification on this basis.  *See, e.g.*, *Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 487 (S.D. Cal. 2009) ("Plaintiffs have failed to show that application of California law to a nationwide class is appropriate."); *Sweet v. Pfizer*, 232 F.R.D. 360, 372 (C.D. Cal. 2005) (Plaintiffs' "one statement cannot combat Defendants' assertion and evidence that the application of 51 different standards for each claim make this case inappropriate for class certification."); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (2003) ("the differing standards of liability required by laws of various states preclude a finding that common questions of law predominate").

### (iv)    Nationwide Warranty Class Actions Consistently Denied

These California decisions are in accord with opinions throughout the country:

> [T]he states have diverse bodies of law on warranty and negligent misrepresentation, and each state has its own CPL.  The state laws on these claims present different procedural and substantive elements, including differing requirements of privity, demand, scienter, and reliance.  In addition, bringing the case under the Magnuson-Moss Act does not make uniform the plaintiffs' warranty claims because liability under that Act depends on state law which differs on issues of express and implied warranties….Common questions of law do not predominate in this case.

*Kaczmarek*, 186 F.R.D. at 312-13; *see also, e.g.*, *Dex-Cool*, 241 F.R.D. at 324 ("variations in state law presented by this case defeat predominance").

### (v)    Material Differences Are Dispositive

Plaintiffs only option then is to "credibly demonstrate, through a thorough analysis of the applicable state laws, that state variations will not swamp common issues and defeat predominance."  *Wash. Mut.*, 24 Cal.4th at 926.  But Plaintiffs do not even try to do so.  Nor could they succeed if they had.  *See supra* at 21.

2. **Manageability, Superiority and Subclassing**

The same individual factual and legal issues that defeat predominance equally preclude a finding that the proposed class is manageable or superior. *See, e.g.*, *Utility*, 259 F.R.D. at 488 ("Instructing a jury on varying standards and legal theories is not as simple as plaintiffs suggest…. The class would be far too large to reasonably manage…."); *Paxil*, 212 F.R.D. at 551 ("It is obvious that the proposed trial plan would not be superior….The risk of jury confusion, when taken together with the risk of improperly grouping different states' law, outweighs any possible advantages…."); *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679 (S.D. Cal. 1999) ("When individualized determinations must be made, and then applied under the gamut of state law, class certification would provide massive manageability problems for a court.").

The sheer weight and volume of such issues also **preclude** the conclusion that state law differences, model differences, unit differences, and the myriad installation, environmental, maintenance, and usage differences can be addressed through subclassing. *See, e.g.*, *Utility*, 259 F.R.D. at 488 ("The class would be far too large to reasonably manage, and there would be several different state laws that would apply to different subclasses."); *Bridgestone*, 288 F.3d at 1018-19 (noting proposed class would be unmanageable even on a statewide level due to individual factual differences).

## VI. ALLEGED SPOLIATION

Plaintiffs' reference, Motion at 3, to the "spoliation" of evidence is pure makeweight.

Mr. Koji Kato, a quality assurance manager at the factory in Mexico that assembled the televisions ("HIMEX"), ceased working on LCD RPTV issues in April 2007 and left HIMEX at the same time – **well before this litigation was filed.** When Mr. Kato departed his position at HIMEX, he decided, for his own purposes, to make a copy of all of his work files to bring back to Japan. He made this copy himself on an external hard disk drive that he purchased. Mr. Kato then stored these files at his home (in violation of company policy), while repeatedly certifying to Hitachi, Ltd. in person and **in writing** that he did not have any work files at home. Mr. Kato told no one about these files or his plans to delete them. Indeed, Mr. Kato reiterated to counsel that he did not possess them the very same day (June 3, 2010) he deleted them. Mr. Kato deleted these

Mitchell
Silberberg &
Knupp LLP

2952860.6

24      CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   files for his own purposes, i.e., to cover up his prior violation of company policy in storing the

2   files at home, and **with full knowledge of Defendants' instructions** to preserve them.  Decl. of

3   K. Kato, ¶¶ 4-31, Ex. 4 to Pierce Decl.

4        Defendants promptly notified Plaintiffs, voluntarily produced Mr. Kato for a deposition

5   regarding the deletion, paid to forensically restore the deleted drive, restored 99.69% (or 20,438

6   out of 20,502) of the deleted files/folders, demonstrated to Plaintiffs that the 64 unrecoverable

7   files/folders were irrelevant or insignificant (based on date or file title – e.g., unrelated products),

8   and are in the process of reviewing and producing the recovered documents.  Pierce Decl., ¶¶ 6a-

9   6e and Exs. 5-9.

10        Kato's actions were unfortunate, but they are irrelevant to whether certification is proper.

11  **VII.**       **CONCLUSION**[18]

12        Plaintiffs' Motion for Class Certification should be denied.

13  DATED: October 1, 2010       SETH E. PIERCE
                             ALFREDO ORTEGA

14                             MITCHELL SILBERBERG & KNUPP LLP

15

16                       By: _s/ Seth E. Pierce_____
                             Attorneys for Defendants; Email:  sep@msk.com

17

18

19

20

21

22

23  [18] Defendants have purposefully avoided defending the LCD RPTV designs – because the
ultimate claims are not at issue at the certification stage.  *Eisen v. Carlisle & Jacquelin*, 417 U.S.

24  156, 178 (1974).  Defendants' decision to follow the rules should not be equated with ambivalence
about its defenses on the merits.  Defendants firmly believe they would prevail on the merits –

25  factually and legally.  *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008)
(proposed notebook computer class action; allegedly defective cooling system; "[T]he failure to

26  disclose a defect that might, or might not, shorten the effective life span of [a product or part] that
functions precisely as warranted throughout the term of its express warranty cannot be

27  characterized as causing a substantial injury to consumers, and accordingly does not constitute an
unfair practice under the UCL."); *Long v. Hewlett-Packard Co.*, 2007 WL 2994812, at *6-7 (N.D.

28  Cal. July 27, 2007) (allegedly defective laptops; same conclusion under CLRA).

Mitchell
Silberberg &
Knupp LLP

2952860.6

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**CERTIFICATE OF SERVICE (CM/ECF)**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I hereby certify that on October 1, 2010, I electronically filed the foregoing documents entitled (1) DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; (2) DECLARATIONS OF S. PIERCE, N. KAKU, N. OGURA, T. MOCHIZUKI, W. WARREN, W. WHALEN, T. OMAR, AND R. DAVIS IN SUPPORT OF OPPOSITION; (3) EXPERT REPORT OF ABID KAMEL; AND (4) REQUEST FOR JUDICIAL NOTICE with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following email address(es): jczeisler@milberg.com; jkoncius@lange-koncius.com; jlange@lange-koncius.com; rlax@lax-law.com; clayrobbinsiii@yahoo.com; debra.mcmullen@yahoo.com; psafirstein@milberg.com; wimsatt@earthlink.net; info@mcmc-law.com.

DATED:  October 1, 2010                    SETH E. PIERCE
                                           ALFREDO ORTEGA
                                           MITCHELL SILBERBERG & KNUPP LLP


                                           By: /s Seth E. Pierce
                                           Attorneys for Defendants, Hitachi Home
                                           Electronics (America), Inc., Hitachi
                                           America, Ltd., and Hitachi, Ltd.
                                           Email:  sep@msk.com

Mitchell
Silberberg &
Knupp LLP

2952860.6

26          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION