SETH E. PIERCE (SBN 186576), sep@msk.com
ALFREDO ORTEGA (SBN 261961), axo@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HITACHI TELEVISION OPTICAL BLOCK CASES<br><br>This Document Relates To: All Actions | Master File No. 08cv1746 DMS (NLS)<br><br>The Honorable Dana M. Sabraw<br>Magistrate Judge Nita Stormes<br><br>**DEFENDANTS' SUR-REPLY TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

## I. INTRODUCTION

Plaintiffs seeking to certify a consumer class action must demonstrate factual cohesion.

Plaintiffs and their expert, Mr. Amador, contend that, like the "single, defective alignment geometry" claim in *Wolin,* the LCD RPTVs contain a "single characteristic defect" that satisfies the factual cohesion requirement. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1176 (quote), 1173-74 (discussion) (9th Cir. 2010); Reply at 6:28-7:4, ECF 128; Amador Reply Decl. ("Amador Reply") at 1:10-12, ECF 129 (explaining alleged defect).

Amador asserts that the "single characteristic defect" is the televisions' purported inability "to mitigate the excess heat" and UV/IR radiation "emitted by the lamp." Amador Reply at 1:10-12. Amador believes that all of the televisions lack "provisions to mitigate the intense heat and light," and that all will fail prematurely as a result. *Id.* at 5:24-26.

Defendants' evidence, however, demonstrates that the capacity of the **37 different television models and hundreds of different production configurations** to generate, dissipate, and withstand heat and light **is not uniform**. There is no single geometry or defect as there was in *Wolin*. To the contrary, Plaintiffs' proposed class covers hundreds of different design configurations (and, thus, defective design and failure to disclose claims), making it completely unsuitable for sample-based, representative adjudication. *See* Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Opp.") at 12, ECF 109 (collecting cases).[1]

## II. PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO COMMON PROOF

Amador's Reply Declaration does not dispute, at all, **the existence** of the design and production differences painstakingly identified and detailed in Defendants' Opposition and close to 3,000 pages of supporting evidence. *See, e.g.*, Amador Reply at 1:28 (three lamp manufacturers), 2:22 (100W and 120W lamps), 3:10-11 (noting that Defendants' expert "correctly observes that the number of polarizers … varies"), 3:19 (different base materials), 4:13-15 (discussing panel manufacturer and size); 5:28-6:1 (discussing variations in cooling components).

Amador contends that these variations only determine when, not whether, the televisions

---

[1] Plaintiffs contend that Defendants concede the existence of a "single characteristic design" and thus factual cohesion. Reply at 6:28-7:4. That is entirely false.

1   will fail. *See, e.g.*, Amador Reply at 2:25-26 (defective regardless of lamp manufacturer/wattage),
2   3:17-19 (polarizers will fail regardless of "glass or quartz substrate" mounting), 1:17-20 ("Dr.
3   Kemal merely discusses how quickly the televisions will in fact fail").

4   But that misses the point. All televisions – indeed, all products – eventually fail. Plaintiffs'
5   complaint is that the LCD RPTVs fail **prematurely** because they do not "mitigate the excess heat"
6   and UV/IR radiation "emitted by the lamp." Amador Reply at 1:10-12. The critical question is
7   whether that claim – **for all the various models and configurations** – is subject to common proof.

8   Plaintiffs and Amador first try to argue that common proof is viable because the design
9   variations identified are "peripheral elements of the Optical Engine" Reply at 1:13. But this is an
10  excess heat case. The number of fans, where the fans are positioned, how much air the fans blow,
11  the size of the air openings, the efficiency of the ducting, the size of the heat generating lamp, the
12  number and location of polarizers, polarizer/panel surface area, the heat conductivity of the
13  components, etc., are not peripheral – they are the focus of Plaintiffs' defective design claim.

14  Plaintiffs and Amador next try to surmount the identified differences by characterizing the
15  alleged defect as "forced air cooling" – because all the televisions use forced air cooling. Amador
16  Reply at 1:13-14 ("forced air cooling without adequate airflow"). But, as demonstrated in
17  Defendants' Opposition, and particularly the Declarations of N. Ogura and N. Kaku, and Dr.
18  Kemal's Report, each television's capacity to generate, dissipate, and withstand heat varied
19  **considerably.** It is Defendants' specific designs (plural) that are on trial, not the general concept
20  of forced air cooling. Those specific designs **are not** subject to common proof and evaluation.

21  Plaintiffs and Amador finally argue that the identified differences are immaterial.

22  First, whether each design, with all the differences noted, properly generates and dissipates
23  heat (i.e., whether the design differences are material enough) would be the focus of trial. The
24  certification inquiry does not ask whether the differences will be sufficient – that goes to the
25  merits – but whether the different designs/configurations can be assessed through common
26  evidence. They can not. Each design – each set of differences – must be evaluated separately.

27  Second, Plaintiffs and Amador have the burden of demonstrating that the models and
28  configurations are materially identical. Amador's unsupported assertions are insufficient –

Mitchell
Silberberg &
Knupp LLP
3193822.6

2     CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' SUR-REPLY

1   especially when compared to Defendants' extensive evidence to the contrary.

2       **A.    COOLING SYSTEM**

3       Defendants demonstrated numerous differences relating to the cooling system and the

4   material impact those differences would have on heat within the optical engine:

5   - The LCD RPTVs utilized 2, 3, 4, or 5 cooling fans – the exact number and location
6   varying by design. Opp. at 16:6-16:20.

7   - The LCD RPTV models had different size fans (60 to 100mm), different size air-
8   intake openings (approximately 3 to 25 square inches), different sources of cooling
9   air (upper vs. lower cabinet), different types and numbers of filters and different fan
10   blade rotation speeds (1800 to 3750 revolutions per minute). Opp. at 16:22-17:20.

11   - The LCD RPTV models' air flow ducting varied considerably in size, shape, and
12   layout. Opp. at 17:22-18:1.

13   Amador devotes one-paragraph (in his 6-page Reply Declaration) to these critical differences –

14   conclusorily dismissing them as "irrelevant." Amador Reply at 5:27-6:9. But Amador's

15   unsupported conclusion does not satisfy Plaintiffs' burden or trump Defendants' evidence.

16       **B.    LAMPS:  WATTAGE AND MANUFACTURER**

17       Defendants demonstrated that the LCD RPTV's lamp's wattage varied by optical engine

18   design and that this one change could lead to a 35% difference in projected life. Opp. at 14:10-17.

19   Amador acknowledges that higher wattage lamps will radiate "more energy," but suggests without

20   citation that the amount of heat/radiation impacting the optical engine parts will be "substantially the

21   same." Amador Reply at 2:19-22. Defendants' evidence, **including a design study demonstrating**

22   **a material increase in temperature and radiation**, disproves Amador's unsupported assertion of

23   substantial similarity. Ogura Decl., ¶ 17a(i)(b) at 10, ECF 109-5, and Ex. 4.

24       Defendants demonstrated that three different lamp manufacturers were utilized, and that

25   differences in the manufacturer's proprietary arc designs can generate different levels of heat at

26   the same wattage level. Opp. at 14:19-28. Amador suggests that that the heat output will be

27   "substantially the same regardless of who manufactures" the lamp. Amador Reply at 2:2-3. But

28   Defendants' evidence, **including a design study demonstrating an increase in temperature**

1  **from switching lamp manufacturers ,** prevails over Amador's vague, unsubstantiated references
2  to the "laws of physics and engineering principles." *Compare* Ogura Decl., ¶ 17a(ii)(b) at 11
3  (study) *with* Amador Reply at 2:4-5.[2]

### C. PANELS AND POLARIZERS

Defendants demonstrated that the number and configuration of polarizers varied by optical engine design, and how this would affect the temperature and temperature-related failure of those parts. Opp. at 15:2-13. Amador dismisses Defendants' evidence, but his new assertions contradict his prior deposition testimony. *Compare* Amador Reply at 3:25-4:4 *with* Amador Tr. 176:8-177:6 ("[I[f I include two input polarizers … I will double the life of the polarizer functionality? A. You might extend it. I don't know if you would double it….I'm not sure how much you'd gain….Q. But it could be a substantial extension? A. It could…"), Ex. 2 to Pierce Decl., ECF 109-2.[3]

Defendants demonstrated how the size and composition of the polarizer base material varied by optical engine design, and the temperature impact these differences would have on the polarizers themselves. Opp. at 15:15-26. Amador does not respond, other than to note in passing that the polarizers "can be harmed even if mounted on a glass or quartz substrate." Amador Reply at 3:18-19. But Amador's "rebuttal" does not address Defendants' core point – that heat conductivity, and thus the time to "harm," varies by base material composition and size.

Defendants demonstrated that the size and surface area of the polarizers and LCD panels varied by optical engine design, and the significant temperature impact of even small differences in surface area. Opp. at 15:28-16:4. Amador responds, without support, that the size difference would make "no practical difference." Amador Reply at 4:26-27.

### D. OTHER VARIATIONS

Defendants demonstrated why component density matters and how it varied by optical

---

[2] Amador's basic description of how mercury lamps generally work is inapposite because it is based on the supposition that UHP lamps only contain mercury plasma. But mercury lamps contain several elements that vary by manufacturer and affect the spectrum.

[3] Amador's new conclusions also appear internally inconsistent *Compare* Amador Reply at 3:27-28 ("Hitachi made efforts to minimize the amount of light energy the input polarizers absorb…") *with* 4:5-6 ("the first polarizer … is always subject to harm from the full amount of light energy").

engine design.  Opp. at 18:3-14.  Defendants also demonstrated the existence of running (production line) changes and the impact these changes would have on optical engine temperature (e.g., closing air vents).  Opp. at 18:18-19:10.  Defendants finally demonstrated the impact that environment, installation, and usage practices could have on longevity.  Opp. at 19:12-18. Amador does not address this evidence at all.[4]

### E. AMADOR'S REPLY CONTRADICTS HIS PRIOR TESTIMONY

Amador's terse, late, and wholly unsupported Reply Declaration also directly contradicts his own prior deposition testimony that the only way to assess the temperature impact of a design difference is to measure it through testing -- testing Hitachi, Ltd. performed, and Amador did not:

```
Q   Can you know generally or estimate without conducting tests?
A   You would want to conduct a test for each device or for each
    system, that's how you would know it.
Q   Can you estimate it without conducting a test?
A   That would -- no.  It's -- it varies from one device to the next
    and one system to the next….
Q   But you didn't perform any tests yourself?
A   No, I did not.
```

Amador Tr. at 69:19-70:7, Ex. 2 to Pierce Decl.

### III. CONCLUSION

Factual cohesion ensures due process for the absent class, *res judicata* for the defendant, and judicial manageability.  Plaintiffs must demonstrate the feasibility of trial by common proof to ensure that the adjudication of one claim is the functional equivalent of adjudicating them all.  Plaintiffs have failed to meet their burden.

DATED: November 22, 2010

SETH E. PIERCE
ALFREDO ORTEGA
MITCHELL SILBERBERG & KNUPP LLP

By: /s Seth E. Pierce
    Seth E. Pierce
    Attorneys for Defendants

---

[4] Plaintiffs contend that Defendants' unit level evidence runs afoul of *Wolin*.  Reply at 5:15-23. But *Wolin* expressly recognizes that where the premature failure claim "requires proof specific to that individual litigant" – e.g., whether the tire failed prematurely due to the single, geometry defect or other factors specific to the user – "the predominance test" is not "easily satisf[ied]." *Wolin*, 617 F.3d at 1174 (casting doubt on whether "Tire Warranty" claim could be certified).

## CERTIFICATE OF SERVICE (CM/ECF)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I hereby certify that on November 22, 2010, I electronically filed the foregoing documents entitled **Defendants' Sur-Reply to Plaintiffs' Motion for Class Certification** with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following email address(es):   jczeisler@milberg.com; jkoncius@lange-koncius.com; jlange@lange-koncius.com; rlax@lax-law.com; eric@hop-law.com; clayrobbinsiii@yahoo.com; debra.mcmullen@yahoo.com; psafirstein@milberg.com; wimsatt@earthlink.net; and info@mcmc-law.com

DATED:  November 22, 2010

SETH E. PIERCE
ALFREDO ORTEGA
MITCHELL SILBERBERG & KNUPP LLP


By: /s Seth E. Pierce
Attorneys for Defendants, Hitachi Home Electronics (America), Inc., Hitachi America, Ltd., and Hitachi, Ltd.
Email:  sep@msk.com