1  SETH E. PIERCE (SBN 186576), sep@msk.com
   ALFREDO ORTEGA (SBN 261961), axo@msk.com
2  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
3  Los Angeles, California 90064-1683
   Telephone: (310) 312-2000
4  Facsimile: (310) 312-3100

5  Attorneys for Defendants

6

7

8               UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11                                    | Master File  No.  08 CV 1746 DMS (NLS)

12                                    | Judge Dana Sabraw
                                      | Magistrate Judge Nita Stormes
13 IN RE HITACHI TELEVISION OPTICAL
   BLOCK CASES                        | **[REDACTED COPY OF SEALED]**
14
                                      | **DEFENDANTS' OPPOSITION TO**
15      This document relates to: All Actions | **PLAINTIFFS' RENEWED MOTION FOR**
                                      | **CLASS CERTIFICATION**
16
                                      | Date:        04-22-2011
17                                    | Time:        1:30 p.m.
                                      | Courtroom:   10
18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

3529148.10

CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................................... 1

II.    CLAIM/PROPOSED CLASS .......................................................................... 2

III.   TEMPERATURE/RADIATION AND THE ALLEGED IMAGE
       PROBLEM ..................................................................................................... 3

       A.     Heat and Light Energy ....................................................................... 3

       B.     Polarizer and LCD Panel Heat Sensitivity ........................................ 4

       C.     Alleged Causation .............................................................................. 5

IV.    PLAINTIFFS DO NOT AND CANNOT DEMONSTRATE CLASS
       ELEMENTS ................................................................................................... 5

       A.     Common Factual Issues Do Not Predominate ................................... 5

              1.     Predominance Inquiry in Single-State Warranty Class
                     Actions Focuses On Model Differences, Human Factors, and
                     Member Specific Claim Elements ............................................ 6

                     a.     Case Law Regarding Model AND Configuration
                            Variations ...................................................................... 6

                     b.     Human/Environmental Factors Case Law ...................... 6

                     c.     Individual Claim Elements Case Law ............................ 7

              2.     Wolin v. Jaguar Decision And Plaintiffs' Other Cited
                     Decisions ................................................................................. 7

              3.     Applying the Law To The Current Claims ................................ 8

                     a.     LEVEL ONE:  Model Design Differences ..................... 9

                            (i)     Lamp Wattage ................................................... 9

                            (ii)    Lamp Manufacturer ......................................... 10

                            (iii)   Number And Location Of Polarizers ................ 11

                            (iv)    Polarizer Base Material And Base Material
                                    Size ................................................................. 11

                            (v)     Polarizer/Panel Surface Area .......................... 12

                            (vi)    Number And Location Of Cooling Fans ........... 12

                            (vii)   Fan Size, Air Opening Size and RPMs ............. 13

                            (viii)  Air Source ...................................................... 13

i     CASE NO.  08 CV 1746 DMS (NLS)

Mitchell
Silberberg &
Knupp LLP

3529148.10

# TABLE OF CONTENTS
## (continued)

**Page(s)**

(ix) Internal Cooling Configuration ........................................... 14

(x) Design Density ................................................................. 14

b. LEVEL TWO:  Model Configurations AKA Running Changes ................................................................. 15

c. LEVEL THREE:  Human Factors ................................................ 16

d. LEVEL FOUR:  Class Member Specific Elements Of The Claim ................................................................. 17

(i) Failure ............................................................... 17

(ii) Warranty, Warranty Period And Breach ........................... 17

(iii) Reliance ............................................................. 18

(iv) Various Defenses .................................................... 21

4. Manageability, Superiority And Subclassing ............................. 22

5. Plaintiffs' Rebuttal ....................................................... 22

6. Plaintiffs' Burden Unsatisfied .......................................... 23

V. KATO FILE DELETION ................................................................. 24

A. Plaintiffs' "Motion" for sanctions In FN 7 Is Improper ....................... 24

B. Alleged Spoliation Is Not Predominate, Common Issue ........................ 25

VI. CONCLUSION ............................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

3529148.10

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Akkerman v. Mecta Corp., Inc.*,
    152 Cal. App. 4th 1094 (2007)....................................................................... 20

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................... 1, 6

*Benner v. Becton Dickinson & Co.*,
    214 F.R.D. 157 (S.D.N.Y. 2003)................................................................... 23

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975)....................................................................... 21

*Broberg v. The Guardian Life Ins. Co. of Am.*,
    171 Cal. App. 4th 912 (2009)....................................................................... 21

*Caro v. Procter & Gamble Co.*,
    18 Cal. App. 4th 644 (1993)................................................................... 19, 20

*Cartwright v. Viking Indus., Inc.*,
    2009 U.S. Dist. Lexis 83286 (E.D. Cal. Sept. 11, 2009).................................... 8

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005)................................................................... 8, 17

*City of St. Petersburg v. Total Containment, Inc.*,
    265 F.R.D. 630 (S.D. Fla. 2010) ............................................................ 18, 22

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008)..................................................................... 18

*Cohen v. Directv, Inc.*,
    178 Cal. App. 4th 966 (2010)....................................................................... 20

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006)......................................................................... 8

*Daugherty v. Am. Honda Motor Co., Inc.*,
    144 Cal. App. 4th 824 (2006)....................................................................... 17

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................... 23

*Frosini v. Bridgestone Firestone N. Am. Tire, LLC*,
    2007 WL 2781656 (C.D. Cal. Aug. 24, 2007).................................................. 6

Mitchell
Silberberg &
Knupp LLP

3529148.10

iii      CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

<div align="center">

**TABLE OF AUTHORITIES**
**(continued)**

</div>

2

3

<div align="right">

**Page(s)**

</div>

4

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ............................................................................... 23

5

*Hamilton v. O'Connor Chevrolet, Inc.*,
    2006 WL 1697171 (N.D. Ill. June 12, 2006) ...................................... 19

6

7

*Heisler v. Maxtor Corp.*,
    2010 WL 4788207 (N.D. Cal. Nov. 17, 2010) ................................... 17

8

*Hicks v. Kaufman*,
    89 Cal. App. 4th 908 (2001) ............................................................... 17

9

10

*Hoey v. Sony Elecs., Inc.*,
    515 F. Supp. 2d 1099 (N.D. Cal. 2007) ............................................ 17

11

12

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ................................................................ 6

13

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ........................................................ 6, 22

14

15

*In re Firearm Cases*,
    126 Cal. App. 4th 959 (2005) ............................................................. 19

16

17

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
    177 F.R.D. 360 (E.D. La. 1997) ........................................................... 6

18

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
    174 F.R.D. 332 (D.N.J. 1997) .......................................................... 5, 6

19

20

*In re Ford Motor Co. Vehicle Paint Litig.*,
    182 F.R.D. 214 (E.D. La. 1998) ...................................................... 6, 7

21

22

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*,
    170 F.R.D. 417 (E.D. La. 1997) ........................................................... 7

23

*In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982) .............................................................. 21

24

25

*In re Neurontin Mktg., etc.*,
    257 F.R.D. 315 (D. Mass. 2009) ........................................................ 21

26

27

*In re St. Jude Med., Inc.*,
    522 F.3d 836 (8th Cir. 2008) .............................................................. 21

28

Mitchell
Silberberg &
Knupp LLP

3529148.10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kaczmarek v. Int'l Bus. Machs. Corp.*,
 186 F.R.D. 307 (S.D.N.Y. 1999)...................................................................... 6, 7, 23

*Kearns v. Ford Motor Co.*,
 567 F.3d 1120 (9th Cir. 2009) ........................................................................... 19

*Keilholtz v. Lennox Hearth Prods. Inc.*,
 268 F.R.D. 330 (N.D. Cal. 2010) ...................................................................... 20

*Kwikset Corp. v. Superior Court*,
 51 Cal. 4th 310 (2011)................................................................................. 18, 19

*Long v. Hewlett-Packard Co.*,
 2007 WL 2994812 (N.D. Cal. July 27, 2007) ................................................ 17, 20

*Lymburner v. U.S. Fin. Funds, Inc.*,
 263 F.R.D. 534 (N.D. Cal. 2010) ....................................................................... 19

*Mass. Mutual Life Ins. Co. v. Superior Court*,
 97 Cal. App. 4th 1282 (2002)..................................................................... 8, 19, 20

*Mazza v. Am. Honda Motor Co.*,
 254 F.R.D. 610 (C.D. Cal. 2008) ......................................................................... 8

*Miranda v. S. Pac. Transp. Co.*,
 710 F.2d 516 (9th Cir. 1983) .............................................................................. 24

*Newton v. Merrill Lynch, etc.*,
 259 F.3d 154 (3d Cir. 2001) ............................................................................... 21

*O'Connor v. Boeing N. Am., Inc.*,
 197 F.R.D. 404 (C.D. Cal. 2000) ....................................................................... 21

*Oestreicher v. Alienware Corp.*,
 544 F. Supp. 2d 964 (N.D. Cal. 2008) ........................................................... 3, 17

*Parkinson v. Hyundai Motor Am.*,
 258 F.R.D. 580 (C.D. Cal. 2008) ................................................................ 7, 8, 21

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
 685 F. Supp. 2d 456 (S.D.N.Y. 2010) (Scheindlin, J.)................................. 24, 25

*Resolution Trust Corp. v. Deloitte & Touche*,
 822 F. Supp. 1512 (D. Colo. 1993) .................................................................... 25

Mitchell
Silberberg &
Knupp LLP

3529148.10

v    CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

<div align="center"><u>**TABLE OF AUTHORITIES**</u>
<u>(continued)</u></div>

<div align="right"><u>**Page(s)**</u></div>

*Sanbrook v. Office Depot, Inc.*,
2009 U.S. Dist. Lexis 30857 (N.D. Cal. March 30, 2009) ................................. 8

*Sanders v. Apple Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ...................................................... 7, 20

*Sanneman v. Chrysler Corp.*,
191 F.R.D. 441 (E.D. Pa. 2000) .............................................................. 6, 7

*Schwartz v. Upper Deck Co.*,
183 F.R.D. 672 (S.D. Cal. 1999) ................................................................ 22

*Smith v. Ga. Energy USA, LLC*,
259 F.R.D. 684 (S.D. Ga. 2009) ................................................................ 25

*Stearns v. Select Comfort Retail Corp.*,
2010 WL 2898284 (N.D. Cal. July 21, 2010) .......................................... 7, 18

*Util. Consumers' Action Network v. Sprint Solutions, Inc.*,
259 F.R.D. 484 .............................................................................................. 22

*Watkins v. U.S. Army*,
875 F.2d 699 (9th Cir. 1989) ..................................................................... 19

*Webb v. Carter's Inc.*,
2011 WL 343961 (C.D. Cal. Feb. 3, 2011) .......................................... 7, 20

*Wilens v. TD Waterhouse Group, Inc.*,
120 Cal. App. 4th 746 (2003) ....................................................................... 19

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ..................................................... 7, 8, 9, 17

<div align="center"><u>**STATUTES**</u></div>

28 U.S.C. § 2072 ............................................................................................ 19

Cal. Bus. & Prof. Code
§ 17208 .......................................................................................................... 21

Mitchell
Silberberg &
Knupp LLP

3529148.10

CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Cal. Civ. Code
§ 1783 .............................................................................................................. 21
§ 1791.1(c) ...................................................................................................... 18
§ 1792.4 ........................................................................................................... 21
§ 1792.5 ........................................................................................................... 21
§ 1794.3 ........................................................................................................... 21
§ 1795.5(c) ...................................................................................................... 18

Cal. Com. Code § 2725 ............................................................................................... 21

## OTHER AUTHORITIES

Charles Alan Wright *et al.*, *Federal Practice and Procedure*, § 1785 (Supp. 2002)...................... 6

Federal Rule of Civil Procedure
Rule 9(b)........................................................................................................... 19
Rule 23 ............................................................................................................. 19
Rule 23(b)(3) ...................................................................................................... 5

S.D. Cal. Local
Rule 7.1(e)(2) .................................................................................................... 24
Rule 7.1(f)(1)..................................................................................................... 24

Mitchell
Silberberg &
Knupp LLP

3529148.10

vii                    CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I.     **<u>INTRODUCTION</u>**

Plaintiffs have narrowed the geographic scope of the proposed class, but a fundamental, insurmountable obstacle to certification remains – the proposed class's lack of factual cohesion.

The class certification inquiry, at its core, asks whether the Court can hear evidence regarding one or a few claims, and on that limited basis, adjudicate the claims of the absent class. It follows that certification, or sample-based adjudication, is possible only if the representatives' and the class's claims are factually similar.  *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997) (class's claims must be "sufficiently cohesive").

Factual cohesion ensures fundamental fairness – due process for the absent class and *res judicata* for the defendant.  Factual cohesion also ensures judicial manageability, as any attempt to collectively litigate a multitude of disparate claims would quickly overwhelm the court and jury.

Plaintiffs **contend** that the proposed class's claims are factually cohesive because (i) their central claim is that the televisions fail prematurely due to excess heat/radiation, and (ii) the failure analysis is the same for all the televisions in the proposed class because they all utilize a mercury lamp, have internal, non-serviceable air filters, employ "fans as a means of cooling," and draw/expel cooling air through "inlet/outlet openings."  Pls.' Renewed Mot., ECF 158-1, at 8-9.

Plaintiffs' highly generalized description of the technology cannot mask the overwhelming factual variability that exists in this case – variability that exists on four distinct levels.

First, the proposed class covers **37 different television models** that, *inter alia*, (i) utilize different lamps that generate variable levels of heat/radiation based on wattage and bulb design, (ii) employ different numbers and configurations of heat-sensitive polarizers, that are themselves mounted on ███████ base materials of varying heat conductivity, (iii) make use of polarizers and LCD panels with different surface areas and thus heat absorption rates and tolerances, (iv) have different internal cooling layouts that incorporate variable numbers and sizes of cooling fans, and (v) have variously sized air-intake openings and different sources of cooling air.

Second, the proposed class covers **multiple, relevant configurations per model** due to "running changes" in the designs that were implemented during mass production – i.e., the last unit produced for a given model differed significantly from the first, with multiple interim

Mitchell
Silberberg &
Knupp LLP

3529148.10

1        CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

iterations.  The exact modifications implemented varied by model, but include, for example, changing the number of air ventilation slots and the volume of cooling air directed onto the optical components.  These sub-model configurations exponentially increase the number of "designs" that would need to be separately evaluated.

Third, **human factors**, such as whether the television was installed properly, how it was maintained, usage patterns, and the environmental conditions to which it was subjected, all bear on time to failure – which is the critical question.  These external, purchaser-specific factors would need to be evaluated on a class member by class member basis.

Fourth, the **statutory elements** of the claims asserted require numerous purchaser-specific factual and legal issues to be resolved to qualify each class member's entitlement to recovery – including, for example, (i) whether each claim is barred by applicable statutes of limitation?  (ii) whether the class member's television has actually failed?  (iii) whether the class member received an express warranty and from which defendant?  And so on.

Even now, after months of briefing, Plaintiffs barely discuss, let alone refute, the extensive design and configuration variations.  Rather, Plaintiffs and their expert blithely declare the televisions "materially identical."  Plaintiffs also continue to disregard the other factual variations that preclude the requisite cohesiveness – the human factors and threshold statutory elements.

But Plaintiffs have the burden.  Plaintiffs must demonstrate that adjudicating Ms. Markee's claim (i.e., her model, her particular model's configuration, her installation, etc.) will fairly and accurately adjudicate **all the rest**.  Plaintiffs must demonstrate this cohesiveness with evidence and analysis.  Unsupported, cursory assertions do not suffice.  But that is all Plaintiffs offer – yet again.

Defendants, by contrast, provide below and in their supporting declarations, extensive, **unrefuted** evidence of the relevance of model variations and other factors to the probability and timing of any heat-related failure – evidence that precludes common factual findings.  Defendants further demonstrate the numerous factual issues that require class member specific adjudication.

Where, as here, common factual findings are not possible, certification must be denied.

## II.   CLAIM/PROPOSED CLASS

Plaintiffs contend that heat and radiation generated by the lamp in Hitachi-brand LCD Rear

Mitchell
Silberberg &
Knupp LLP

3529148.10

2        CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1 Projection televisions ("LCD RPTV") prematurely degrade the televisions' polarizers and LCD

2 panels, causing the screen to display "bright blue and red haze, spots, and streaks."  Compl., ¶ 13,

3 ECF 11; *see* Decl. of S. Pierce ("Pierce Decl."), Ex. 1 (alleged examples).

4     Plaintiffs allege that their LCD RPTVs failed in this way after their warranty expired,[1] but

5 before the end of the LCD RPTVs' expected useful life.  Plaintiffs, in short, believe that their LCD

6 RPTVs should have lasted longer, that the LCD RPTVs' warranty time limitations are inadequate,

7 and that free warranty repair should be performed for the televisions' useful life.  *See* Pls.' Orig.

8 Mot. for Class Cert. at 8:10-13 (citing failure after 5 years); *see also* Compl., ¶¶ 3, 22, ECF 11.

9     Plaintiffs allege that all LCD RPTVs – all models/configurations, regardless of use – will

10 exhibit the same problem before the end of their expected useful life and propose to certify a class

11 of **all California purchasers** of the televisions.[2]  Pls.' Renewed Mot., ECF 158-1, at 1:14.

## III.   TEMPERATURE/RADIATION AND THE ALLEGED IMAGE PROBLEM

### A.   HEAT AND LIGHT ENERGY

14     The polarizers and LCD panels in the LCD RPTVs degrade with use **over time** – primarily

15 as a result of exposure to heat/radiation generated by the lamp.  Ogura Decl. I at 5-6;[3] Pls' Exp.

16 Amador Tr., Ex. 2 to Pierce Decl. ("Amador Tr.") at 49:2-5 ("temperature will shorten its

17 lifetime").  This degradation is normal.  Ogura Decl. I at 5:12-13.  When those parts are degraded

18 too much – when they wear out – they must be replaced or the television discarded.[4]  *Id.* at 5-6.

19     LCD RPTV lamps generate a material amount of heat during normal operation as a by-

20 product of light creation.  *See* Ogura Decl. I, Ex. 6 at 148 (████ lamp surface temperature).

21

---

22 [1] Plaintiffs do not allege that repairs were denied during the warranty term.  Compl., ¶ 15, ECF 11.

23 [2] Defendants assume the new proposed class covers all 37 Hitachi-brand LCD RPTV models.

24 [3] Mr. Ogura is offering two declarations in support of this opposition – (i) a slightly updated version of the declaration he submitted in the Fall (**"Ogura Decl. I"**), and (ii) a new declaration

25 that responds to the points raised in Mr. Amador's Reply Declaration (**"Ogura Decl. II"**).

26 [4] Plaintiffs try, spuriously, to make much of Defendants' assertion that the polarizers and LCD panels degrade with exposure to heat and radiation and will eventually fail.  But all products eventually wear out.  That does not render them defective or actionable.  *See Oestreicher v.*

27 *Alienware Corp.,* 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008), and other California cases cited, *infra*,

28 at p. 17 and n.15, expressly rejecting Plaintiffs' theory of liability under the UCL, FAL, and CLRA.

1   LCD RPTV lamps also generate and radiate ultraviolet (UV) and infrared (IR) radiation

2   during normal operation.  (UV and IR are invisible to the human eye.)  UV radiation's higher

3   energy photons attack molecular bonds that hold matter together.  IR radiation's lower energy

4   photons are not powerful enough to destroy molecular bonds, but increase temperature when they

5   are absorbed by a component (i.e., IR radiation is a source of heat).  *See* Kemal Rebuttal Rpt. for a

6   detailed discussion regarding light energy's composition and effect on polarizers and LCD panels.

7       **B.      POLARIZER AND LCD PANEL HEAT/RADIATION SENSITIVITY**

8   Polarizers and LCD panels are very sensitive to heat.  Pls.' Exp. Rpt ("Amador Rpt.") at

9   11; Amador Reply Decl. ("Amador Reply"), ECF 129, at 3:20 ("very sensitive to temperature").

10   The greater the heat, the shorter the life.  Ogura Decl. I at 5; Defs' Exp. Rpt. ("Kemal

11   Rpt.") at 19; Amador Tr. at 10:23-25 ("Q….hotter the temperature is the shorter the life span will

12   be?  A.  That is correct...."), 41:24-42:23, 43:11-20.

13   Any increase in heat will materially shorten the polarizers' and LCD panels' respective

14   lives.  *See* Decl. of T. Mochizuki ("Mochizuki Decl.") at 5 and Ex. 6 (discussing effect of █████

15   █████ ).  Decreases in temperature will similarly extend life.  Ogura Decl. I at 5; Amador Tr. at

16   10:13-22 ("life of the panel will extend if it's operated cooler").

17   Studies performed during design testing of the various LCD RPTVs evidence these points.

18   • A design modification study on the 50VF820, circa July 2005, determined that

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   • A design target life study on the 50VF820, circa September 2005, determined that

23   ██████████████████████████████████████████████████████

24   ████████████████████████████████████     ██████████████████████

25

___

26   [5] The difference actually would have been more significant, but for the fact that the proposed design change ██████████ the same polarizer's temperature ██████████ at a later point in the study (as the test

27   conditions changed to reflect anticipated use conditions over time).  This later decrease ameliorated some of the increased heat experienced earlier in its life.  If the ████████████████ had remained

28   constant, the overall reduction in life would have been far greater.  Mochizuki Decl. at 5 and Ex. 6.

Mitchell
Silberberg &
Knupp LLP

3529148.10

4        CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    Polarizers and LCD panels also are extremely sensitive to radiation.  Increases in IR

2    radiation exposure will increase component temperature.  Increases in UV radiation exposure will

3    degrade the components at the molecular level.[6]  Kemal Rebuttal Rpt. at 5; Amador Tr. at 134:11-

4    18.  Thus, just like temperature, increasing or reducing IR or UV radiation exposure will extend or

5    reduce component life.  *See* Ogura Decl. I at 6-7.

6    Studies performed during design testing of the LCD RPTVs evidence radiation's effect.

7    *See, e.g.*, Ogura Decl. I at 10 and Ex. 4 (discussing and attaching January 2004 design study on

8    60V715 which determined that ███████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   **C.    ALLEGED CAUSATION**

11   Plaintiffs' expert contends that heat- and radiation-induced polarizer and LCD panel failure

12   are the cause of the problems alleged.[7]  *See* Amador Rpt. at 12; Amador Reply, ECF 129, at 1:8-

13   17.  Thus, the capacity of the televisions to generate, dissipate, and withstand heat and radiation is

14   the central factual issue in this case.  But it is not appropriate for class adjudication, because the

15   myriad model and configuration variations, and customer-specific variables, preclude common

16   evaluation of the televisions' capacity to generate, dissipate, and withstand heat and radiation.

17   **IV.    PLAINTIFFS DO NOT AND CANNOT DEMONSTRATE CLASS ELEMENTS**

18   Class certification, pursuant to Federal Rule of Civil Procedure ("FRCP") 23(b)(3),

19   requires three separate, but related findings:  predominance, manageability, and superiority.

20   **A.    COMMON FACTUAL ISSUES DO NOT PREDOMINATE**

21   Where a single jurisdiction's law applies, the predominance inquiry examines the "factual

22   questions that qualify each class member's case[.]"  *In re Ford Motor Co. Ignition Switch Prods.*

23   *Liab. Litig.*, 174 F.R.D. 332, 339-40 (D.N.J. 1997).  The purpose is to determine "what will have

24   

25   [6] UV radiation, however, should only strike the **blue** polarizers and LCD panel, and IR radiation
     should only strike the **red** polarizers and LCD panel.  *See* Amador Tr. at 158:21-159:1 (explaining

26   that UV radiation is limited to the blue light path and IR radiation to the red light path).

27   [7] While Plaintiffs' refusal to permit forensic inspection of their televisions precludes definitive
     analysis, Plaintiffs' pictures (Ex. 1 to Pierce Decl.) are consistent with the blue-path LCD panel or

28   polarizer (or both) failing – most likely due to excess heat.  Ogura Decl. I at 5 (probable cause).

Mitchell
Silberberg &
Knupp LLP

3529148.10

1  to be proved at trial" and "whether those matters can be presented by common proof."  7B Charles

2  Alan Wright *et al.*, *Federal Practice and Procedure*, § 1785 (Supp. 2002); *Ford Ignition Switch*,

3  174 F.R.D. at 345 n.6 ("assessing the evidentiary paths that a trial on the merits would likely traverse"

4  critical to inquiry).  There is no bright line test.  *Amchem*, 521 U.S. at 623 (class's claims must be

5  "sufficiently cohesive").  But the fundamental question is clear – can a court hear evidence

6  regarding one or a few claims, and on that limited basis, adjudicate the remainder?

### 1.   Predominance Inquiry in Single-State Warranty Class Actions

8  The considerations upon which this decision turns in single-state warranty cases are well

9  established.  Plaintiffs must demonstrate that design/configuration differences and human factors

10  (e.g., environment, usage) are immaterial **and** that the claim elements do not require individual

11  proof.  If Plaintiffs fail to make that showing, or Defendants' evidence demonstrates the opposite,

12  common issues do not predominate and certification must be denied.

### a.   Case Law Regarding Model AND Configuration Variations

14  Cases denying or reversing certification on the basis of model design or configuration

15  differences are common.  *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th

16  Cir. 2002) ("[T]he class certification order comprise[s] 67 master tire specifications…preclud[ing]

17  any finding 'that the questions of law or fact common to the members of the class predominate'").[8]

### b.   Human/Environmental Factors Case Law

19  Cases denying certification on the basis of human factors, including environmental

20  considerations and customer usage, are equally common.  *See, e.g., Bronco II Litig.*, 177 F.R.D. at

21  373 (car roll-over class; individual "environmental factors" and "differences in vehicle

22

---

23  [8] *See also, e.g., Kaczmarek v. Int'l Bus. Machs. Corp.*, 186 F.R.D. 307, 310-12 (S.D.N.Y. 1999)
("detailed factual inquiry into the differences between…models" precludes certification);
24  *Sanneman v. Chrysler Corp.,* 191 F.R.D. 441, 450 (E.D. Pa. 2000) ("hundreds of makes and
models"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1081 (6th Cir. 1996) ("ten different models,
25  and…these models have been modified over the years"); *In re Ford Motor Co. Vehicle Paint
Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998) ("This case does not involve…a simple, fungible
26  product.  Rather, Ford's challenged course of conduct span[s]…different models of vehicles, made
of different materials…."); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 372
27  (E.D. La. 1997) ("varying configurations…all of which can affect the stability index"); *Frosini v.
Bridgestone Firestone N. Am. Tire, LLC*, 2007 WL 2781656, at *15 (C.D. Cal. Aug. 24, 2007)
28  ("75 different populations of tires, differing in design, size and capacities").

Mitchell
Silberberg &
Knupp LLP

3529148.10

1  maintenance and use by individual consumers…can affect the handling and stability").[9]

2  **c.     Individual Claim Elements Case Law**

3  Also common are cases denying certification where one or more elements of the claim will

4  require class member by class member fact finding and adjudication.  *See, e.g.*, *Webb v. Carter's*

5  *Inc.*, 2011 WL 343961, *12 (C.D. Cal. Feb. 3, 2011) ("materiality and reliance would vary from

6  consumer to consumer" precluding certification of CLRA and UCL claims); *Stearns v. Select*

7  *Comfort Retail Corp.*, 2010 WL 2898284, at *20 (N.D. Cal. July 21, 2010) ("warranty claims

8  involve elements that are individual to each purported class member, such as the provision of

9  notice, an opportunity to cure, and reliance.").[10]

10  **2.     Wolin v. Jaguar Decision and Plaintiffs' Other Cited Decisions**

11  *Wolin v. Jaguar*, a recent decision from the Ninth Circuit, is fully in accord.

12  In *Jaguar*, plaintiffs proposed to certify a class of Michigan and Florida purchasers of

13  2004-2006 model year Land Rover LR3 SUVs.  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

14  F.3d 1168, 1170-71 (9th Cir. 2010).  Plaintiffs alleged that an admitted, "single, defective

15  alignment geometry" caused a rough ride and premature wear of the automobile's tires, and

16  asserted various claims.  *Id.* at 1173, 1176.

17  The Ninth Circuit stated that Plaintiffs' claim that Jaguar knew of, failed to disclose, and

18  failed to remedy upon demand a "single, defective alignment geometry" that existed in all the

19  LR3s produced could proceed on a class basis, but that "[c]laims for breach of the Tire Warranty

20

21  [9] *See also, e.g., Sanneman*, 191 F.R.D. at 451 (car paint peeling case; "Even if ultraviolet rays are

22  the root cause of [the problem], a determination will nonetheless be necessary, for each vehicle, as to whether any other factors contributed to the [problem]."); *Ford Vehicle Paint*, 182 F.R.D. at 220 (paint peeling case; "the environmental factors to which the vehicles were exposed" and "how

23  individual drivers used their vehicles" preclude factual predominance); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 425 (E.D. La. 1997) (home siding;

24  "Location and climate around [the] plaintiffs' homes [were] also likely to be varied factors.  They [would] affect moisture absorption, and go directly to the generalized claim of generic product

25  defect" and thus the ability to rule on common proof); *Kaczmarek*, 186 F.R.D. at 312 (computer card case; "outside problems such as line noise, receiving modem problems, and internet problems

26  may have caused the[] problems [at issue].").

27  [10] *See also, e.g., Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) ("fraud and warranty claims…rarely are certified."); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 595

28  (C.D. Cal. 2008) ("a host of individual questions regarding warranty coverage preclude a finding that common questions…predominate.").

Mitchell
Silberberg &
Knupp LLP

3529148.10

[due to premature wear] do not easily satisfy the predominance test" due to variables that would affect the causation analysis:

> A determination whether the defective alignment caused a given class member's tires to wear prematurely requires proof specific to that individual litigant….Whether each proposed class member's tires wore out, and whether they wore out prematurely and as a result of alleged alignment defect, are individual causation and injury issues….

617 F.3d 1168, 1174 (9th Cir. 2010).  The *Jaguar* case was remanded for further proceedings.

*Jaguar*, thus, reflects the class action paradigm or dichotomy:  single defect claims that are subject to common proof can be certified, whereas multiple-causation claims that lack factual cohesion (e.g., numerous models/configurations, human factors) cannot be certified.

Plaintiffs' other case citations are likewise fully consistent with this paradigm.  In each, the court confronted a single, uniform claim and granted class certification on that basis:

- In *Cartwright v. Viking Indus., Inc.*, 2009 U.S. Dist. Lexis 83286, *39-40 (E.D. Cal. Sept. 11, 2009), the plaintiffs alleged that the class's windows had a uniform defective corner geometry and utilized an ineffective sealant.

- In *Mass. Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1286 (2002), the plaintiffs alleged that the insurer defendant sold vanishing premium insurance policies – where the premium is paid from policy dividends – without disclosing the insurer's expectation that yields/dividends would decline.[11]

Defendants' case citations, discussed *supra*, also fit this paradigm.  In each, the court confronted multiple models, or configurations, or relevant human factors, or individual claim elements, or all four, that precluded factual cohesion, and denied certification on that basis.

### 3.    Applying the Law to the Current Claims

"[C]lass actions typically involve complex facts that are unlikely to be on all fours with existing precedent."  *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005).  The

---

[11] *See also Sanbrook v. Office Depot, Inc.*, 2009 U.S. Dist. Lexis 30857, at *2-3 (N.D. Cal. March 30, 2009) (single marketing brochure); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (single model, Mercury Villager, "same throttle body"); *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 615 (C.D. Cal. 2008) (single model, Acura RL, single braking system); *Parkinson v. Hyundai Motor Am., Inc.*, 258 F.R.D. 580, 585 (C.D. Cal. 2008) (single model/model year).

Mitchell
Silberberg &
Knupp LLP

3529148.10

8       CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    question is whether, here, we have a single defect claim or a collection of disparate claims.

2        Plaintiffs and their expert, Mr. Amador, contend that, like the "single, defective alignment

3    geometry" claim in *Jaguar,* the LCD RPTVs contain a "single characteristic defect" that satisfies

4    the factual cohesion requirement.  *See Jaguar*, 617 F.3d at 1176 (quote), 1173-74 (discussion);

5    Amador Reply, ECF 129, at 1:10-12 (explaining alleged defect).

6        Amador asserts that the "single characteristic defect" is the televisions' purported inability

7    "to mitigate the excess heat" and UV/IR radiation "emitted by the lamp."  Amador Reply, ECF

8    129, at 1:10-12.  Amador believes that all of the televisions lack "provisions to mitigate the intense

9    heat and light," and that all will fail prematurely as a result.  *Id.* at 5:24-26.

10       Defendants' evidence, however, demonstrates that the capacity of the LCD RPTVs to

11   generate, dissipate, and withstand heat and light **is not uniform**.  There is no single geometry or

12   defect to evaluate – no single claim to adjudicate.  Each model, configuration, usage pattern, and

13   claim must be separately evaluated.  This variability exists on four distinct levels.

### a.    LEVEL ONE:  Model Design Differences

15       The **first level** concerns material model design differences among the subject LCD RPTVs.

### (i)    Lamp Wattage

17       First, it is **undisputed** that the wattage of the LCD RPTV's lamp varied by optical engine

18   design – ████████████  Ogura Decl. I at 10:21-28 (chart); Amador Reply, ECF 129, at 2:25-28.

19   The wattage of the lamp matters because a ██████ lamp generates more light and heat than a ██

20   ██ lamp.  Amador Tr. at 235:10-25; Kemal Rpt. at 40; Ogura Decl. II at 4:19-25.  Design-stage

21   tests performed by Hitachi, Ltd. demonstrate that this one change can lead to an approximately

22   ██████████ in projected LCD panel life.  Ogura Decl. I at 10:4-14 and Ex. 4 (study).

23       Mr. Amador downplayed this variable at his deposition, but could not quantify its impact.

24   Amador Tr. at 237:22-238:8.  Later, in his Reply Declaration, Amador indicated, without citation,

25   that the amount of heat/radiation impacting the optical engine parts will be "substantially the

26   same" regardless of lamp wattage.  Amador Reply, ECF 129, at 2:17-19.  But Defendants'

27   evidence, including the referenced design test, disproves Amador's unsupported assertion of

28   substantial similarity.  Ogura Decl. I at 10:4-14 and Ex. 4 (study); Ogura Decl. II at 18:1-19:17.

Mitchell
Silberberg &
Knupp LLP

3529148.10

9       CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1     (Ogura Decl. II contains a **detailed rebuttal** of each of the points discussed in Amador's Reply.)

2                    **(ii)**      **Lamp Manufacturer**

3         Second, it is __undisputed__ that the LCD RPTV lamps were sourced from ▮▮▮ different

4   vendors – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ogura Decl. I at 11-12 (manufacturer by engine

5   chart); Amador Reply, ECF 129, at 1:26-28. The manufacturer of the lamp matters because

6   different companies use different, proprietary lamp designs that generate different levels of heat

7   and light energy **at the same wattage level.** Kemal Rpt. at 40; Ogura Decl. II at 10:24-13:23.

8   Design-stage tests performed by Hitachi, Ltd. demonstrate that this one change alone can

9   materially decrease component life. Ogura Decl. I at 11, Ex. 14 (study).

10       Mr. Amador downplays this difference as well, stating that heat and radiation output will

11   be "substantially the same regardless of who manufactures" the lamp. Amador Reply, ECF 129, at

12   2:2-3. Amador asserts that the "laws of physics" dictate this result because the mercury inside the

13   lamps has a characteristic emission spectrum and, in any event, Hitachi, Ltd.'s engineering

14   specifications required a substantially similar emission spectrum. *Id.* at 2:1-3, 2:12-15.

15       But "UHP (mercury vapor) lamps contain multiple elements in addition to mercury that

16   affect the emission spectrum…." Ogura Decl. II at 15:7-8 and Ex. 2. "The exact elements used,

17   and their quantity, vary by lamp manufacturer." *Id.* at 15:10-11. Moreover, the lamp's mix of rare

18   gases is "not the sole determinant of the lamp's emission spectrum. The composition of the lamp's

19   glass, pressure within the lamp, the composition of the tungsten electrode and other proprietary

20   lamp characteristics designed to enhance life or increase performance will also affect the emission

21   spectrum." *Id.* at 15:24-27 and Ex. 3. Nor did Hitachi, Ltd. "require that the emission spectrum be

22   the same for each of the 37 different LCD RPTV models that Hitachi, Ltd. designed and, in fact,

23   the lamp specifications and anticipated emission spectrum differed depending on the lamp

24   manufacturer and wattage selected…." *Id.* at 14:1-4, 10:24-13:23 (reprinting emission spectra and

25   detailing differences).

26       Defendants' evidence, **including a design study demonstrating an increase in**

27   **temperature from switching lamp manufacturers,** and charts of the materially **different**

28   emission spectra themselves (Ogura Decl. II at 10:24-17:17), prevail over Amador's makeweight

Mitchell
Silberberg &
Knupp LLP

3529148.10

10      CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   references to the "laws of physics and engineering principles."

2         **(iii)**  **Number and Location of Polarizers**

3      Third, it is **<u>undisputed</u>** that the LCD RPTV optical engines utilized different numbers and

4   configurations of heat-sensitive input and output polarizers – the very parts alleged to have failed.

5   Ogura Decl. I at 14 (chart by engine); Amador Reply, ECF 129, at 3:10-12.  The number and

6   placement matters because adding more input polarizers would reduce the heat and light impacting

7   the LCD panel and output polarizers and reduce the energy load each input polarizer is required to

8   bear, thus extending life.  Ogura Decl. I at 13-14; Kemal Rpt. at 48.  Adding output polarizers

9   would similarly reduce the energy load each output polarizer is required to bear.  *Id.*

10      Mr. Amador stated at his deposition that changing the number could substantially extend

11   polarizer life – but was unable to quantify the impact without testing:

12       Q:  "[I]f I include ▮ input polarizers…[will that] double the life of the polarizer
    functionality?  A.  You might extend it.  I don't know if you would double it….I'm

13       not sure how much you'd gain….
    Q.  But it could be a substantial extension?  A.  It could…too many variables" [to

14       know how much].

15   Amador Tr. at 176:8-177:6.  This testimony was consistent with Amador's Report, in which he

16   acknowledged that polarizers "absorb[] a significant amount of energy[.]"  Amador Rpt. at 21.

17      Later, in his Reply Declaration, Amador reversed course and stated definitively, without

18   any testing, that the number will not "affect the amount of energy passing through a given light

19   path" and thus polarizer or LCD panel longevity.  Amador Reply, ECF 129, at 3:10-4:12.  But this

20   assertion is inconsistent with his prior Report, in which he stated that energy absorbed by the input

21   polarizers would reduce the amount striking the output polarizers.  *See* Amador Rpt. at 22 (one-

22   half/one-quarter discussion); *see* Ogura Decl. II at 24:10-24 (discussing inconsistency).

23      Defendants' evidence, **including a design study demonstrating the impact,** prevails over

24   Amador's unsupported and inconsistent assertions to the contrary.  Ogura Decl. I at 12-13 and Ex.

25   18; Ogura Decl. II at 23:1-28:26 (explaining how polarizer's absorb light/heat, that absorption

26   specifications varied, and the cumulative effect of adding additional polarizers).

27         **(iv)**  **Polarizer Base Material and Base Material Size**

28      Fourth, it is **<u>undisputed</u>** that the LCD RPTV optical engines utilized ▮ different polarizer

              11    CASE NO.  08 CV 1746 DMS (NLS)

      DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  base materials – ███████████████████████████████████████████

2  ███. Ogura Decl. I at 18-19 (chart identifying differences by engine); Amador Reply, ECF 129,

3  at 3:16-19 (disputing effect, but not existence, of this variable).  The base material matters because

4  different base materials "conduct" (remove) heat away from the polarizers to varying degrees –

5  based on the physical properties (heat conductivity) of the base material and the size of the base.

6  Ogura Decl. I at 17; Kemal Rpt. at 47, Amador Tr. at 181:2-4 ("Q. What base material … can

7  impact the temperature…?  A. Yes.").

8  <center>**(v)      Polarizer/Panel Surface Area**</center>

9       Fifth, it is **<u>undisputed</u>** that the LCD RPTV optical engines used polarizers and LCD panels

10  with different surface areas.  Ogura Decl. I at 15-16 and 19 (identifying differences); Amador

11  Reply, ECF 129, at 4:15.  Surface area matters because smaller panels get hotter than larger panels

12  when subjected to the same amount of energy – a fact Mr. Amador conceded at his deposition.

13  Ogura Decl. I at 15, 19; Kemal Rpt. at 47-48; Amador Tr. at 189:13-19.

14  <center>**(vi)      Number and Location of Cooling Fans**</center>

15       Sixth, it is **<u>undisputed</u>** that the LCD RPTV models utilized ████████ fans to cool the

16  components in the optical engine, with the number and location varying by design.  Kaku Decl. at

17  9-10 (chart identifying differences); Amador Reply, ECF 129, at 5:27-6:1 (disputing effect, but not

18  existence, of these variables).  Design-stage tests performed by Hitachi, Ltd. demonstrate that the

19  presence (and thus number) of cooling fans in the vicinity of the optical assembly – even if not

20  directed at the polarizers and LCD panels themselves – would significantly decrease polarizer and

21  LCD panel temperature, extending life.  Kaku Decl. at 8-9, 12 and Ex. 5 (study).

22       Mr. Amador contends this difference, like the others, is immaterial.  Yet he conceded at his

23  deposition that he did not perform any temperature testing regarding this variation.  Amador did

24  purport to "test" the potential impact of the additional fans with his "eyes" and, on that basis,

25  concluded that they could not impact polarizer or LCD panel temperature.  Amador Tr. at 231:11-

26  231:14 ("your test…consisted of you looking…?  Right…that is a test").  But Amador's purported

27  ability to visually measure temperature differentials inside the sealed optical engine compartment

28  is just not credible.  Indeed, earlier in the day, Amador could not testify without a thermometer

Mitchell
Silberberg &
Knupp LLP

3529148.10

<center>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</center>

that the temperature inside the deposition room was between 50ºF and 90ºF:

> I'm an engineer.  I like to take readings with instruments.  So if you want the
> temperature in this room, let's use a thermometer.

Amador Tr. at 17:2-4.  Moreover, Amador's visual temperature test directly contradicts Hitachi, Ltd.'s design studies, Amador's own prior testimony that actual temperature testing (with temperature measuring devices) is required, and his prior, commonsense statement that additional fans could have an impact.  *Id.* at 69:15-25 (testing required),[12] 208:6-10 ("could contribute").

### (vii)    Fan Size, Air Opening Size and RPMs

Seventh, it is **<u>undisputed</u>** that the LCD RPTV models had different size fans ███████ ████), with different size air-intake openings (approximately 3 to 25 square inches), and different blade rotation speeds (████████████████████ nute).  Kaku Decl. at 12-13, 21-22 (charts); Kemal Rpt. at 50-52; Amador Reply, ECF 129, at 5:27-6:1 (disputing effect, but not existence, of variables); Amador Tr. at 202:15-21 ("there were some variations").  Size and speed matter because bigger, faster fans produce more cooling.  Kaku Decl. at 10-11.

Mr. Amador dismisses these differences – without testing – as immaterial.  Amador Tr. at 202:22-203:18; Amador Reply, ECF 129, at 5:27-6:1.  But actual design-stage testing performed by Hitachi, Ltd. confirmed the impact bigger cooling capacity systems have on polarizer and LCD panel temperature.  *See, e.g.*, Kaku Decl. at 11-12 ████████████████████ ████████████████████████████████████

### (viii)   Air Source

Eighth, it is **<u>undisputed</u>** that the source of cooling air for the optical engine varied – some LCD RPTV models drew air from the lower cabinet (around the optical engine), while others drew air from the upper cabinet (behind the screen).  Kaku Decl. at 13-16 (chart); Kemal Rpt. at 55.  This is important because the temperature of the air and the potential for dust clogging (of the air

---

[12] Plaintiffs argued, in the last round of briefing, that Defendants are quoting Amador out of context because the referenced testing quotes pertained to a different variable.  But Amador repeatedly asserted the need for temperature testing to assess the significance/impact of any design variation.  *See, e.g.*, Amador Tr. at 53:13-22, 57:8-12, 69:10-25, 73:14-75:9 ("Again, **I have told you repeatedly** that these sorts of things can be measured and should be measured, then you can have the answer you would want.") (emphasis added).

Mitchell
Silberberg &
Knupp LLP

3529148.10

13          CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  filter) varied considerably by source location.  Kaku Decl. at 14-16; Kemal Rpt. at 55.  Air in the

2  ███████████████████████████████████████████████ would be materially hotter

3  than air pulled from the ███████████████████████████████████████.  Kaku

4  Decl. at 14.  Air in the ███████████ also was markedly cleaner – since the █████████ was

5  thoroughly cleaned during manufacture and contained no external air openings.  Kaku Decl. at 15.

6  Air in the ████████████, in contrast, was in close proximity to various air intake openings –

7  increasing the chance and rate of filter dust adhesion and thus clogging.  Kaku Decl. at 15-16.

8      Mr. Amador notes the critical significance of air filter clogging (and temperature

9  generally), but prior to his deposition was not aware that the LCD RPTV models sourced air from

10  the different locations.  Amador Tr. at 202:22-203:14 (clogging); 212:13-18, 215:1-17 (source

11  same).  Later, in his Reply Declaration, Amador labels the distinction "irrelevant" – without any

12  testing or analysis.  Amador Reply, ECF 129, at 6:4-7.

### (ix)  Internal Cooling Configuration

14      Ninth, the LCD RPTV models had materially different internal cooling duct configurations.

15  Kaku Decl. at 24 and Ex. 39.  Cooling duct configuration matters because the size, turns, and

16  narrowing and widening of the ducts and other passages through which the cooling air travels have

17  a dramatic effect on the LCD RPTV's ability to cool internal components.  Kaku Decl. at 23-24.

18      Mr. Amador does not appear to disagree with the physics, but he contended at deposition

19  that the cooling configurations do not vary.  Amador Tr. at 197:5-197:18.  But even a cursory

20  examination of the schematics reveals that the LCD RPTVs' cooling configurations varied

21  substantially.  *See* Kaku Decl., Ex. 39; Kemal Rpt. at 55, 57-62.  Amador's failure to address this

22  point, or any of the cooling points, in his Reply Declaration speaks volumes.

### (x)  Design Density

24      Tenth, it is **undisputed** that the LCD RPTV models had different design densities – i.e.,

25  how many components were installed, how closely together.  Kaku Decl. at 25, Exs. 40, 41; Kemal

26  Rpt., Table 5 at 46; Amador Tr. at 195:2-10 ("slight variations").  Design density matters because

27  it affects cooling.  Closely packing the polarizers and LCD panels will subject them to more

28  radiative heat (from each other), and the narrower passages created thereby permit less cooling air

Mitchell
Silberberg &
Knupp LLP

3529148.10

14      CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   than when those same parts are more widely dispersed.  Kaku Decl. at 24; Kemal Rpt. at 48, 56.

2        Mr. Amador contends – again without any testing – that millimeters simply do not matter.

3   Amador Tr. at 197:5-198:4 (testing required), 229:16-230:2 (downplaying absence of testing based

4   on visual conclusions).  But given the tight spaces at issue, a ██████████ range is material.

5   Such a difference could increase the airflow significantly.  Kemal Rpt. at 56.

6        The preceding highlights **some**[13] of the relevant design differences that exist **by model**.

7                         **b.      LEVEL TWO:  Model Configurations AKA Running Changes**

8        The **second level** of variability concerns **production** differences among the models.

9        While the bulk of design-related activities are performed during the design and pre-

10   production phase, it is common to make **design changes during mass production**, and numerous

11   such changes – that would impact optical component temperature and the efficacy of the cooling

12   system – were made to the LCD RPTV models:  Kaku Decl. at 25:9-26:12; Kemal Rpt. at 69-72.

13   •   In July 2005, mid-production, the design of the lower cabinet in three models,

14       60VS810, 60VS810A, and 60VX915, was changed ████████████████ in all

15       subsequently produced units of those models**.**  Kaku Decl. at 26-27.

16   •   In the period May 2005 to January 2006, mid-production, air cooling ducts were

17       reconfigured in the 50VS810, 50VS810A, 50VX915, 60VS810, 60VS810A,

18       60VX915, 70VS810, and 70VX915, ████████████████████████████

19       ████████████ in all subsequently produced units of those models.  Kaku Decl. at 28-29.

20        These **examples** are just the tip of the iceberg.  Kaku Decl. at 26-30, 26 n.5.

21        Running changes affect only certain models and may affect those models to different

22   degrees.  *See* Kaku Decl. at 25:9-23.  Moreover, such changes are not implemented uniformly.  For

23   example, the air cooling duct change**s** discussed above – there were two – were implemented at

24   different times for the affected models, and in some cases the two changes were implemented at

25

26   _____

27   [13] *See also, e.g.*, Amador Tr. at 80:8-12 (noting that source, in addition to amount, of heat can
     matter; "It's a complex set of factors."), 81:13-85:19 (long list of variables); *see also* Kemal Rpt.
     at 54-55 (number and size of air filters), 48 (panel manufacturer); Ogura Decl. I at 25:1-8
28   (polarizer manufacturer); Ogura Decl. II at 26:1-6 (polarizer transmission specifications).

Mitchell
Silberberg &
Knupp LLP

3529148.10

                                         15          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   different times for the same model.  The chart at page 30 of Mr. Kaku's Declaration regarding

2   these changes, printed in part below, illustrates the timing point and ensuing complexity:



10        The result is that the first unit produced for a given model is materially different from the

11  last – with a plethora of interim iterations of varying temperature significance.  Each of these

12  **configurations** would need to be separately evaluated, further precluding factual cohesion.

13            c.        **LEVEL THREE:  Human Factors**

14        The **third level** concerns installation, usage, or similar factors that could affect failure.

15        The LCD RPTVs were subject to a variety of different pre- and post-sale conditions that

16  could materially affect longevity, including:

17  •  Pre-sale storage conditions.  *See* Amador Tr. at 31:4-24.

18  •  Variable room temperature.  *See id.* at 27:13-18.

19  •  Variations in dust/dirt conditions.  *See id.* at 221:2-5.

20  •  Usage patterns.  *See id.* at 93:13-94:4, 103:17-23 ( "might be good [or]…bad").

21  •  Home theater setups that do not properly turn off the unit.  Ogura Decl. I at 23-24.

22  •  Programming selection.  Amador Reply, ECF 129, at 5:5-8, Ogura Decl. I at 23:12-18.

23  •  Blocked air vents/installing the unit to close to a heating vent.  Kaku Decl. at 31:20-25.

24  •  Repair/refurbishment by Rent-A-Center in between lease to own installment contracts.

25     Decl. of B. Warren ("Warren Decl.") at 2:22-27.

26        Products are not used in a vacuum.  How the product is used and the conditions to which it

27  is subjected are significant determinants of longevity.  But these factors are highly variable – as

28  between class members and even over time as to the same class member.  Plaintiffs concede as

Mitchell
Silberberg &
Knupp LLP

3529148.10

1    much in their Objection to Defendants' Inspection Demand:

2           Plaintiffs object to the inspections of Plaintiffs' homes as such inspections would be
             unlikely to result in admissible evidence as the condition of Plaintiffs' homes at this
3            date would have **no relevance** to the conditions of the home in which any plaintiff
             lived at the time the Television malfunctioned…

4    Pls.' Resp. to Defs' Third Req. for Insp. at 5:5-9 (emphasis added), Ex. 3 to Pierce Decl.

5           These facts, which are customer-specific, further preclude the required factual cohesion.

6                   **d.       LEVEL FOUR:  Class Member Specific Elements of the Claim**

7           The **fourth level** concerns claim elements that vary by class member.  The predominance

8    inquiry must examine **all** of the elements of and the defenses to each cause of action to determine

9    whether such matters are subject to common proof.  Here, Plaintiffs' claims will require the

10   determination of numerous individual factual issues on a class member by class member basis:

11                                  **(i)       Failure**

12          Each class member will have to demonstrate that his or her unit actually failed.  Plaintiffs

13   aver that failure is not an element of the claim,[14] but the weight of authority is to the contrary.

14   *See, e.g.*, *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 832, 835, 839 (2006)

15   (rejecting UCL, CLRA, and warranty claims; no obligation "to repair latent defects that lead to a

16   malfunction after the term of the warranty"); *Heisler v. Maxtor Corp.*, 2010 WL 4788207, *5

17   (N.D. Cal. Nov. 17, 2010) ("injury within the warranty period…threshold requirement").[15]

18                          **(ii)      Warranty, Warranty Period and Breach[16]**

19          Each class member will need to establish that his or her LCD RPTV unit was purchased

---

[14] Plaintiffs citations are inapposite.  *Chamberlan* does not address the issue at all.  402 F.3d at
962.  *Jaguar* does not address whether failure is required to state a claim under California law.
617 F.3d at 1173.  And *Hicks* is an outlier decision – repeatedly rejected by other courts.  *Hicks v.
Kaufman*, 89 Cal. App. 4th 908, 923 n.54 (2001); s*ee, e.g.*, decisions cited, *infra*, at footnote 15.

[15] *See also, e.g.*, *Oestreicher,* 544 F. Supp. 2d at 973 ("failure to disclose a defect that might, or
might not, shorten the effective life span …does not constitute an unfair practice under the UCL.");
*Long v. Hewlett-Packard Co.*, 2007 WL 2994812, at *8 (N.D. Cal. July 27, 2007) ("failure to
disclose…not actionable under" CLRA or UCL since laptop "function[ed] properly for the duration
of HP's limited one-year warranty"); *Hoey v. Sony Elecs., Inc.*, 515 F. Supp. 2d 1099, 1105 (N.D.
Cal. 2007) ("must allege more than…a defect occurring outside the warranty period").

[16] Plaintiffs assert that Defendants' warranty response is a common issue. Pls.' Renewed Mot. at 11.
But warranty decisions are made at the independent servicer level.  *See* T. Omar Decl. at 2:18-28.

Mitchell
Silberberg &
Knupp LLP

3529148.10

17        CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

with a distributor's ("manufacturer's") express warranty, since **not** all units were sold with such a warranty.  *See* Warren Decl., ¶¶ 5-7 (retailer provided express warranty instead).

Each class member with an express distributor's warranty will need to prove who issued the warranty, since the issuer varied over time.  *See* Warren Decl., ¶¶ 5-7.  Each Plaintiff would likewise need to prove that he or she purchased the television directly from a specific defendant to establish an implied warranty claim against that defendant.  *See, e.g., Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("vertical contractual privity" required; "end consumer…who buys from a retailer is not in privity with a manufacturer").  (Plaintiffs often lump the defendants together – "Hitachi."  But Defendants are separate corporations and there is no allegation of alter ego.  Hearing Tr. at 18-19, Ex. 4 to Pierce Decl.)

Each class member with an express distributor's warranty will need to establish the duration of the warranty, since terms varied.  *See* Warren Decl., ¶¶ 5-7 (one year versus three years); *see, e.g.*, *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640 (S.D. Fla. 2010) (denying certification, in part, because "Defendants issued warranties of varying lengths").  The term of the implied warranty would likewise vary:  60 days (no express, but statutory minimum for new sale), 90 days (three year express, but statutory maximum for used sale – e.g., RAC re-lease/sale) or one-year (one year express with co-extensive implied or three years express with one-year statutory maximum for new sale).  *See* Cal. Civ. Code §§ 1791.1(c), 1795.5(c).

Each plaintiff would need to establish that failure occurred within the implied or express warranty term.  *See* cases cited at footnote 15, *supra*, and related text.

Each plaintiff would need to establish that he or she provided notice to the warrantor.  *Stearns*, 2010 WL 2898284, at *20 (denying certification of express warranty claim, in part, because each class member would need to prove "notice" and "an opportunity to cure").

Each plaintiff would, finally, need to establish that repair was denied.  *See id.*

### (iii)     Reliance

Each class member will have to prove that he or she relied upon a material omission or misrepresentation – an entirely subjective inquiry.  *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011) ("as a result of…requires a showing of a causal connection or reliance")

Mitchell
Silberberg &
Knupp LLP

3529148.10

18          CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

(internal quotations omitted); *id.* at 330 n.14 (recognizing "subjective" nature of inquiry).[17, 18]

Plaintiffs argue that in a UCL/CLRA class action, class-wide reliance is presumed and need not be proven for each class member, even though it must be alleged and proven by the named plaintiff.  But that approach – even if permitted under California procedural law – cannot be applied in federal court under FRCP 23.  Procedural rules cannot "modify any substantive right."  Rules Enabling Act, 28 U.S.C. § 2072.  Absolving class members of their obligation under the statute to prove reliance, for the sake of certifying a class under FRCP 23, would improperly abridge defendants' substantive rights.[19]  *See Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171, *13 n.10 (N.D. Ill. June 12, 2006) (rejecting "relaxed reliance" proposal because "Rule 23 cannot be used to relax or modify the standards and rules that would otherwise apply to an individual litigant's case"); *see generally Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (applying FRCP 9(b) pleading standards to UCL and CLRA claims).

Plaintiffs alternatively argue that class member reliance can be established, on a common basis for the entire class, by demonstrating that the alleged omission/misrepresentation is material.  But reliance and materiality are virtually interchangeable in the fraud context.  *See, e.g., Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993) ("materiality means that without the misrepresentation, the plaintiff would not have acted as he did"); *Mass. Mutual*, 97 Cal. App. 4th at 1292 ("burden of showing causation as to each" satisfied "by showing materiality as to all.").

Plaintiffs' assertion, thus, begs the question whether materiality/reliance **can** be established through common proof.  *See, e.g., Mass. Mutual*, 97 Cal. App. 4th at 1294 n.5 (certification

---

[17] Plaintiffs allege both omissions and misrepresentations.  *See* Pls.' Renewed Mot., ECF 158-1, at 15:8-9 ("defect not disclosed"), 16:3 ("affirmations of fact and/or promises");

[18] *See also, e.g., In re Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005) (the "unfair" prong of the UCL is "not so elastic as to stretch the imposition of liability to conduct that is not connected to the harm by causative evidence"); *Wilens v. TD Waterhouse Group, Inc.*, 120 Cal. App. 4th 746, 754 (2003) ("causation [is] a necessary element of proof" for CLRA claim).

[19] Some federal courts have applied the presumption, s*ee, e.g., Lymburner v. U.S. Fin. Funds, Inc.*, 263 F.R.D. 534, 543 (N.D. Cal. 2010), but those decisions do not discuss, let alone explain, how that result comports with the Rules Enabling Act.  *See Watkins v. U.S. Army*, 875 F.2d 699, 721 (9th Cir. 1989) ("a prior decision is not precedent on issues that were neither raised by counsel nor discussed in the opinion of the court") (citation omitted).  Nor can those decisions be explained.

Mitchell
Silberberg &
Knupp LLP

3529148.10

19        CASE NO.  08 CV 1746 DMS (NLS)

1   inappropriate where "single determination as to materiality is not possible"); *Keilholtz v. Lennox*

2   *Hearth Prods. Inc.*, 268 F.R.D. 330, 342 (N.D. Cal. 2010) (same).[20]

3        A number of pre- and some post-*Tobacco II* cases apply a reasonable person standard – a

4   common method of proof.  But that approach does not comport with Proposition 64's requirement

5   that claimants prove injury in fact "as a result" of the misrepresentation or omission.  If a

6   reasonable person would be misled, but the claimant was in fact not (e.g., because the

7   representation was never heard, was irrelevant to the claimant, or was never relied upon), then the

8   claimant has not suffered damage/injury in fact "as a result" of the misrepresentation.  Omission

9   plaintiffs must likewise prove that disclosure would have affected the purchase decision.

10        Assertions are seldom, if ever, intrinsically material.  The materiality or lack thereof of an

11   assertion/omission is solely a function of its significance, **if any**, to the recipient.  The better

12   reasoned decisions recognize the subjective nature of causation and hold that materiality/reliance

13   can only be assessed on a class member by class member basis.  *See, e.g.*, *Caro*, 18 Cal. App. 4th

14   at 668 ("it would be a matter of individualized proof whether the claim…constituted a material

15   misrepresentation"); *Akkerman v. Mecta Corp., Inc.*, 152 Cal. App. 4th 1094, 1103 (2007) ("each

16   class member would have to prove…reliance and causation"); *Cohen v. Directv, Inc.*, 178 Cal.

17   App. 4th 966, 979 (2010) (articulating why alleged HD misrepresentation may not have induced

18   reliance or been material to individual subscribers).[21, 22, 23]

19

20   [20] Indeed, *Mass. Mutual*'s often cited quote is nothing more than a truism.  If the misrepresentation
was in fact material to **everyone**, then reliance by **all** necessarily follows.  That begs the question.

21
22   [21] Recent case decisions holding that a class cannot be defined to include persons who do not have
Article III standing (because they did not suffer injury from the alleged misrepresentation or
concealment) are in accord with this principle.  *See, e.g.*, *Webb*, 2011 WL 343961, at *6-7, 12;

23   *Sanders*, 672 F. Supp. 2d at 991.

24   [22] Some cases may lend themselves to common proof.  Plaintiffs **contend** that this is such a case –
that the failure to disclose that the components would degrade with use and eventually fail is a

25   material omission **that would have affected every purchase.**  Plaintiffs, however, offer no
**evidence** in support of this bold assertion or any means of proving it for the entire class.  Nor is it

26   self-evident.  *See, e.g., Long*, 2007 WL 2994812, at *8 ("consumer's only reasonable expectation
was that the [laptops] would function properly for the duration of HP's limited one-year

27   warranty").  But Plaintiffs have the burden of demonstrating that this claim element is subject to

28   common proof.  Defendants do not have the burden of demonstrating the opposite.  Finally, even if

(…continued)

Mitchell
Silberberg &
Knupp LLP

3529148.10

20       CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

### (iv)   Various Defenses

2    Defendants' affirmative defenses further preclude factual cohesion.  *See In re N. Dist. of*

3    *Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (when "affirmative

4    defenses…may depend on facts peculiar to each plaintiff's case," certification erroneous).

5    Defendants have alleged, for example,[24] that some of Plaintiffs' claims are barred by

6    applicable statutes of limitation.  Answer at 24:1-5, ECF 14.  Plaintiffs' claims are generally

7    subject to three or four-year statutes of limitation.  Cal. Com. Code § 2725 (Warranty:  4 years);

8    Cal. Bus. & Prof. Code § 17208 (UCL:  4 years); Cal. Civ. Code § 1783 (CLRA:  3 years).  But

9    the LCD RPTVs were sold starting in 2003 – five or more years before the complaint was filed.

10    Early purchasers may attempt to argue that the alleged concealment tolls the statute, *see*

11    *Broberg v. The Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009), but that

12    would only compound the individuality, as tolling depends on subjective facts specific to each

13    purchaser – i.e., when they knew or should have know a claim existed.  *See, e.g.*, *O'Connor v.*

14    *Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) ("individualized, fact-intensive nature

15    of" discovery rule analysis precludes certification).

16    ─────────────────────

17    (…continued)
an inference is granted, Defendants are still entitled to rebut it on a class member by class member

18    basis – defeating factual predominance.  *See, e.g.*, *In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) (relaxed reliance standards do not "eliminate the right of a defendant to present

19    evidence negating a plaintiff's direct or circumstantial showing of causation and reliance," thus "common issues [do] not predominate"); *Newton v. Merrill Lynch, etc.*, 259 F.3d 154, 191-92 (3d

20    Cir. 2001) ("[A]ctual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member."); *In re Neurontin Mktg., etc.*, 257 F.R.D. 315, 325-26 (D.

21    Mass. 2009) (collecting cases).  While a small number of rebuttals does not prevent predominance, *see Blackie v. Barrack*, 524 F.2d 891, 906 n.22 (9th Cir. 1975), Plaintiffs have not proven that only

22    a few class members would be subject to such defenses.

23    [23] Courts have issued a bewildering array of inconsistent decisions regarding the meaning and

24    impact of Proposition 64's amendment.

[24] Other examples include (i) whether the LCD RPTV was sold "as is" and that sale complied with

25    the disclaimer disclosure rules (*see* Warren Decl. at 4:1-6 and Cal. Civ. Code § 1792.4 and .5), (ii) whether the LCD RPTV was purchased new or used (*see* J. Lange Decl., Ex. 4, ECF 145-1

26    (disclaiming warranty as to subsequent purchasers), and (iii) whether the LCD RPTV was misused (*see* Cal. Civ. Code § 1794.3, "unauthorized or unreasonable use" exemption).  *See, e.g.*, *Parkinson*,

27    258 F.R.D. at 595 (rejecting certification of warranty claim in part because whether product was

28    misused would require inquiry into "individual circumstances of each alleged denial").

Mitchell
Silberberg &
Knupp LLP

3529148.10

21   CASE NO.  08 CV 1746 DMS (NLS)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    None of these claim elements, among others, can be established through common proof.

2    **4.    Manageability and Superiority**

3    The same individual factual and legal issues that defeat predominance equally preclude a

4    finding that the proposed class is manageable or superior.  *See, e.g.*, *Util. Consumers' Action*

5    *Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 488 ("The class would be far too large to

6    reasonably manage…."); *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679 (S.D. Cal. 1999)

7    ("When individualized determinations must be made…class certification would provide massive

8    manageability problems for a court."); *Bridgestone*, 288 F.3d at 1018-19 (noting proposed class

9    would be unmanageable even on a statewide level due to individual factual differences).

10    **5.    Plaintiffs' Rebuttal**

11    Plaintiffs and Amador try to argue that common proof is nonetheless viable because the

12    design variations identified above are "peripheral elements of the Optical Engine"  Plfs' Reply,

13    ECF 128, at 1:13.  But this is an excess heat/radiation case.  The number of fans, where the fans

14    are positioned, how much air the fans blow, the size of the air openings, the efficiency of the

15    ducting, the wattage of the lamp, the number, location and other physical properties of the

16    polarizers, the heat conductivity of the components, etc., are not peripheral – they are central to

17    Plaintiffs' defective design claim.

18    Plaintiffs and Amador next try to surmount the identified differences by characterizing the

19    alleged defect as "forced air cooling" – because all the televisions use forced air cooling.  Amador

20    Reply, ECF 129, at 1:13-14 ("forced air cooling without adequate airflow").  But even Mr.

21    Amador concedes that forced air cooling is not inherently defective.  Amador Rpt. at 19

22    ("theoretically possible to design a rear projection television with air cooling sufficient to maintain

23    a proper operating temperature") and 3 (air cooling is "mainstream approach").

24    The question is whether the specific design is inadequate.  But as demonstrated above, and

25    particularly in the Declarations of N. Ogura and N. Kaku, and Dr. Kemal's Report, each

26    television's capacity to generate, dissipate, and withstand heat varied **considerably.**  It is

27    Defendants' many specific and varied designs (plural) that are on trial, not the general concept of

28    forced air cooling.  Those specific designs **are not** subject to common evaluation.  *See, e.g.*, *City*

Mitchell
Silberberg &
Knupp LLP

3529148.10

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    *of St. Petersburg*, 265 F.R.D. at 652-55 ("[W]e cannot simply subscribe to Plaintiffs' 'uniform

2    defect' theory that all models of FlexPipe suffer from the same defect, notwithstanding changes in

3    those models over the years.").

4           Plaintiffs and Amador finally argue, as noted, that the identified differences are immaterial.

5    But whether each distinct design, with all the differences noted, properly generates, dissipates and

6    resists heat and light energy (i.e., whether the differences are material enough) would be the focus

7    of trial.  The certification inquiry does not ask whether the differences will be sufficient – that goes

8    to the merits – but whether the different designs/configurations can be assessed through common

9    evidence.  They can not.  Each design – each set of differences – must be evaluated separately.

10                  **6.    Plaintiffs' Burden Unsatisfied**

11          Plaintiffs and Amador ultimately have the heavy burden of demonstrating that the models

12   and configurations are materially identical, that human factors are irrelevant, and that individual

13   claim elements do not predominate – that the claims are factually cohesive.  Pls.' Orig. Mot. for

14   Class Cert. at 8:25-27 (conceding burden).  Conclusory statements or analysis do not suffice.  *Gen.*

15   *Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) ("rigorous analysis" required).

16          Yet, despite months of briefing, including Plaintiffs' Motion, Reply, Rebuttal, Amador's

17   Rpt. and Reply, and now this new Motion, Plaintiffs still have never addressed most of these issues

18   (e.g., configuration variations; human factors), and Amador's unsupported assertions of design

19   substantial similarity crumble under the weight of Defendants' extensive evidence to the contrary.

20          Plaintiffs "conclude that the differences…are not material, and genuflect to their expert's

21   report."  *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 172 (S.D.N.Y. 2003).  But Plaintiffs

22   and their expert must do more.  They must demonstrate that the differences are immaterial – a

23   burden they wholly fail to meet, again.  *See also Kaczmarek*, 186 F.R.D. at 312 ("Plaintiffs have

24   not satisfied their burden of showing that the different models are not materially different….").[25]

25

26   _____

     [25] Defendants have purposefully avoided defending the LCD RPTV designs – because the ultimate
     claims are not at issue at the certification stage.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178

27   (1974).  Plaintiffs improperly label this a tacit admission.  Pls.' Renewed Motion, ECF 158-1, at
     1:22.  But Defendants' decision to follow the rules should not be equated with ambivalence about the

28   merits.  Defendants firmly believe they would prevail on the merits – factually and legally.

Mitchell
Silberberg &
Knupp LLP

3529148.10

                                    23        CASE NO.  08 CV 1746 DMS (NLS)
          DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## V.     <u>KATO FILE DELETION</u>

On October 20, 2010, Judge Stormes ruled that Mr. Kato intentionally deleted certain electronic files he was storing at home (notwithstanding Defendants' litigation hold) and that Mr. Kato's actions were attributable to Defendants through "standard principles of agency."  October 20, 2010 Order, ECF 122.  Judge Stormes, however, declined to impose any sanctions pending the outcome of forensic recovery efforts and discovery, and further briefing regarding the prejudice, if any, suffered by Plaintiffs.  (Defendants do not believe Plaintiffs have suffered any prejudice.)

On November 9, 2010, this Court extended the deadline for Defendants to object to the spoliation finding until Judge Stormes' rules on Plaintiffs' forthcoming motion for sanctions.  November 9, 2010 Order, ECF 138.  Plaintiffs filed their motion on March 8, 2011.

If Judge Stormes and any reviewing court conclude that relevant files have been irretrievably destroyed, Plaintiffs were prejudiced, and sanctions are appropriate, and those sanctions impact the certification analysis, Plaintiffs may seek relief at that time.  But unless and until that occurs, this Court should not base any decision on the October 20, 2010 decision or Mr. Kato's deletion – the ultimate significance of which have yet to be determined.

### A.     PLAINTIFFS' "MOTION" FOR SANCTIONS IN FN 7 IS IMPROPER

Plaintiffs, nevertheless, seek to exclude all of Defendants' lamp variability evidence as a sanction for the apparent deletion of one email file regarding lamps.  But Plaintiffs cannot move for spoliation sanctions in a footnote.  *See* S.D. Cal. Local Rule 7.1(f)(1), 7.1(e)(2); *Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 522 (9th Cir. 1983) ("[S]anctions should not be imposed without the[] procedural protections [of notice, an opportunity to respond, and a hearing].").  (It is also noteworthy that Plaintiffs do not discuss this email file at all in their pending sanctions motion.)

Plaintiffs' attempt here proves why full briefing is required.  The lamp emails Plaintiffs reference were apparently deleted, but the index file remains.  Decl. of D. Tulo at 3:12-28.  The index file includes sender/recipient and subject line information.  *Id.*  The index information for the lamp email file indicates that these three emails pertained to lamp life and lamp returns from the field – not the wattage and manufacturer variability argued above.  Decl. of Y. Tamura at 2.  Thus, the missing emails afford no basis for striking Defendants' evidence.  *See Pension Comm. of*

Mitchell
Silberberg &
Knupp LLP

3529148.10

24          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  *the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 467 (S.D.N.Y.

2  2010) (Scheindlin, J.) (sanctions require finding that "party is prejudiced without that evidence").

3      Moreover, even if Plaintiffs were somehow granted an adverse inference or presumption

4  regarding the effect of lamp variability, Defendants could still rebut the presumption with contrary

5  evidence of the kind presented above – evidence which demonstrates the lack of factual cohesion.

6  *Id.* at 470 ("Even a mandatory *presumption*, however, is considered to be rebuttable.").

7      **B.      ALLEGED SPOLIATION IS NOT PREDOMINATE, COMMON ISSUE**

8      Plaintiffs' final argument – that resolution of the alleged spoliation is a common issue that

9  supports certification – would convert every pre-trial ruling into a common issue that justifies class

10  treatment.  Pre-trial proceedings in proposed class actions constantly call upon the Court to rule on

11  issues of potential class-wide significance **if a class action is certified.**  Motions to dismiss

12  determine the scope of the putative class' claims.  Motions to compel determine what evidence

13  will be made available to the putative class including with respect to whether a class should be

14  certified.  Motions for temporary restraining orders determine if conduct affecting the entire

15  putative class will be allowed.  The list is infinite.

16      All of these rulings can be said to impact the putative class, but none justify certification.

17  A contrary ruling would convert every evidentiary ruling, every motion, every pre-trial act into an

18  additional basis for class treatment.  Indeed, under Plaintiffs' logic, even the mere allegation of

19  wrongdoing – e.g., alleged spoliation – would be sufficient to certify the class.  That is not the law.

20      Plaintiffs' case citations do not hold otherwise.  *See Smith v. Ga. Energy USA, LLC*, 259

21  F.R.D. 684, 695-96 (S.D. Ga. 2009) (holding that class entitled to spoliation inference, not that

22  spoliation supported certification); *Resolution Trust Corp. v. Deloitte & Touche*, 822 F. Supp.

23  1512 (D. Colo. 1993) (certifying class without any discussion of spoliation allegation or claim).

24  **VI.    CONCLUSION**

25      Plaintiffs' Renewed Motion for Class Certification should be denied with prejudice.

26  DATED: March 10, 2011          SETH E. PIERCE
                                   MITCHELL SILBERBERG & KNUPP LLP

27                                 By: s/ Seth E. Pierce

28                                 Attorneys for Defendants; Email:  sep@msk.com

Mitchell
Silberberg &
Knupp LLP

3529148.10

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**CERTIFICATE OF SERVICE (CM/ECF)**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I hereby certify that on March 10, 2011, I electronically filed the foregoing documents entitled **DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following email address(es):  spencer@reyeslaw.com, cbarragan@reyeslaw.com, jczeisler@milberg.com, jkoncius@lange-koncius.com, jlange@lange-koncius.com, rlax@lax-law.com, and psafirstein@milberg.com.

DATED:  March 10, 2011                    SETH E. PIERCE
                                          ALFREDO ORTEGA
                                          MITCHELL SILBERBERG & KNUPP LLP


                                          By: /s Seth E. Pierce
                                              Attorneys for Defendants, Hitachi Home
                                              Electronics (America), Inc., Hitachi
                                              America, Ltd., and Hitachi, Ltd.
                                              Email:  sep@msk.com

Mitchell
Silberberg &
Knupp LLP

3529148.10

26          CASE NO.  08 CV 1746 DMS (NLS)
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION