1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11   IN RE HITACHI TELEVISION OPTICAL      )   Civil No. 08cv1746 DMS (NLS)
     BLOCK CASES                           )
                                           )   **ORDER:**
12                                         )
     This document relates to all actions  )   **(1) DENYING PLAINTIFFS' MOTION**
13                                         )   **FOR SANCTIONS**
                                           )
14                                         )   **(2) GRANTING DEFENDANTS'**
                                           )   **MOTION TO FILE SUR-REPLY**
15                                         )
                                           )   [Doc. Nos. 175 & 194.]
16   _____)

17   **I.     INTRODUCTION**

18          On August 27, 2010, Plaintiffs filed a Motion alleging spoliation of evidence and seeking

19   forensic investigation of a hard drive from which electronic files had been deleted.  [Docket No. 99 (the

20   "Spoliation  Motion").][1]  The Court found Defendants ("Hitachi") had spoliated documents by

21   intentionally deleting computer files following notice of this lawsuit.  [Doc. No. 122, (the "Spoliation

22   Order").]  The Court reserved judgment on the appropriate sanction until the extent of any prejudice

23   could be determined through forensic analysis of the pertinent hard drives and the deposition of Hitachi

24   regarding the efforts made to preserve and produce electronic data.  On March 16, 2011, Plaintiff filed a

25   Motion for Sanctions as a Result of Defendants' Spoliation .  [Docket No. 175, ("Mot." or "Sanctions

26   Motions").]  On April 22, 2011, Hitachi filed an Opposition [Docket No. 185 ("Opp.")].  On May 6,

27

28          ─────────────────────
                [1]The Opposition to the Spoliation Motion is Docket No. 106 and the Reply to the Spoliation
     Motion is Docket No. 107.

                                                  1

1  2011, Plaintiffs filed a Reply [Docket No. 192 ("Reply").]  On May 11, 2011, Hitachi filed a Motion to

2  Strike or File a Sur-Reply [Docket No 194.].  Having held oral argument on May 13, 2011, and having

3  read all pertinent papers and attachments thereto, the Court **GRANTS** the Motion to File a Sur-Reply,

4  and **DENIES** the Motion for Sanctions.

5  **II.    BACKGROUND**

6          This is a putative class action alleging a defect in the optical block of Hitachi's rear projection

7  televisions.  Plaintiffs contend that the Hitachi-brand LCD Rear Projection Televisions ("LCD RPTV")

8  failed prematurely.  Hitachi assembled the LCD RPTV in Mexico through its subsidiary, Hitachi

9  Consumer Products de Mexico, S.A. de C.V. ("HIMEX ").  HIMEX and its engineers were responsible

10 for implementing design changes and reconditioning televisions that malfunctioned.  In response to a

11 Rule 30(b)(6) request, Hitachi designated Koji Kato, the former Chief Engineer in Quality Assurance of

12 HIMEX, as its person most knowledgeable regarding the cause of the alleged defect and any measures

13 taken to counter it.  Just before his deposition in July 2010, Hitachi "de-designated Mr. Kato" upon

14 learning that Kato had intentionally deleted electronic files relevant to the litigation.

15         Plaintiffs thereafter took Kato's deposition in his individual capacity.  Kato testified in relevant

16 part that between July 2002 and April 2007 he was employed by Hitachi Ltd., but was "loaned out" to

17 Hitachi Home Electronics (America), Inc. ("HHEA") and also worked at HIMEX.  (Kato Tr. at 13-16;

18 Kato Decl. ¶ 1.)[2]  Kato lived in Chula Vista, California, and traveled across the border to HIMEX's

19 factory for most of his work.  (Kato Tr. at 13-15.)  He took work files home on occasion and saved them

20 on his personal computer.  He then transferred the work files to a 200 GB Maxtor External Hard Drive,

21 and eventually transferred the work files to an 80 GB Maxtor External Hard Drive.  In doing so, Kato

22 deleted the files off his home computer and the 200 GB hard drive, which no longer functions.  (Kato

23 Decl.¶ 15.)  Kato copied these files in violation of Hitachi's trade secret policy, which forbids employees

24

25         [2]There are three Kato Declarations.  This first declaration is in opposition to the Spoliation
   Motion,  was signed on September 16, 2010, is Docket No. 106-7 and  will be referred to as "Kato
26 Decl."  The second declaration was signed on the same day also in opposition to the Spoliation Motion,
   is Docket Number 106-9 and will be referred to as "Kato II Decl."  The third declaration is in
27 opposition to the Sanctions Motion, was signed on April 20, 2011, is Docket Number 185-2 and will be
   referred to as "Kato Decl. III."  Plaintiff deposed Mr. Kato on July 2, 2010 and excerpts of his
28 deposition transcript are Docket Number 194-2 and will be referred to as "Kato Tr."

to copy or otherwise store company information on home computers or other storage devices.  (Kato

Decl. ¶ 16.).  Kato does not recall telling anyone at Hitachi that he possessed a copy of these files.  (*Id.*).

 After Hitachi designated him as a 30(b)(6) witness, and just prior to his deposition, Kato deleted the

work files off the 80 GB hard drive and ran a defragmentation program.

"Deleting" a document does not typically eliminate information on a hard drive.  (Tulo Decl. ¶¶

22-23.)[3]  When a file is deleted it becomes unallocated space, space designated as unused and available.

*Id*.  The deletion of the file is noted in the Master File Table ("MFT"), which is the index system that

indicates where files are stored on the hard drive.  (Stenhouse Decl. II ¶7)[4]  The file becomes invisible to

the operating system but it exists until it is overwritten with new or other data.  (Tulo Decl. ¶¶ 22-23;

Stenhouse Tr. at 85-89.)  A defragmentation utility reorganizes blocks of data in order to allow the

computer program to retrieve files more efficiently.  (Tulo Decl. ¶ 29)  A defragmentation program is

not designed to, and does not, make it impossible to recover the deleted files and is not the equivalent of

"wiping" the disk.  (*Id.*)  When a defragmentation utility moves blocks of data, it is possible that some

blocks of data will be moved into the space where deleted files were stored and, when that happens, the

deleted file can no longer be recovered.  In contrast, a "wiping" or "file eraser" program actively fills the

space where the deleted file was stored with meaningless data in order to make it impossible to recover

the deleted data.  (*Id.* at ¶¶ 29-30.)  Plaintiff's expert, Mr. Stenhouse, concedes that the defragmenter is

not designed to "wipe" and only makes recovery impossible for deleted files that happen to be

[3]There are four declarations from Hitachi's expert, David Tulo.  The first declaration is in opposition to the Motion for Spoliation was signed on September 16, 2010, appears as both Docket No. 106-15 and Docket No. 194-2 and will be referred to as "Tulo Decl."  There is also a Tulo Declaration in opposition to Motion to Certify Class, which is Docket No. 173-20 and is not referenced in this Order.  The third Tulo Declaration in opposition to the Motion for Sanctions was signed on April 21, 2011, is Docket No. 185-7 and shall be referred to as "Tulo Decl. III."  The fourth declaration in support of the sur-reply was signed on May 10, 2011, is Docket No. 194-3, and shall be referred to as "Tulo Decl. IV."

[4]There are three declarations from Plaintiff's expert, David. P. Stenhouse.  The first declaration in support of the Spoliation Motion, was signed on August 24, 2010, should be part of Docket 99, but was never e-filed and appears as Docket No. 185-11 and shall be referred to as "Stenhouse Decl."  The second declaration cited above is in support of the reply to the Spoliation Motion, was signed on September 23, 2010, is Docket No. 107-1, and shall be referred to as "Stenhouse II Decl."  The third declaration in support of the reply to the Motion for Sanctions was signed on May 5, 2011, is Docket No. 192-1 and shall be referred to as "Stenhouse Decl. III."  Hitachi deposed Stenhouse on March 24, 2011, the transcript of that deposition is both Docket No. 185-10 and 194-2, and shall be referred to as "Stenhouse Tr."

08cv1746 DMS (NLS)

1    overwritten in the normal course of optimizing file storage.  (Stenhouse II Decl. ¶ 12.)

2          Upon learning of Kato's deletion of files, Hitachi notified Plaintiffs' counsel about the deletion,

3    took possession of Kato's 80 GB drive, and hired forensic consultant Ji2 to restore as much of the 80

4    GB drive as could be salvaged.  (Pierce Decl. ¶¶ 4-5, 9.)[5]  On July 2, 2010, the date originally reserved

5    for the 30(b)(6) deposition, Hitachi produced Kato in Japan for a deposition regarding the deletion.

6    (Pierce Decl. ¶7.)  Hitachi offered to produce an alternate 30(b)(6) witness on that same date, but

7    Plaintiffs preferred Hitachi's alternative offer to produce (at Hitachi's cost) an alternate 30(b)(6) witness

8    at a future date in the United States.  (*Id.*).

9          Ji2 used a software program called "Encase", the industry standard and most widely recognized

10   computer forensic software platform, to recover deleted files from the hard drive.  Encase examines the

11   space on the hard drive where the deleted files were stored, as recorded on the MFT.  (Tulo Decl. ¶ 37.)

12   The program then recovers the deleted files from the drive's unallocated space or, if the files were

13   overwritten, it notes what was previously stored in that location.  (Tulo Decl. ¶ 38.)  The forensic

14   recovery performed "looked for all deleted files in the unallocated space" of the hard drive. (Snyder

15   Decl. ¶ 9 [Docket No. 106-13].)  Plaintiffs' expert, David Stenhouse, monitored the recovery search.

16         As a result of the search, Hitachi claimed it had recovered 99.69% of the deleted documents and

17   only 64 files/folders remained unrecoverable.  (Mot. at 14; Reply at 3.)[6]  Based on Stenhouse's expert

18   opinion, Plaintiffs argued Hitachi could not possibly ascertain how many documents were recovered

19   because an unknown quantity could have been deleted without a trace.  (Mot. at 14.)  Stenhouse's

20   opinion was based on his theory that defragmentation likely corrupted the MFT and that Encase only

21   looked for documents in the unallocated space of a hard drive based on what was listed in the MFT.

22   (Stenhouse Tr. at 158-161.)  If the MFT is incomplete due to corruption from defragmentation, the

23   Encase program would not know to look for all deleted documents.  (*Id.*)  (Stenhouse Tr. at 73-75, 82.)

24

25         [5]There are two declarations of Hitachi attorney Seth E. Pierce.  The first declaration in
     opposition to the Spoliation Motion was signed on September 16, 2010, is Docket No. 106-1, and shall
26   be referred to as "Pierce Decl."  The second declaration in opposition to the Sanctions Motion was
     signed on April 21, 2011, is Docket No. 185-9, as shall be referred to as "Pierce Decl.II."

27
           [6]The forensic analysis restored 18,619 deleted files in 1,819 folders and revealed 64 items (4
28   folders and 60 files) were deleted but overwritten.  (Snyder Decl. ¶ 3.)

1   Stenhouse advocated the use of a data carving protocol that would expand Ji2's search to the entire

2   unallocated space, not just the portions implicated by the MFT.  (Stenhouse Tr. at 116-24.)  In this way,

3   forensic recovery would capture data or files missing from the MFT.  Hitachi opposed the data carving,

4   arguing it would not recover any useful data because defragmentation  does not corrupt the MFT.

5   Accordingly, Plaintiffs filed a motion for further forensic examination, and also for a finding of

6   spoliation, and for the production of a Rule 30(b)(6) witness to testify about company policies regarding

7   preservation and production of electronic data.  (the Spoliation Motion.)

8          In an Order dated October 20, 2010, the Court found Hitachi committed spoliation via the

9   actions of Kato.  (the Spoliation Order.)   Based on the record at the time, the Court could not make an

10  objective determination of the degree of prejudice the deletion of files may have caused.  Therefore, the

11  Court granted Plaintiffs' motion to carry out a further forensic search of Kato's hard drive, using

12  Hitachi's consultant Ji2 but under a protocol recommended by Plaintiffs' expert Stenhouse.  (Spoliation

13  Order.) The Court also granted Plaintiffs' request for Hitachi to designate a Rule 30(b)(6) witness to

14  testify about what Hitachi did to attempt to preserve its electronic documents. [*Id.*]

15         Under Stenhouse's protocol, Ji2 used a method called "data carving" to search Kato's hard drive.

16  The data carving examined all of the unallocated space in the hard drive,  as opposed to the prior effort

17  which searched only the unallocated space in which the MFT indicated deleted files had been stored.

18  (Tulo Decl. ¶41(b)(i)(b).)  As  Hitachi argued, data carving is an unsophisticated search instrument

19  because it does not disclose when the files were deleted or whether the files were deleted automatically

20  or by a user.  (*Id.*)  Thus, there is no way to determine if  Kato deleted the documents or whether the

21  documents were deleted after the lawsuit was filed.  (Opp. at 6.)  The Court ordered the data carving

22  based upon expert Stenhouse's view that the MFT was unreliable because "the Master File Table is

23  damaged by the defragmenting process".  (Stenhouse Decl. ¶18, *see also* Stenhouse II Decl. ¶ 7).  As

24  described below, Stenhouse's assertion that defragmentation damages the MFT was subsequently shown

25  to be inaccurate.

26         Ji2 performed the data carving and produced 829 file fragments in addition to the 99.69% of the

27  documents recovered initially.  (May 13, 1011 Sanctions Hrg. Tr. at 5-6 [Docket No. 210.]).  The issue

28  of prejudice is now fully briefed and the Court has had an opportunity to hear oral argument from

1  counsel.

2  **III.   MOTION TO STRIKE OR FILE SUR-REPLY**

3       As an initial matter the Court addresses Hitachi's Motion to Strike or File a Sur-Reply. [Docket

4  No. 194.]  Hitachi claims Plaintiffs have improperly raised a new argument in their Reply brief focusing

5  on the loss of the "64 files/folders" that were found to be unrecoverable after Ji2's initial restoration

6  efforts. [*Id*. at 1.]  Hitachi states Plaintiffs' opening brief focused on the additional 829 file fragments

7  uncovered by the second forensic analysis performed by Ji2 using Stenhouse's methodology, not the 64

8  files. [*Id*.]  At oral argument, Plaintiffs said they did reference the 64 files in the opening paragraph of

9  their opening brief by talking in terms of 99.69 % of documents Hitachi claimed to have initially

10  recovered. (Sanctions Hrg. Tr. at 3.)  However, the suggested reference does not appear in the opening

11  brief until page 14, at which point Plaintiffs state:

12         As explained above, and as expected, full reconstruction and restoration of
       Kato's files has proven to be impossible–despite Hitachi's previous and
13         unsubstantiated claim to have reproduced 99.69% of the destroyed
       documents–a claim initially rebutted by Stenhouse and now conclusively
14         disproved through Ji2's data carving.

15  (Mot. at 14.)

16       Plaintiffs argued that Hitachi could not possibly say how many files were recovered or

17  unrecovered because certain files were deleted without a trace.  They punctuated this point by saying

18  Hitachi had previously only conceded to the 64 files being unrecoverable (or recovery of 99.69% of the

19  files) and were proved wrong by the discovery of the additional 829 file fragments.  (*Id*.)  Although

20  Plaintiffs do not address the prejudice from the 64 files in the opening brief, it was not unreasonable for

21  Plaintiffs to focus on the allegedly *additional* prejudice revealed by the 829 file fragments.  Moreover,

22  Plaintiffs never conceded a lack of prejudice from the 64 files.  Accordingly, the Court will not strike

23  the Reply but **GRANTS** the Motion to File a Sur-Reply.

24  **IV.   DISCUSSION**

25       Plaintiffs seek an order from this Court imposing the following sanctions:

26      1.     At trial the jury be instructed that Hitachi destroyed relevant documents in this case and

27           to impose an adverse inference with respect to the contents of the destroyed documents;

28      2.     The burden of proof on any dispositive or class certification motions regarding the

1    existence of a common defect should be shifted from Plaintiffs to Hitachi; and

2    3.    Plaintiff's counsel be awarded reasonable attorneys' fees and expenses incurred in

3          connection with Kato's spoliation as set forth in the Compendium of Plaintiffs' Counsel's

4          Declarations Regarding Counsel Fees and Expenses.

5    Plaintiffs justify the sanctions by claiming Hitachi's spoliation has "forever deprived [them] of

6    [an] unknown number of documents which can never be reconstructed" and which is forcing them to

7    rely on "incomplete and spotty evidence."  [Mot. at 10.]; *see Anheuser-Busch, Inc. v. Natural Beverage*

8    *Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (prejudice found where party was forced to rely on incomplete

9    and spotty evidence due to spoliation).  Apart from documents that Plaintiffs claim have disappeared

10   without a trace, they are specifically referring to the 829 data fragments unearthed by the latest forensic

11   analysis and the 64 files found to be unrecoverable following Hitachi's initial recovery efforts.  (Mot. at

12   3-5; Sur-reply at 1.)  Plaintiffs state 310 of the 829 fragments are incomprehensible.  (Mot. at 3-5.)

13   They also argue that the fragments will never be capable of complete recovery or reconstitution so as to

14   match exactly the documents that were deleted.  (*Id*.)

15   Hitachi argues that "every one of the purportedly destroyed source files for these Document

16   Fragments exists and was either produced by Defendants in 2009 or is non-responsive." (Opp. at 1.)

17   Hitachi contends none of the documents were destroyed to the point of being eliminated without a trace.

18   (*Id*.)

19   **A.    Spoliation Previously Decided**

20   At various points in its Opposition, Hitachi contends there was no spoliation in this case.  The

21   Court will not revisit the issue of spoliation as this matter has already been decided in the Spoliation

22   Order.  In order to prove spoliation, a party must show: 1) the party with control over the evidence had

23   an obligation to preserve it at the time of destruction; (2) the evidence was destroyed with a "culpable

24   state of mind"; and 3) the evidence was relevant to the party's claim or defense.  *Zubulake v. UBS*

25   *Warburg*, LLC ("*Zubulake IV*"), 220 F.R.D. 212 , 220 (S.D.N.Y 2003); *see also United States v. Kitsap*

26   *Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (willful spoliation occurs when a party destroys

27   evidence after being given notice that documents were potentially relevant to the litigation before they

28   were destroyed.)  In the Spoliation Order the Court found the following undisputed facts established

7

1    spoliation:

2              (1) Kato intentionally deleted his work files from the 80 MB Maxtor
               External Hard Drive in June 2010 after he learned Hitachi had designated
3              him as a Rule 30(b)(6) "person most knowledgeable" about alleged
               defects in the optical block of its rear projection TVs.
4
               (2) After he deleted the documents, he ran a disc optimization utility that
5              he knew would make recovery of these files more difficult.

6              (3) At the time he deleted these documents, Kato knew about the
               company's "litigation hold" and knew he had specific instructions to
7              preserve them.

8    [*Id.* at 122.]

9         Accordingly, the Court will address whether Plaintiffs were prejudiced by Kato's spoliation, the

10   degree of prejudice, and the appropriate sanction, if any.[7]

11        **B.    Legal Standards**

12             1.    <u>Sanctions Under Rule 37 of Federal Rules of Civil Procedure</u>

13        Sanctions are potentially available under Rule 37(a)(5) for a party who successfully moves for

14   an order compelling discovery.  Fed. R. Civ. P. 37(a)(5).[8]  Rule 37(a)(5) provides for the payment of

15   fees when a motion for an order compelling discovery is granted, but cautions: "the court must not order

16   this payment if: . . . (ii) the opposing party's nondisclosure, response, or objection was substantially

17   justified; or (iii) other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A).

18             2.    <u>Sanctions Under the Inherent Authority of the Court</u>

19        A court may sanction a party who has despoiled evidence based on its "inherent power" to

20   respond to abusive litigation practices.  *Fjelstad v. American Honda Motor Co., Inc.*, 762 F.2d 1334,

21   1337-38 (9th Cir. 1985).  Inherent powers, however, must be exercised with restraint and discretion.

22

23        _____

24        [7] Hitachi takes great pains to argue that since deletion of the files does not equal complete
     elimination or destruction, and the documents were eventually capable of retrieval, there was no
25   spoliation.  (Opp. at 1-2.)  The alteration of the document through deletion, however, constitutes
     spoliation.  *Infor Global Solutaion (Michigan), Inc. v. Saint Paul Fire and Marine*, 2009 WL 5909255
26   (N.D. Cal. Oct. 21, 2009).  Accordingly, Hitachi's arguments go to the evaluation of the degree of
     prejudice.

27        [8]When a court order has been violated, sanctions are also available under Rule 37(b)(2) of
     Federal Rules of Civil Procedure.  In this case, no Court Order was violated and sanctions under Rule
28   37(b)(2) are not at issue.

*Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) (citations omitted).

If spoliation is shown, "the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F.Supp.2d 1038, 1060 (N.D. Cal., 2006) (internal citations omitted), *overturned on other grounds*. Prejudice is determined by looking at whether the spoliating party's actions impaired the non-spoliating party's ability to go to trial, threatened to interfere with the rightful decision of the case, or forced the non-spoiling party to rely on incomplete and spotty evidence. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).

A party's destruction of evidence need not be in "bad faith" to warrant the imposition of evidentiary sanctions. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Sanctions may be imposed on a party that merely had notice that the destroyed evidence was potentially relevant to litigation. *Id.* Motive or degree of fault in destroying the evidence, however, should be considered in choosing the appropriate sanction. *Advantacare Health Partners L.P. v. Access IV*, 2004 WL 1837997 *4, (N.D. Cal. 2004).

Hitachi argues that bad faith is required for any sanction for spoliation. (Opp. at 19.) The Ninth Circuit has recognized that *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) and *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) "can be read to preclude a court's inherent power to sanction a party in the absence of bad faith" but then rejected that interpretation:

> The bad-faith requirement recognized in Roadway, however, is very likely limited to the context of sanctions in the form of cost- and fee-shifting. *See Chambers*, 501 U.S. at ---- - ----, 111 S.Ct. at 2140-41 (Scalia, J., dissenting). This court has, since *Roadway*, confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.1988).

*Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg Co.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992).

In determining the appropriate sanction for spoliation, a court will seek a sanction that will: (1) penalize those whose conduct may be deemed to warrant such a sanction; (2) deter parties from engaging in the sanctioned conduct; (3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to the same position it would have been in absent the wrongful destruction of evidence by the opposing party. *Advantacare*, 2004 WL 1837997

at * 3, *citing National Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976); *Wyle v. R.J. Reynolds Indus., Inc*., 709 F.2d 585, 589 (9th Cir. 1983).  Courts should also examine: 1) the degree of fault of the party who destroyed the evidence and whether a lesser sanction exists that would avoid substantial unfairness to the opposing party.  *Brosnan v. Tradeline Solutions, Inc.*, 681 F. Supp.3d 1094, 1104 (N.D. Cal. Jan. 15, 2010), *citing Schmid v. Milwaukee,* 13 F.3d 76, 79 (3rd Cir. 1994).

## C.  Prejudice

The Court will address each of Plaintiffs' claims of prejudice in turn.

### 1.  Documents lost without a trace

Plaintiffs contend they will never know exactly what was on Kato's hard drive and what was deleted without a trace.  In ordering the data carving, the court relied upon Stenhouse's assertion that the MFT is damaged by the defragmentation process.  (Stenhouse Dec. ¶ 18.)  Evidence submitted in opposition to the Motion for Sanctions proves this statement was not accurate.  Kato's 80 GB hard drive was a NTFS (New Technology File System) formatted hard drive.  (Tulo Decl. III at ¶ 12.)  Kato used a "Windows Optimizer"; he selected "My Computer" in Windows, right clicked on the 80 GB  HDD icon, and selected Properties.  He then selected "Tools" and believes he selected "Defrag."  (Kato Decl. ¶ 27.)  As Expert Tulo describes in his third declaration: the Microsoft defragmentation utility used by Kato on NTFS hard drives does not remove any entries from the MFT.  (Tulo Decl. III. ¶¶ 11, 35.)   The Microsoft TechNet Library states that the Disk Defragmenter verifies that the new MFT "is an exact duplicate of the original."  (Tulo III Decl. at ¶ 35, *quoting* Ex. 4 - http://technet.microsoft.com/en-us/library/bb742585.aspx).  Tulo examined the Microsoft TechNet Library and Support website before concluding that, even if the MFT itself were defragmented, no entries would be deleted and the MFT would remain "exactly the size" it was before the defragmentation process and that "deleted file entries in the File Table are 'not reclaimed.'" (Tulo Decl. III ¶ 42, *quoting* Ex. 5 - http://support.microsoft.com/kb/174619).

This is a critical flaw in Stenhouse's theory.  Stenhouse theorized: if the MFT itself were moved and defragmented, only the active file entries would be moved and the entries related to deleted files would be relegated to unallocated space, and possibly overwritten in the defragmentation process. (Stenhouse Tr. at 73)  Microsoft documentation, however, proves that this does not happen.

1    Accordingly, there is no support for Stenhouse's theory that defragmentation damages the MFT and no

2    support for his assertion that the original recovery performed by Ji2 was insufficient.  Indeed Stenhouse

3    admitted that his sole reason for believing files might have been eliminated without a trace was based on

4    the fact that Kato defragmented the hard drive (Stenhouse Tr. at 143); and that he was not certain

5    whether the defragmentation utility would actually fail to move the deleted file list.  (Stenhouse Tr. at

6    73-74.)

7        Additionally, Stenhouse agreed (even under his theory of the damaged MFT) that it was only a

8    *possibility* that documents could be deleted without a trace.  (Stenhouse Tr. at 144.)  In this case,

9    Stenhouse stated he had not seen any evidence that documents had been deleted without a trace.  (*Id.* at

10   80, 150.)  He further stated the chances of documents being deleted without a trace were significantly

11   lower if the computer was taken out of service relatively immediately after deletion of files.  (*Id*. at 149.)

12   The Stenhouse "disappearing without a trace" theory would require not only a damaged MFT (which

13   Microsoft documentation proves is not possible), but also that the original MFT was randomly

14   overwritten <u>and</u> that each and every piece of the file was also randomly overwritten.  (Tulo Decl. III at

15   ¶¶ 43-44.)  Tulo saw no evidence that such a "perfect storm" had taken place and neither did Stenhouse.

16   (Tulo Decl. ¶ 27; Stenhouse Tr. at 141.)

17       Moreover, Stenhouse was not asked to provide any opinions on the actual reports provided by

18   Ji2 following the data carving analysis.  (Stenhouse Tr. at 30.)  Stenhouse's opinions were based on a

19   theory of what could happen when defragmentation takes place.  In contrast, Hitachi's expert, David

20   Tulo, examined Ji2's results and stated definitively there was no evidence that either the MFT was

21   corrupted or that any files were deleted without trace.  (Tulo Decl. ¶ 27.)  Tulo states:

22           ...I have seen no evidence of file storage system index damage or
             corruption.  I have seen no evidence leading me to conclude that any files
23           have been deleted in such a way as to leave no trace of them–let alone a
             "significant likelihood" of that outcome.
24

25   (*Id*. at ¶ 43(b).)

26       Plaintiffs have presented nothing to contradict Tulo's conclusions.  Plaintiffs did submit a third

27   Stenhouse Declaration, which states Stenhouse's disagreement with Hitachi's conclusion that no files

28   were deleted without a trace.  Stenhouse claims that Hitachi's conclusion is "entirely premised on its

11

assumption that Mr. Kato ceased use of his hard drive immediately after his deletions and defragmentation."  (Stenhouse Decl. III ¶ 3.)  Thus, Stenhouse claims that because Kato used the drive after deletions (albeit only once) "it is impossible to conclude that portions of the Master File Table and other areas on the hard drive have not been overwritten after Mr. Kato's deletions and defragmentation of the drive, resulting in deletions without a trace as I described in my September 23, 2010 Declaration." (*Id.*)  Stenhouse, however posits no explanation for how the MFT could have been overwritten.  In light of Stenhouse's prior admission that his sole basis for assuming corruption of the MFT was the defragmentation, and the Microsoft documentation proving that the MFT is not corrupted by defragmentation, Stenhouse's assertion that documents could still have disappeared without a trace is unpersuasive.

Thus, the Court concludes no documents were lost without a trace.

### 2.     Documents Identified as Deleted

During oral argument, the following exchange took place:

> THE COURT [to Mr. Lax for Plaintiffs]: So are you saying that the Defense has to prove with 100–percent certainty that the recovered document is the same document that was on Mr. Kato's computer?
> MR. LAX: What I'm saying is that Hitachi has to reproduce the documents that are on Mr. Kato's computer or be able to prove in some other way that the documents are identical.
> THE COURT: Well, talk to me about what the burden is.  Is it a –it's a more likely than not–isn't it a probability that the document recovered is more likely than not the same document that was on Mr. Kato's computer?
> MR. LAX: I think that that's right, you Honor.

(Sanctions Hrg. Tr. at 75 [Docket No. 210].)

Hitachi has shown that it is more likely than not it has already produced the documents deleted by Kato.

### a.     The 829 Document Fragments From Data Carving

The 829 file fragments fall into three general types; email, unformatted partial repair log entries, and incomprehensible documents.  (Mot. at 4.)  Hitachi has painstakingly identified a "duplicate" document for each document fragment except for 6 fragments which contain gibberish.  Hitachi did this by pointing to "multiple combinations of unique serial numbers and words that would not randomly appear in close proximity to each other."  (Opp. at 4.)   In this way Hitachi was able to

link or match fragments to documents Hitachi previously produced to Plaintiffs in 2009.   Hitachi

provides three examples of how this process identified matching documents.  (Opp. at 3, Appendix

Illustration 1-3).  Hitachi took the fragment recovered from data carving and matched it with one or

more source documents that had either been produced or were not relevant. Hitachi paralegal Nicole

Leon declares that she compared each document fragment and "was able to locate a source or duplicate

document for each Document Fragment."  (Leon Decl. ¶ 4(c) [Docket No. 185-12.][9]  The full results of

this investigation are found in Exhibit 1 to the Leon Declaration. [Docket No. 185-13.]  The Court has

not been provided with the source documents and is without sufficient information to make an

independent judgment as to the accuracy of the matches.  Plaintiffs, however, do have all the source

documents and do not contest the accuracy of any match.  Instead, Plaintiffs argue that they have still

been prejudiced because the documents on Kato's computer may not have been exact duplicates.  (Reply

at 4.)

        Plaintiffs argue that the law presumes that the documents lost were adverse to Hitachi's case.

(*Id.*).  This is not true for the document fragments because data carving does not provide any

information as to when the deletion occurred. (Tulo Decl. IV at ¶ 1.)  Thus, the fragments could be from

documents deleted long before the litigation or documents automatically created and deleted.  Indeed,

this is likely because, if the documents had existed when Kato deleted documents in 2010, the

documents would have been present in the MFT. In the absence of any evidence of destruction with

notice, no presumption attaches.

        Moreover, even if the fragments could not be matched up to produced documents (as they were),

the data carving fragments would not be proof of documents lost through wrongful deletion.  First, the

fragments recovered from the data carving protocol could also be deleted copies of files that had been

stored elsewhere or deleted temporary back-up files that are automatically generated and deleted.

(Stenhouse Tr. at 128-29.)  Additionally, as just discussed, the fragments could be from documents

---

        [9]Leon qualifies that six of the fragments could not be matched because they did not contain any
key words or any words at all.  Hitachi theorizes that the gibberish fragments only contain formatting
(Opp. at 3, n.1), and Stenhouse agreed that the gibberish could only be formatting or metadata.
(Stenhouse Tr. at 126-127.)

1   deleted long before the litigation was filed.  Plaintiffs are not entitled to recovery of every document

2   deleted prior to notice of the need to preserve documents and are not entitled to a presumption that

3   documents deleted at a remote time were adverse to Hitachi.

b.      The 64 Documents from the Encase Recovery

5          Plaintiffs also claim prejudice from the 64 unrecoverable files identified in the initial search by

6   Ji2.  (Reply at 2.)   Hitachi has demonstrated that 61 of the files are irrelevant to the litigation or a

7   duplicate has already been produced.  (Sur-reply at 2-10.)[10]  For example, one file was produced in

8   2001, before the LCD RPTVs at issue had been designed; some of the files relate to flat panel

9   televisions, some relate to plasma televisions, and some relate to CRT (Cathode Ray Tube) televisions.

10   (Id.)  Other files concern unrelated manufacturing issues, such as environmental testing equipment and

11   hazardous chemical use.   Still other files were index files for which the underlying documents were not

12   overwritten, so no substantive information was lost.

13          Plaintiffs cite the case of Phillips Electronics North America Corp. v. BC Technical, 2011 WL

14   677462 (D.Utah, Feb. 16, 2011), for the proposition that similarity of file names and matching of

15   fragments to other produced documents is not sufficient to rebut the assumption of prejudice because,

16   "[n]obody knows. . . how similar or how different those documents will be."  (Sanctions Hrg. Tr. at 18.)

17   The court finds no similarity between this case and Phillips.  In Phillips there was no serious argument

18   that prejudice was lacking due to Phillips' possession of similar documents.  In that case, BCT

19   executives destroyed 17,800 documents of which more than 15,000 could not be retrieved because the

20   executives used sophisticated wiping programs.  Id. at *2, 46-47, 55.  In this case, Kato did not "wipe"

21   the hard drive and only a very small number of documents could not be recovered.[11]  More importantly,

22   Phillips alleged trade secret misappropriation and copyright infringement and some of the lost files had

23   the same names as proprietary and confidential Phillips documents.  The court found that Phillips was

24

25          [10] Hitachi provides a chart detailing, for example, which files pre-date the design or manufacture

26   of the televisions in issue or relate to other products.

27          [11] It is clear that Kato did not use a "wiping" program because if he had, every single deleted file

would be unrecoverable, as opposed to only the 64 unrecoverable in this case.  (Tulo Decl. ¶36); see

28   also Stenhouse Tr. at 84: "Q: Is the defragmentation utility a forensic wiping program?  A: No."

1    prejudiced by not being able to prove the extent of BCT's misappropriation of trade secrets and

2    copyright infringement.  *Id.* at *14.  In other words, the fact that Phillips had a document with the same

3    name did not preclude prejudice because the fact that BCT had possession of those documents was

4    relevant.

5           By contrast, in this case Hitachi produced thousands of documents and has persuasively

6    connected fragments recovered through forensic examination to those documents previously produced.

7    Where only file names remained, Hitachi has shown there is no relation between those unrecovered

8    documents and the claims and defenses in this case.

9           The remaining 3 files for which Hitachi has no information are emails that went through the

10   company server and were copied to other employees' files which would have been previously produced

11   in discovery if responsive.  (*Id.*)   Additionally, the subject of the emails is discernable from its index

12   file.  (*Id.*)  One email refers to lamp testing to learn how long the lamp would last and two refer to lamps

13   being returned from the field.  These emails do not shed light on the alleged defective component in this

14   lawsuit because there is no allegation that the lamps failed prematurely. (Sanctions Hrg. Tr. at 54-55.)

15   Additionally, the emails were sent to multiple mail recipients and would have gone through the main

16   server.  (*Id*. at 57.)  Finally, there is no information as to when the 3 remaining files were deleted.  Even

17   after data carving, the only information available is that the emails were on the hard drive on or about

18   April 26, 2007.  (Tulo IV Decl. ¶1.)  Thus, there is no proof that the files were deleted after notice of

19   relevance.

20                    3.    Degree of prejudice

21           At the end of the day, there are only three email files for which Hitachi cannot account by

22   reference to prior documents or information and the file names of these documents indicate that they are

23   not relevant to any issue in this case.  (Sur-Reply at 10.)  Perhaps more importantly, these three files

24   represent a tiny fraction of material that was deleted; 20,000 or so documents have otherwise been

25   retrieved.  (Tulo Decl. ¶ 43(d)).  These are in addition to thousands of other documents produced by

26   Hitachi.  (Pierce Decl. ¶¶ 2, 8.)  The three files were randomly overwritten by the defragmentation

27   program, meaning they were not specifically targeted as files that contained critical or unique

28   information pertaining to the disputes in this litigation. Under these circumstances, there is no evidence

1  that would lead the Court to conclude Kato's spoliation has impaired Plaintiffs' ability to go to trial,

2  threatened to interfere with the rightful decision of the case, or forced  Plaintiffs to rely on incomplete

3  and spotty evidence.  *Leon*, 464 F.3d  at 959.

4        Hitachi has met its burden of proving Plaintiffs did not suffer evidentiary prejudice.

5        **D.**    **Evidentiary Sanctions**

6        Plaintiffs request three types of sanctions: adverse inference on the spoliated documents; shifting

7  of the burden of proof on the issue of common defect; and reasonable attorneys' fees and costs.  Hitachi

8  contends  there is no basis for the imposition of sanctions because neither the company nor Kato acted

9  with bad faith.

10        Hitachi's argument misses the mark, however, because the destruction of evidence need not be in

11  bad faith to warrant the imposition of an adverse inference.  *Glover*, 6 F.3d at 1329 ("Surely a finding of

12  bad faith will suffice, but so will simple notice of 'potential relevance to the litigation'")(citation

13  omitted); *see also Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363, 368 n. 2. (9th

14  Cir. 1992)(limiting bad faith requirement to sanctions in the form of cost and fee shifting).  California

15  district courts have adopted the three-part adverse inference test from the Second Circuit requiring: "(1)

16  the party having control over the evidence had an obligation to preserve it; (2) the records were

17  destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim

18  or defense." *Lewi*s *v. Ryan*, 261 F.R.D. 513, 521  (S.D.Cal., 2009).[12]  Even if these three requirements

19  are met, the court must exercise its discretion to determine if an adverse inference is appropriate.  *See*

20  *Keithley v. Homestore.com, Inc.* 2008 WL 4830752 at *10 (N.D. Cal. November 6, 2008) (finding

21  adverse inference "a harsh remedy that is disproportionate to Plaintiffs' conduct in this case" and

22  declining to recommend inference); *see also Unigard*, 982 F.3d at 367 (court has "broad discretion to

23  fashion, on a case-by-case basis, an appropriate sanction for spoliation.")

24

---

25       [12]In *Lewis*, this court found a culpable state of mind where the sanctioned party failed to comply
with a court order requiring it produce discovery, instead responding that it was looking for documents.

26  The court issued a second order requiring production of the discovery.  After the second order, the
sanctioned party claimed all documents had been destroyed.  The Court specifically found that the

27  sanctioned party pointed to no efforts to preserve relevant documents and no effort to comply with the
first Court order to produce the documents. On these facts, the Court found a culpable state of mind in

28  that the sanctioned party was "at best, reckless and grossly negligent." *Lewis*, 261 F.R.D. 521.

1    Here, Kato acted with a culpable state of mind because he purposely deleted the files from his

2    hard drive after notice of the relevance of the documents to this litigation.  Hitachi, however, has shown

3    that the files were not destroyed, that the retrieved fragments more likely than not are already produced

4    documents, and that the three that were irretrievable were not relevant.  Therefore, imposition of an

5    adverse inference is not justified.  For the same reasons, a burden shifting sanction regarding proof of

6    common defect is not warranted.  Moreover, because the Court has found little or no prejudice to

7    Plaintiffs, evidentiary sanctions are not necessary to place the risk of an erroneous judgment on the party

8    who wrongfully created the risk or to restore the prejudiced party to the same position he would have

9    been in absent the spoliation.  *See Advantacare*, 2004 WL 1837997 *4.[13]

10       **E.    Fee Shifting as a Sanction**

11       Plaintiffs seek $500,000 in fees in connection with the Spoliation and Sanction motions.

12          1.    Fee Shifting Under the Inherent Authority of the Court

13       Fee shifting under the inherent authority of the court requires a finding of bad faith.  *Chambers*

14    *v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).  In *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006), the

15    Ninth Circuit stated: "Before awarding [attorneys' fees], the court must make an express finding that the

16    sanctioned party's behavior 'constituted or was tantamount to bad faith.'  *Leon* at 961, *quoting Primus*

17    *Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997); *see also  Otsuka v. Polo Ralph*

18    *Lauren Corp.*, 2010 WL 366653 at *4 (N. D. Cal. Jan. 25, 2010) (declining to award monetary sanctions

19    in the absence conduct tantamount to bad faith); *Peschel v. City of Missoula*, 664 F.Supp.2d 1137, 1148

20    n.8 (D. Mont. 2009)(same).[14]

21

22       [13]Plaintiffs assert: "Having determined that spoliation occurred and that such spoliation has
     prejudiced Plaintiffs, *see* Spoliation Order at 5-6, sanctions should be imposed."  (Mot. at 7.)  Plaintiffs
23    misstate the findings of the Spoliation Order, which clearly says: "Whether and to what extent
     Plaintiffs' ability to prove its claims has been compromised by Kato's conduct must await determination
24    at a later date."  [Spoliation Order at 5.]

25       [14]At first blush, a rule requiring bad faith for fee shifting, but not for evidentiary sanctions, is
     counterintuitive.  This seeming discordance, however, disappears upon examining the two different
26    rationales for sanctioning spoliation.  An adverse inference can be given in the absence of bad faith
     when it is necessary to eliminate prejudice caused by spoliation.  In contrast, because fee shifting "is
27    punitive . . . the penalty can be imposed only in exceptional cases and for dominating reasons of
     justice.'" *Dogherra v. Safeway Stores, Inc.* 679 F.2d 1293, 1298 (9th Cir. 1982)(citation omitted.); *see*
28    *also Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d. 644, 648-49 (9th Cir. 1997)(noting, in the

1    The *Leon* court defined bad faith: "A party 'demonstrates bad faith by delaying or disrupting the

2    litigation or hampering enforcement of a court order." *Leon*, 464 F.3d at 961, *quoting Primus*, 115 F.3d

3    at 649.[15]  This generic definition is borrowed from a case deciding whether a frivolous argument should

4    be sanctioned under the court's inherent authority and it is the only time the Ninth Circuit has defined

5    "bad faith" in the specific context of sanctions under the inherent authority of the court for spoliation of

6    evidence.  The court in *Leon* found bad faith where the spoliator (Leon) knew of the litigation hold,

7    intentionally deleted 2,200 files and then wrote a program to write-over (wipe) any files from the

8    unallocated space of the hard drive.  *Id.* at 959.  The Ninth Circuit rejected Leon's assertion that he only

9    intended to delete personal files, noting that the deleted pornographic "files created on his

10   employer-issued computer were relevant to a lawsuit centering on the existence of legitimate grounds

11   for firing Leon." *Id*.

12           Unfortunately, the Ninth Circuit muddied the definition of "bad faith" by concluding Leon's

13   "deletion and 'wiping' of 2,200 files, acts that were indisputably intentional, amounted to **willful**

14   spoliation of relevant evidence." *Leon,* 464 F.3d at 959 (emphasis added).  This finding is confusing

15   because "willful" spoliation requires only notice of relevance.  This imprecise terminology, however,

16   cannot stand for the proposition that all "willful" spoliation is in "bad faith."  The Ninth Circuit case law

17   makes clear that sanctions under the inherent authority are available "not only for bad faith, but also for

18   willfulness or fault by the offending party."  *Unigard Sec. Ins. Co,*, 982 F.2d at 368, n.2.  Thus, it would

19   be illogical to read willful and bad faith as synonyms; *see also Lewis v. Ryan* 261 F.R.D. 513 (S.D. Cal.

20   2009)(finding insufficient evidence of bad faith despite destruction after notice of relevance.)

21   Moreover, equating willfulness with bad faith would render all spoliation in bad faith, a result not

22

23

24   _____

25   context of sanctions for raising frivolous arguments, that a finding of bad faith "is especially critical
     when the court uses its inherent powers to engage in fee-shifting ).  Thus, because fee shifting is
     punitive in nature, and can chill advocacy, it logically requires a finding of bad faith.

26

27       [15]The *Primus* court held: "A finding of bad faith is warranted where an attorney 'knowingly or
     recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an

28   opponent.' A party also demonstrates bad faith by 'delaying or disrupting the litigation or hampering
     enforcement of a court order.'" *Primus*, 115 F.3d at 649 (citations omitted.)

1   contemplated by Ninth Circuit precedent.[16]

2          Neither the briefs of the parties nor the court's independent research has revealed any specific

3   definition of bad faith in the context of sanctioning spoliation under the inherent authority of the court.

4   Accordingly, it is appropriate to look to other jurisdictions for guidance.  In a recent case, the Federal

5   Circuit held an intent to impede the opposition is necessary for a finding of bad faith spoliation: "To

6   make a determination of bad faith, the district court must find that the spoliating party 'intended to

7   impair the ability of the potential defendant to defend itself.'" *Micron Tech, Inc. v. Rambus*, Inc. ___

8   F.3d ___, 2011 WL 1815975 * 12 (Fed. Cir. May 13, 2011), *quoting  Schmid v. Milwaukee Elec. Tool*

9   *Corp.,* 13 F.3d 76, 80 (3rd Cir. 1994) (citing cases from the First, Third and Seventh Circuits).  The

10  *Rambus* court concluded: "The fundamental element of bad faith spoliation is advantage-seeking

11  behavior by the party with superior access to information necessary for the proper administration of

12  justice." *Id.*;[17] *see also Hamilton v. Signature Flight Support Corp.*, 2005 WL 3481423 *7 (N.D. Cal.

13  Dec. 20, 2005) (lack of conscious disregard of obligation to preserve evidence weighs against sanction).

14         This advantage seeking behavior was specifically relied upon by the *Napster* court in imposing

15  reasonable attorneys' fees based on "wrongful" destruction.  *In re Napster, Inc.,* 462 F.Supp.2d 1060,

16  1073-4 and 1078 (N.D. Cal., 2006).  The *Napster* court, specifically found that the spoliator had issued

17  an email that was "clearly designed to instruct the recipients to delete all of their Napster-related emails

18  going forward in order to avoid surrendering them."  *Id. at 1073.*  Additionally, as described above, the

19  *Leon* court relied upon the finding that Leon intended to delete documents relevant to his employer's

20  lawsuit against him, behavior that could satisfy the advantage-seeking bad faith standard.

21         Moreover, the court has found no case within the Ninth Circuit rejecting a definition of bad faith

22

23

24         _____

      [16]Plaintiffs assert that "this Court's finding that the documents were purposefully destroyed
25  satisfies any definition of bad faith. *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, 2010 WL
    743792, 15 (S.D. Cal. 2010), *quoting Napster*, 462 F.Supp.2d at 1066; see also *Lewis* at 518." (Reply at
26  7.)  *Zeiss* and *Napster*, however, merely state that bad faith is not required for sanctions and do not
    equate purposeful destruction with bad faith.

27
      [17]The Third and Seventh Circuit law differs from the Ninth Circuit in that bad faith is not
28  required for an adverse inference.  The definition of bad faith is, nonetheless, instructive.

based upon intent to deprive the other side of evidence.[18]  Given that sanctions under the inherent

authority are available "not only for bad faith, but also for willfulness or fault" [*Halaco,* 843 F.2d at

380], bad faith must require more than destruction with notice of relevance.  Black's Law Dictionary

defines bad faith as "not simply bad judgment or negligence, but ... conscious doing of a wrong because

of dishonest purpose or moral obliquity."  *as quoted in Theofel v. Farey-Jones*, 359 F.3d 1066, 1069 (9th

Cir. 2004).  In terms of spoliation, the dishonest purpose is most logically the impediment to the other

side's ability to litigate.  Accordingly,  this court adopts the *Rambus* definition of bad faith as intent to

impede the opposition.

Plaintiffs rely upon the following language from *Advantacare:* "disobedient conduct not shown

to be outside the control of the litigant is sufficient to demonstrate willfulness, fault **and** bad faith."

*Advantacare Health Partners L.P. v. Access IV*, 2004 WL 1837997 *4, (N.D. Cal. 2004), *quoting*

*Jorgensen v. Cassiday,* 320 F.3d 906, 912 (9th Cir. 2003), *quoting  Hyde & Drath v. Baker*, 24 F.3d

1162, 1167 (9th Cir.1994).  (*See* Mot.at 15 n. 5.)  This reliance is misplaced.  First, *Advantacare,*

*Jorgenson*, and *Hyde& Drath* all involved violations of court orders: the disobedient conduct.  Here,

there was no violation of any court order and this definition is not directly relevant to the situation

presented in this case.  Second,  *Hyde & Drath* actually says: "Disobedient conduct not shown to be

outside the control of the litigant is sufficient to demonstrate willfulness, bad faith, **or** fault."[19]

(emphasis added).  This little change is significant because "willfulness, "bad faith" and "fault" are all

separate concepts.  While all bad faith conduct is willful, not all willful acts are in bad faith.  Thus, even

---

[18]The court is aware that some District Courts within the Ninth Circuit have awarded monetary sanctions without requiring bad faith, as defined as an intent to hide evidence from the other side.  *See* *Padgett v. City of Monte Sereno*, 2007 WL 878575 (N.D. Cal. March 20, 2007)(awarding monetary sanctions for spoliation without any discussion of the bad faith requirement for fee shifting); *Kopitar v. Nationwide Mut. Ins. Co.*, 266 F.R.D. 493, 501 (E.D.Cal. 2010) (imposing monetary sanctions without discussion), *citing  Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc*., 264 F.R.D. 517, 530 (N.D. Cal.2009)(also imposing sanctions without discussion).  There is no reason to believe that these cases were wrongly decided.  The facts and circumstances of each case could have warranted a finding of bad faith under the court's inherent authority or under Rule 37.

[19]The *Advantacare* opinion mistakenly uses the "and" language.  The Court has no reason to believe that Plaintiffs were aware that *Joregenson* and *Hyde & Drath* opinions used the "or" language.  Additionally, there is no reason to believe the error was in any way significant in *Advantacare* as the sanctioned parties in that case had engaged in egregious conduct that met the definition of willfulness, bad faith and fault.

20

though conduct not outside the litigant's control is sufficient to meet the standard of "willfulness, bad faith, or fault," it is not clear such conduct is sufficient to show "bad faith" as opposed to "willfulness" or "fault."

To the extent that Plaintiffs intend to rely on *Philips Electronics North America Corp. v. BC Technical*, 2011 WL 677462 *48 (D.Utah Feb 16, 2011), such reliance is also misplaced. The Phillips court did state: "Bad faith, or culpability, 'may not mean evil intent, but may simply signify responsibility and control.'" *Id., quoting Phillip M. Adams & Associates, L.L.C. v. Dell, Inc.*, 621 F.Supp.2d 1173, 1193 (D.Utah 2009). But, there is no reason to believe that the *Philips* court intended to define bad faith as not requiring a bad intent because *Phillips* defines either "bad faith or culpability", two separate concepts. Additionally, the *Adams* case quoted is defining culpability **in contrast to** bad faith. Finally, to the extent that the *Philips* court did intend to define bad faith in absence of any bad intent, the court respectfully declines to adopt such a definition.

a.   <u>No Bad Faith Because No Intent to Impede Evidence</u>

In this case, there is no evidence of intent of impede Plaintiffs' access to evidence, and therefore, no evidence of bad faith. Unlike the facts in *Leon*, Kato's reason for deleting files was truly personal, that is, to cover up a prior misrepresentation to Hitachi that he had no work files at home. (Opp. at 20; Kato Decl. ¶¶ 29-30.) This is a key distinction because Kato's violation of Hitachi's work rules is not an issue in this litigation. Additionally, before deleting the files from his hard drive, Kato copied the ones he thought were relevant to Hitachi's server. Thus, Kato exhibited a desire to preserve relevant documents. Doubtless, Kato lacked "authority to make unilateral decisions about what evidence was relevant," *Leon,* at 956-957. Nonetheless, his attempt to preserve relevant documents is important to the question of bad faith. Moreover, Kato's level of culpability does not rise to the level of Leon's because Kato did not "wipe" the drive; he came forward and admitted his misconduct, and has cooperated in Hitachi's efforts to restore and explain the deleted files.

Another distinction between this case and *Leon* is that the spoliator here is not the litigant. There is no evidence here that suggests Hitachi knew Kato was storing his HIMEX work files at home. He specifically certified otherwise. (Opp. at 21, Kato Decl at ¶¶ 18-20). It would be odd indeed for Hitachi

21

to have proffered Kato as a 30(b)(6) witness had it known of or been complicit in his decision-making.[20]

Although Hitachi may be responsible for Kato's conduct, it did not have control over Kato's actions.

The Court takes this into consideration because a sanction award must be just, and "a determination of

the correct sanction for a discovery violation is a fact-specific inquiry." *Phillips*, 2011 WL 677462 at *

56.  Even if  Kato's actions meet the bad faith requirement, Hitachi's do not.  Kato was not instructed to

delete the files, he did so on his own volition.  The company did not have control over Kato's personal

hard drive, nor was it negligent in this regard.  Hitachi reasonably believed Kato did not have any stored

files at home due to the regular certifications he signed to that effect.  This is contrary to the *Phillips*

case cited by Plaintiffs, where several upper management and executive employees "covered up

deletions through sophisticated wiping, shredding, or overwriting, all in direct disobedience to [the]

court's orders." *Phillips* at *55.  The BCT spoliators also engaged in a cover up attempt that included

repeatedly lying  under oath about the destruction of the documents. *Id.* at 2 (rejecting argument that the

company is not culpable for employee actions)

> b.     Even If Bad Faith Existed, Monetary Sanctions Are Unwarranted

In evaluating whether sanctions are necessary to penalize those in the wrong or to deter parties

from engaging in the sanctioned conduct, Hitachi's role and behavior regarding the spoliation is

important. *Advantacare*, 2004 WL 1837997 * 4.  Although Hitachi does not specifically set forth all

their efforts at collecting documents, it is clear that Hitachi instituted a litigation hold and informed its

employees.  (Pierce Decl. ¶ 2 [Docket No. 106-1.]  Additionally, Kato states that he received document

preservation instructions shortly after this suit was filed in September of 2008.  (Kato Decl. 1 at ¶ 22.)

Nonetheless, Plaintiffs argue that Hitachi failed in various ways to adequately preserve documents.  The

Court will address each alleged failure in turn.

Plaintiffs claim "Hitachi wholly failed to request that Kato produce documents relevant to this

litigation, and further failed to take affirmative steps to gather and preserve Kato's files. *See Spoliation

Order at 4-5.*"  (Mot. at 1, n.2.)  The Spoliation Order, however, made no such finding, instead it

---

[20]The court also notes that Hitachi could have simply designated another employee for the 30(b)(6) deposition and covered up the deletion of documents.  Instead, Hitachi candidly admitted the deletion and attempted to alleviate all prejudice from the deletion.

1   specifically stated that Hitachi should have taken such steps and "[w]hether Hitachi took such steps has

2   yet to be determined."  [Spoliation Order at 5.]

3          Plaintiffs claim that Hitachi was on notice that Kato had brought work files home but failed to

4   ask Kato to produce such documents. (Mot. at 8.)  This assertion, however, is misleading because the

5   documents cited by Plaintiffs as proof of notice also contain Kato's certification that he had erased all

6   work files he found at home.  (Kato Decl at ¶¶ 18, 20).  Hitachi reasonably believed based on Kato's

7   certification, that all such information had been deleted.  Therefore, it was not reasonably necessary for

8   Hitachi to ask Kato to produce the files it believed no longer existed.  Moreover, the computer and hard

9   drives at issue were purchased by Mr. Kato, and were not the property of Hitachi.  (Kato Decl. at ¶ 8,

10  11, 14).

11         Plaintiffs also claim that Hitachi negligently failed to locate Kato's work computers or email

12  account. (Mot. at 5.)  This assertion finds no support in the evidence.  Rather, Hitachi lays out a detailed

13  history of Kato's company computers which reflects that all of them were either junked, lost or

14  reassigned prior to the filing of this lawsuit.[21]  Moreover, once Hitachi became aware of Kato's

15  spoliation, it made  immediate efforts to retrieve the information.  There is no basis upon which to

16  conclude Hitachi was negligent in attempting to retrieve Kato's work files or that any prejudice resulted

17  from a delay on the part of Hitachi since, as it has shown, most of the information contained in the

18  deleted documents was produced in 2009.

19         Similarly Kato's email account was purged over a year prior to the filing of this litigation.  (Mo

20  Decl. ¶¶34 [Docket No. 185-5.]).  Any failure to preserve evidence prior to being on notice of the

21  litigation cannot form the basis for sanctions.

22         Plaintiffs next claim that Hitachi negligently failed to search the email back-up server.  (Mot. at

23  5.)  As Hitachi points out, Hitachi objected to the discovery request seeking the backup data in both the

24  responses and in meet and confer efforts, but Plaintiffs never moved to compel.  (Pierce Decl. Ex. 4, ¶ 5)

25

26         [21] Dell GX110 was junked years before case was filed; HP3250 laptop was lost 16 months before
27  case was filed; Dell GX150 junked three months before case was filed; Dell GX280 deleted, reassigned
    multiple times in months before case was filed; and email purged 12 months before case was filed.
28  (Opp'n at Appdx. Illustr. 4.)

1    Thus, there is nothing sinister in Hitachi's refusal to search backup data.

2          Finally, Plaintiffs claim that "Hitachi wholly failed to fulfill its obligation" to preserve

3    documents, citing the deposition testimony of Koji Hirata, a Hitachi engineer.  (Mot at 13.)  Plaintiffs

4    claim that Hirata testified that he was neither asked to search for, nor produce relevant documents.  This

5    claim is likewise misleading.  When Hirata was promoted off the team, his papers and files were moved

6    to the common design area where the optical engine team worked.  (Hirata Decl. ¶ 4 [Docket No. 185-

7    1.])  Because Hirata had been promoted and no longer worked on the LCD RPTVs, he asked two

8    engineers (Ogura and Ikeda) who remained on the team to look for any responsive documents.  (Hirata

9    Decl. ¶ 5.)  Ogura and Ikeda did so.  (Ogura Decl. ¶ 5, [Docket No. 185-3.])  Additionally, another

10   employee, Yuzo Tamura, coordinated the collection effort, including all of Hirata's electronic

11   documents.  (Tamura Decl. III, at ¶¶ 4-7 [Docket No. 185-4])  Accordingly, Hirata's failure to personally

12   look for documents is meaningless.

13         When Hitachi regained control of Kato's hard drive it immediately contacted Plaintiffs with

14   remedial offers attempting to lessen the damage voluntarily and swiftly.  Hitachi voluntarily paid for the

15   forensic recovery of the drive Kato admitted deleting, as well as the costs to produce a new 30(b)(6)

16   witness in the United States,  including the court reporter and two interpreters.  (Opp. at 22; Pierce Decl.

17   ¶8.).   Hitachi never participated in any attempt to cover up the deleting and did not in any way impede

18   the recovery of all relevant information.  Considering Hitachi's lack of control over the spoliation, the

19   objectives of punishment and deterrence  would not be served by the imposition of sanctions.

20         Nonetheless, Hitachi is responsible for its employee's spoliation.  To a great extent, Hitachi has

21   met this responsibility by paying for much of the recovery effort.  (Opp. pp.22-23.)[22]  The Spoliation

22   Order appropriately required Plaintiffs to bear the cost of the data carving because the data carving

23   would not have been ordered in the absence of the erroneous opinion of their expert, Mr. Stenhouse.  If

24   there are other expenses associated with the spoliation that Hitachi did not pay, Plaintiffs ought to be

25

26         [22] Although Hitachi has not attempted to estimate all of its costs, it did estimate at the hearing on
     the Spoliation Motion, that it had incurred approximately $100,000 for that portion of the recovery
27   effort, consisting primarily of translation costs and attorneys' fees to review the documents. (Oct. 15,
     2010 Hearing Transcript at p. 38. [Docket No. 140].)
28

1    reimbursed for those.  However, the award of attorneys' fees is a different matter.  Considering Hitachi's

2    speedy corrective action against spoliation that it did not direct  or condone, it would be unjust and a

3    disproportionate sanction to burden Hitachi with an award of attorney's fees.  Therefore, the court

4    declines to do so.

5                        2.        Fee Shifting Under Rule 37

6            Plaintiffs assert that sanctions are available under Rule 37, which does not require bad faith.

7    Rule 37(b)(2)(A) provides for sanctions for failure to comply with a discovery order.  Hitachi did not

8    fail to comply with a discovery order.  Rule 37(d) provides for fee shifting where a party successfully

9    moves to compel a party to appear for deposition or respond to written discovery.  Hitachi did not fail to

10   appear for a deposition or to respond to written discovery.

11           Rule 37(a)(5) provides for the payment of fees when a motion for an order compelling discovery

12   is granted, but cautions: "But the court must not order this payment if: . . . (ii) the opposing party's

13   nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an

14   award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A).   To the extent that Plaintiffs can be considered

15   to have successfully moved for discovery, the court finds that Hitachi's failure to agree to the data

16   carving was substantially justified.  As the advisory committee's notes make clear, the purpose of this

17   rule is to "deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine

18   dispute exists."  Fed. R. Civ. P. 37 Advisory committee's notes.  In this case, a genuine dispute existed

19   as to the necessity for the additional data carving.  The Court granted the Spoliation Motion (Motion for

20   Additional Forensic Investigation) based on testimony from Plaintiff's expert, Mr. Stenhouse.  As

21   discussed above, Mr. Stenhouse's theory that it was possible for documents to disappear without a trace

22   was, at best, overstated.[23]  Accordingly, Hitachi's opposition to the Spoliation Motion and the Sanctions

23   Motion  were substantially justified and no award of fees is warranted.

24           Moreover, when the circumstances are viewed in their entirety, including the prompt admission

25

26           [23]To be clear, the court is not, with the benefit of hindsight, finding that the failure to uncover
     substantial relevant documents renders Hitachi's opposition to the data carving substantially justified.
27   The court is finding that the expert testimony of Mr. Stenhouse was inaccurate as to the possibility of
     files disappearing without a trace and that this inaccuracy renders Hitachi's opposition substantially
28   justified.

                                                    25

of the deletion along with the voluntary payments to restore the data, and all the efforts Hitachi has made to preserve, collect, and produce documents, an award of fees would be unjust.

Finally, Plaintiff's made virtually no effort to meet and confer after receiving the document fragments from the data carving.  Hitachi completed the fragment production in mid-December 2010 and Plaintiff's filed the instant motion for sanctions on March 8, 2011.  Plaintiffs, however, failed to conduct any meet and confer efforts until March 4, 2011 and only then at Hitachi's insistence.  (Pierce Decl. II ¶ 7 [Docket No. 185-9.])  If Plaintiffs had participated fully in the meet and confer process, it is possible that the costs associated with this motion could have been reduced.  Plaintiffs' failure to adequately meet and confer is another reason why it would be unjust to award attorney's fees.

## V.   **CONCLUSION**

Accordingly, the Court **DENIES** Plaintiffs' request for: (1)  a jury instruction that Hitachi destroyed relevant documents in this case and to impose an adverse inference with respect to the contents of the destroyed documents;  (2) the burden of proof on any dispositive or class certification motions regarding the existence of a common defect to be shifted from Plaintiffs to Hitachi; and (3) for reasonable attorneys' fees and costs incurred in litigating the issue of spoliation.

**IT IS SO ORDERED.**

DATED:  August 12, 2011

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court

08cv1746 DMS (NLS)